**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| **SHAWN FORNEK,** | ) | **Case No.** |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **STERIGENICS U.S. LLC; BOB NOVAK;** | ) | **JURY TRIAL DEMANDED** |
| **ROGER CLARK; and GTCR, LLC,** | ) | |
| **Defendants.** | ) | |
| | ) | |

**NOTICE OF REMOVAL**

Pursuant to 28 U.S.C. §§ 1331, 1332, 1441 & 1446, Defendant Sterigenics U.S., LLC

("Sterigenics") hereby removes to this Court the above-styled action, pending as Case No.

2018L011004[1] in the Circuit Court of Cook County, Illinois ("the Action"). In support of this

Notice of Removal, Sterigenics states as follows:

**I.      INTRODUCTION.**

1.      The Action is properly removed to this Court pursuant to the federal removal

statute, 28 U.S.C. § 1441, because: (i) the Action is pending in the Circuit Court of Cook

County, Illinois, which is within the Northern District of Illinois, Eastern Division, 28 U.S.C.

§ 93(a)(1); (ii) the Court has both diversity jurisdiction and original federal jurisdiction over the

Action; and (iii) the procedural requirements for removal set forth in 28 U.S.C. § 1446 and 28

U.S.C. § 1453 are satisfied.

---

[1] Plaintiffs have filed a Routine Motion for Leave to File Her First Amended Complaint Instanter in the Circuit Court, which was granted by the Court. Plaintiff has not, however, served Sterigenics—nor any other Defendant—with this amended complaint, which seeks to add a defendant. Nonetheless, Defendants remove on the basis of the First Amended Complaint. A copy of the Routine Motion for Leave to File Her First Amended Complaint Instanter, the Routine Order, and the proposed First Amended Complaint are included as part of the State Court Record that immediately follows this Notice of Removal.

2.      More specifically, this Court has diversity jurisdiction under 28 U.S.C. § 1332(a),

because complete diversity of citizenship exists as between Plaintiff Shawn Fornek ("Plaintiff")

and Sterigenics.  Defendants GTCR, LLC ("GTCR"), Bob Novak, and Roger Clark are

fraudulently joined to the Action, thus their citizenship should be disregarded for purposes of

determining diversity.  Additionally, this Court also has original federal jurisdiction under 28

U.S.C. § 1331, as the Action arises under federal law.

## II.     FACTS.

3.      On October 10, 2018, Plaintiff filed a Complaint in the Circuit Court of Cook

County, Illinois.  That Complaint was served with summons upon Sterigenics on October 31,

2018.  On November 1, 2018, Plaintiff filed a Routine Motion for Leave to File Her First

Amended Complaint Instanter, which was granted by the Court.  Sterigenics has not yet been

served with this First Amended Complaint.  A copy of the First Amended Complaint as attached

to Plaintiff's Routine Motion for Leave to File Her First Amended Complaint Instanter, is

attached as Exhibit A.  This case arises out of an August 21, 2018, report issued by the federal

government's Agency for Toxic Substances and Disease Registry ("ATSDR") concerning

emissions of ethylene oxide in Willowbrook, Illinois, where Sterigenics operates a contract

sterilization facility (the "Willowbrook facility").  A copy of this report is attached as Exhibit B.

The ATSDR's report was published by the U.S. Environmental Protection Agency ("USEPA")

on its public-access website on August 22, 2018.[2]

---

[2] *See Evaluation of Potential Health Impacts from Ethylene Oxide Emissions*, U.S. DEP'T OF HEALTH AND HUM. SERVICES 1 (August 21, 2018), https://www.atsdr.cdc.gov/HAC/pha/sterigenic/Sterigenics_International_Inc-508.pdf.

A.      **Background on Sterigenics and Ethylene Oxide.**

4.      Sterigenics is a leading provider of state-of-the-art sterilization services.  Ethylene oxide, a gas, is a heavily regulated chemical.  As detailed here, Sterigenics' use of ethylene oxide at the Willowbrook facility is subject to federal regulations promulgated by USEPA and the federal Food and Drug Administration ("FDA"), as well as Illinois regulations promulgated by the Illinois Environmental Protection Agency ("IEPA").  Sterigenics' Willowbrook facility is operating legally and in compliance with applicable regulations.  Indeed, Sterigenics' Willowbrook facility not only meets federal and state standards, but exceeds them.  (Declaration of Kathleen Hoffman ("Hoffman Decl.") ¶¶ 2, 5 (attached as Exhibit C).)

5.      Sterigenics primarily contracts with healthcare products companies to sterilize medical devices, medical equipment, and surgical kits sold or used by those customers.  The FDA regularly inspects[3] Sterigenics' facilities, including the Willowbrook facility, given the importance of sterilization as a final step in the production and preparation of medical and surgical products in the U.S.  (*Id.* at ¶¶ 3–4.)

6.      Ethylene oxide is critical to the healthcare industry.  Over 50% of the medical devices and nearly 90% of the surgical kits[4] used in patient procedures in the U.S. are sterilized by ethylene oxide.  According to the Ethylene Oxide Sterilization Association, ethylene oxide sterilizes over 20 billion medical devices each year in the United States alone.  (*Id.* at ¶ 5.)

---

[3] *See Compliance Policy Guide Section 100.550 Status and Responsibilities of Contract Sterilizers Engaged in the Sterilization of Drugs and Devices*, U.S. FOOD & DRUG ADMIN., https://www.fda.gov/ICECI/ComplianceManuals/CompliancePolicyGuidanceManual/ucm073824.htm (last visited October 18, 2018).

[4] A "surgical kit" refers to the set of instruments a surgeon uses during an operation.  This may include scalpels, clamps, surgical staplers, drills, and other equipment such as the sterilized gowns and drapery used during the procedure.  (Hoffman Decl. ¶ 3.)

7.    The Willowbrook facility, like many ethylene oxide sterilization process plants, is the sole sterilization facility for a number of medical device companies in the Midwest.  On an average day, the Willowbrook facility sterilizes 1,000 cardiac devices used in heart surgery, 1,000 knee implants, 1,500 surgical procedure kits, 16,000 catheters, 11,000 syringes for injections used in radiology diagnosis, and thousands of diabetes monitoring and care kits, renal care products, neurosurgical devices, and respiratory care products.  (*Id.* at ¶ 6.)

8.    For the vast majority of single-use medical devices, complex implantable devices, and surgical kits, ethylene oxide sterilization is widely used because it is the only practical, FDA-approved sterilization method available.  While heat and radiation can sometimes be used for sterilization, those processes degrade plastics and other synthetic materials that are widely used in medical devices and surgical kits, including hypodermic needles, catheters and many other common hospital and operating room equipment.  (*Id.* at ¶ 8.)  Indeed, according to Alec Messina, IEPA Director, ethylene oxide "is the sterilizer of choice because gamma radiation— has too harsh of an effect and . . . oftentimes can destroy . . . that material that . . . they're sterilizing."  (Transcript: Illinois Senate Hearings, Environment and Conservation Committee Hearings (November 14, 2018) at p. 98–99 (Exhibit H).)  Without ethylene oxide sterilization, infection risks would soar dramatically in hospitals and operating rooms.  (Hoffman Decl. at ¶ 7.)  As explained by Messina, "the vast majority of medical equipment that [hospitals] have comes from commercial sterilizers that are using ethylene oxide."  (Ex. H. at p. 99–100.)  For heat- and irradiation-sensitive devices, no currently available sterilization method exists that has been accepted and approved as a practical replacement for ethylene oxide.  (Hoffman Decl. at ¶ 9.)

9.    The Willowbrook facility is subject to stringent FDA requirements.  As part of its Good Manufacturing Practices regulations, the FDA requires that medical devices and equipment

4

be sterilized pursuant to exacting protocols that must be rigorously tested and validated.[5]
Detailed procedures exist for the equipment, methods, and steps used for the ethylene oxide
sterilization of each type of medical device or surgical kit at the Willowbrook facility, and that
equipment is continually checked and calibrated to ensure adherence to those procedures. (*Id.* at
¶ 10.) These FDA-required validation and calibration processes are expensive and can take
anywhere from four to six months to complete. (*Id.* at ¶ 11.)

10. Moreover, it is important to understand that ethylene oxide is present in an urban
atmosphere, such as the Chicago area, from a number of different sources, including natural
sources as well as everyday and commercial activities. Commercial sources of ethylene oxide in
the air we breathe include chemical manufacturers, hospitals, and medical sterilization facilities
near where people work or live. (*Id.* at ¶¶ 13–14.) More than a dozen medical facilities located
in DuPage and Cook counties exist that use ethylene oxide to sterilize medical products –
Sterigenics' Willowbrook facility is far from alone. (*Id.* at ¶ 15.) As a result of all of these
natural and other sources, a general background level of ethylene oxide exists in the air. Not
surprisingly, then, USEPA itself explicitly recognizes that a certain level of ethylene oxide will
be present in the environment and the air we all breathe. (*Id.* at ¶ 12.)

**B. The Release of the ATSDR Report.**

11. On August 21, 2018, ATSDR released a report purporting to address whether
ethylene oxide emissions from the Willowbrook facility pose a public health problem for
people living and working in or near Willowbrook. Broadly speaking, the ATSDR report
combined data gathered by USEPA with a new and controversial risk assessment used by

---

[5] *See Compliance Policy Guide Section 100.550 Status and Responsibilities of Contract Sterilizers Engaged in the Sterilization of Drugs and Devices*, U.S. FOOD & DRUG ADMIN., https://www.fda.gov/ICECI/ComplianceManuals/CompliancePolicyGuidanceManual/ucm073824.htm (last visited October 18, 2018).

USEPA to estimate the potential risk posed by any given concentration of ethylene oxide. (This 2016 assessment was derived pursuant to USEPA's Integrated Risk Information System ("IRIS") program.)  Based on these inputs, the ATSDR report concluded that if the ethylene oxide concentrations actually represented Willowbrook area residents' exposure (*which it did not*), those residents could face potential increased cancer risks.  Unfortunately, the report was released with neither context nor explanation.  (Ex. H at p. 103, "I don't think that—the information that was made available publicly was really presented with sufficient context.".) As noted in a letter signed by Senators Tammy Duckworth and Richard Durbin, as well as Representative Bill Foster, "[t]he lack of context has led to confusion, anxiety, and hardship on both the part of the community and Sterigenics."  A copy of this letter is attached as Exhibit D.[6]

12.     During an August 29, 2018, Willowbrook town hall meeting, an ATSDR representative acknowledged that its report is "not one that indicated immediate health threat or that there was an emergency situation."  (Videotape: Highlights from Village of Willowbrook, IL Town Hall Meeting (August 29, 2018) at 0:42 (to be filed as Exhibit E).)  As the ATSDR representative explained, its "communication strategy fell through [and] did not allow us to really put this [report] into context."  (*Id.*)  Willowbrook Mayor Frank Trilla attempted to allay community fears caused by the report by stating that ATSDR "took the [worst] case scenario, multiplied it by 30 years, 250 days a year, 24 hours exposure . . . and the wind had to be identical for the entire 30 years — under those circumstances 6.4 people out of 1,000 **might** be affected by this."  (*Id.* at 8:20.)  An ATSDR research officer also attempted to downplay concerns regarding

---

[6] A copy of this letter was also published on Senator Duckworth's website. *See* https://www.duckworth.senate.gov /imo/media/doc/18.09.21%20-%20Letter%20re%20Willowbrook%20ambient%20air%20testing%20request%20- %20EPA%20Wheeler%20and%20Stepp%20(002).pdf.

the report by informing residents that ATSDR "biased [the results] on purpose to try to capture what might be the worst exposure in the community when they're downwind from the facility." (*Id.* at 9:55.)  The ATSDR representative also admitted, "I don't know if anyone's home 24 hours a day, 7 days a week for an entire year for 33 years.  Which is what we assumed." (*Id.* at 10:22.)

13.     In calculating the exposure risk in its extreme, worst-case hypothetical, ATSDR also used the highest concentration of ethylene oxide detected in the residential area samples, which were collected under non-representative weather conditions designed to yield the highest possible number.  (Ex. B at p. 11.)  As the ATSDR representative admitted, this concentration is ***not*** reflective of actual long-term exposure.  In addition, ATSDR intentionally excluded from consideration 37 samples and used only two samples that reflected the highest levels of exposure.  (Ex. B at p. 5–7.)  Importantly, the ATSDR report did ***not*** find Sterigenics to be in violation of any applicable USEPA or IEPA regulation or requirement.  Indeed, Alec Messina, IEPA Director, stated during the August 29, 2018, town hall meeting that the Willowbrook facility is "in compliance with all the federal regulations including the emissions standards for ethylene oxide . . . .  [The facility is] in compliance with those regulations and state law." (Ex. E at 3:46.)

**C.     Further Responses to the ATSDR Report.**

14.     Following the ATSDR report's release, William L. Wehrum, the Assistant Administrator of USEPA for Air and Radiation, attempted to provide greater clarity on the report to ease citizen concerns.  Specifically, Mr. Wehrum sent letters to Governor Bruce Rauner and several other senior elected officials specifically noting that "the air concentrations of ethylene oxide are not high enough to cause immediate harm to health for the people in and around

Willowbrook." These letters are attached as Group Exhibit F. Further, Mr. Wehrum noted that "[e]arly indications from the post-control stack testing suggest that emissions have indeed been significantly reduced." Mr. Wehrum also pointed out flaws underlying USEPA's recent National Air Toxics Assessment (the "2014 NATA"), which identified Willowbrook as one of a number of areas potentially having an elevated chronic risk from ethylene oxide.[7] NATA is a screening tool used by the federal government to identify areas of the country, pollutants, or types of pollution sources that may need to be further examined to better understand potential risks to public health. The identification of elevated risks from ethylene oxide in the 2014 NATA are primarily driven by a toxicity value taken from the 2016 IRIS assessment. Mr. Wehrum noted that the NATA assessment's conclusion about the cancer risk of a given concentration of ethylene oxide is based on "someone who is continuously exposed to [ethylene oxide] for 24 hours per day over 70 years."

15.     On September 20 and 21, 2018, a contractor hired by Sterigenics conducted stack tests to measure the actual emissions from the Willowbrook facility. USEPA and IEPA experts were present to observe these tests. (Ex. H at p. 91.)

16.     USEPA is currently in the process of "monitoring air near the Sterigenics facility to better understand the levels of ethylene oxide (EtO) in the air. The first monitors will begin collecting air samples on Nov. 13, 2018."[8] USEPA used the stack testing to select "eight locations that will provide the best picture of [ethylene oxide] concentrations in the outdoor air in

---

[7] Although this National Air Toxics Assessment is called the "2014 NATA" because it uses emissions data from 2014, USEPA actually published the 2014 NATA in 2018.

[8] EPA in Illinois – Outdoor Air Monitoring in the Willowbrook Community, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, https://www.epa.gov/il/outdoor-air-monitoring-willowbrook-community (last visited Nov. 16, 2018).

the communities around the Sterigenics facility."[9]  Air samples will be collected from these

locations for three full months.  USEPA states that it will evaluate the data as it becomes

available and assess whether additional monitoring is necessary.[10]  USEPA will use this data to

conduct a risk assessment of the Willowbrook area.  This risk assessment "will be more

comprehensive than either NATA or the ASTDR analysis.  It will be similar to the types of risk

assessments EPA conducts when it is reviewing its regulations for industries that emit air toxics

to determine whether those rules need to be updated to improve protection of public health."[11]

### III.    DIVERSITY JURISDICTION EXISTS.

17.    A defendant may remove an action from state court to federal court if the action

could have been brought in federal court originally.  28 U.S.C. § 1441.

18.    Federal diversity jurisdiction exists where "the matter in controversy exceeds the

sum or value of $75,000, exclusive of interest and costs," and "is between . . . citizens of

different States."  28 U.S.C. § 1332(a)(1).  Both prerequisites are satisfied here.

### A.    The Amount in Controversy Exceeds $75,000, Exclusive of Interest and Costs.

19.    A "defendant's notice of removal need include only a plausible allegation that the

amount in controversy exceeds the jurisdictional threshold[;]" only when the defendant's

"assertion of the amount in controversy is challenged" do the parties need to submit proof.  *Dart

Cherokee Basin Operating Co. v. Owens*, 135 S. Ct. 547, 554 (2014); *Midland Mgmt. Co. v. Am.

Alternative Ins. Co.*, 132 F. Supp. 3d 1014, 1018 (N.D. Ill. 2015) (same).  The removing party is

---

[9] *Id.*

[10] *Id.*

[11] *See* Sterigenics Willowbrook Facility – Latest Update, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, https://www.epa.gov/il/sterigenics-willowbrook-facility-latest-update (last visited Nov. 16, 2018).

not required "to establish that it was likely that the plaintiff would obtain a judgment exceeding the amount-in-controversy requirement." *Back Doctors Ltd. v. Metro. Prop. & Cas. Ins. Co.*, 637 F.3d 827, 829 (7th Cir. 2011). Rather "jurisdiction will be defeated only if it appears to a legal certainty that the stakes of the lawsuit do not exceed $75,000." *Carroll v. Stryker Corp.*, 658 F.3d 675, 680 (7th Cir. 2011).

20. The nature of Plaintiff's allegations demonstrate that she seeks damages in excess of $75,000. Plaintiff alleges that she was diagnosed with Sjogren's syndrome in 2004 and lobular carcinoma breast cancer in 2006. (Compl. at ¶ 16.) Plaintiff alleges that Sterigenics is responsible for causing her health problems. (*Id.* at ¶ 18.) According to Plaintiff, Sterigenics "has caused and will continue to cause Plaintiff to incur and endure medical bills, lost wages, pain and suffering, mental anguish, disability, disfigurement, reduced life expectancy, and a loss of her normal life." (*Id.* at ¶¶ 79, 85, 97, 113, 119, 127, 133, 141, 147, 155, 169, 177, 183.)

21. Given the nature of Plaintiff's allegations and the lack of any express limitation on the amount of damages sought, the jurisdictional amount requirement is clearly satisfied by her claims.

**B.  Complete Diversity of Citizenship Exists.**

      i.  <u>The Parties are Citizens of Different States and No Proper Defendant is a Citizen of Illinois.</u>

22. Sterigenics is a limited liability company.

23. Where a party is a limited liability company, "[f]or diversity jurisdiction purposes, the citizenship of an LLC is the citizenship of each of its members. . . . Consequently, an LLC's jurisdictional statement must identify the citizenship of each of its members as of the date the . . . notice of removal was filed, and, if those members have members, the citizenship of

10

those members as well." *Thomas v. Guardsmark, LLC*, 487 F.3d 531, 534 (7th Cir. 2007);

*accord Belleville Catering Co. v. Champaign Mkt. Place, L.L.C.*, 350 F.3d 691, 692 (7th Cir.

2003) ("limited liability companies are citizens of every state of which any member is a

citizen.").

24.    Where a party is a corporation, "a corporation shall be deemed to be a citizen of

every State . . . by which it is has been incorporated and of the State . . . where it has its principal

place of business."  28 U.S.C. § 1332(c)(1).

25.    Sterigenics is a Delaware limited liability company whose sole member is Sotera

Health LLC.  (Declaration of Tiffany Ross Neumann ("Neumann Decl.") ¶ 2 (attached as Exhibit

G).)

26.    Sotera Health LLC is a Delaware limited liability company whose sole member is

Sotera Health Holdings, LLC.  (Neumann Decl. ¶ 4.)  Sotera Health Holdings, LLC is a

Delaware limited liability company whose sole member is Sotera Health Topco, Inc.  (*Id.* at ¶ 5.)

Sotera Health Topco, Inc. is a Delaware corporation with its headquarters in Broadview Heights,

Ohio.  (*Id.* at ¶ 6.)  Consequently, Sotera Health LLC is a citizen of Delaware and Ohio.

Therefore, for the purposes of diversity jurisdiction, Defendant Sterigenics is a citizen of

Delaware and Ohio.

27.    Plaintiff has also named GTCR as a Defendant.  As explained *infra*, however,

GTCR is fraudulently joined as a Defendant to this Action.  Fraudulently joined defendants "may

be disregarded for purposes of determining diversity jurisdiction."  *Midland Mgmt. Co.*, 132 F.

Supp. 3d at 1021.

28.    According to the First Amended Complaint, at the time the Action was filed and

at the time of this removal, Plaintiff was and is not a citizen of Delaware or Ohio.  Rather,

according to the First Amended Complaint, Plaintiff has resided in or around Willowbrook, Illinois consistently from 1990 until today. (Compl. at ¶ 16.) This factual allegation demonstrates that Plaintiff resides in and intends to remain in Illinois and is domiciled in this state. *See, e.g.*, *Heinen v. Northrop Grumman Corp.*, 671 F.3d 669, 670 (7th Cir. 2012). Domicile determines an individual's citizenship for diversity purposes. *Id.* Accordingly, for diversity purposes, Plaintiff is a citizen of Illinois.

29.     Because Plaintiff is a citizen of neither Ohio nor Delaware, complete diversity of citizenship exists. *Midland Mgmt. Co.*, 132 F. Supp. 3d. at 1017 (removal based on diversity jurisdiction was proper where properly joined parties were citizens of different states).

ii.     GTCR, Bob Novak, and Roger Clark are Fraudulently Joined.

30.     Plaintiff asserts claims for negligence and willful and wanton conduct against GTCR, Bob Novak, and Roger Clark. Plaintiff also asserts claims for ultrahazardous activity/strict liability, civil battery, and public nuisance against GTCR. These claims are unsupported by any factual allegations regarding the claimed acts or omissions committed by GTCR, Bob Novak, and Roger Clark that allegedly caused Plaintiff's injuries.

31.     "Although a plaintiff is generally free to choose its own forum, a plaintiff 'may not join an in-state defendant solely for the purposes of defeating federal diversity jurisdiction.'" *Midland Mgmt. Co.*, 132 F. Supp. at 1021 (quoting *Schwartz v. State Farm Mut. Auto Ins. Co.*, 174 F.3d 875, 878 (7th Cir. 1999)). "In that case, the defendant is considered fraudulently joined, and may be disregarded for purposes of determining diversity jurisdiction." *Id.*

32.     A defendant is fraudulently joined where "there is no reasonable possibility that the plaintiff could prevail against the [in-state] defendant." *Tile Unlimited, Inc. v. Blanke Corp.*, 788 F. Supp. 2d 734, 738 (N.D. Ill. 2011) (quotations and citations omitted). "The court may

12

consider . . . affidavits in determining whether a party has been fraudulently joined." *Hernandez v. Home Depot, U.S.A., Inc.*, No. 05 C 5963, 2006 WL 1647438, at *2 (N.D. Ill. June 5, 2006).

a.   <u>GTCR is Fraudulently Joined.</u>

33.    Naming GTCR as a Defendant is plainly fraudulent given that Plaintiff fails to allege that GTCR's acts or omissions actually caused *any* of Plaintiff's claimed injuries. Instead, Plaintiff relies on GTCR's alleged ownership as being equivalent to alleged evidence of liability. (Compl. at ¶¶ 21–29.) Perhaps aware of GTCR's tenuous connection to this case, Plaintiff engages in a "smoke and mirrors" approach to make up for the fact that, even by her own allegations, GTCR is utterly irrelevant to her claims. Plaintiff does this by extensively discussing GTCR's alleged investment strategy and business approach, its alleged initiatives to improve Sterigenics' growth, and GTCR's alleged presence on the Sterigenics' board of directors. (*Id.* at ¶¶ 23–25, 28.) Confusingly, Plaintiff spends over a page of her First Amended Complaint recapping an alleged promotional video featuring a discussion between the GTCR Managing Director and the then-CEO of Sterigenics. (*Id.* at ¶ 26.) Although Plaintiff claims this video discusses "GTCR's significant involvement and control over Sterigenics," the quotes provided by Plaintiff belie this assertion. (*Id.*) Instead the alleged discussion highlights that GTCR does its due diligence to understand the healthcare industry, including researching contract sterilization before partnering with Sterigenics, and GTCR committed resources to acquire a supplier of Sterigenics' products. (*Id.*) These voluminous and irrelevant allegations regarding GTCR's business relationship with Sterigenics have absolutely nothing to do with Plaintiff's claims regarding exposure to ethylene oxide emitted by the Willowbrook facility and her assertion that such emissions caused her claimed injuries. Indeed, Plaintiff makes no attempt whatsoever to allege any connection between GTCR and the Willowbrook facility, the only

13

Sterigenics facility at issue in this case. Instead Plaintiff alleges that GTCR's ownership of Sterigenics is sufficient to establish liability for Plaintiff's inhalation of ethylene oxide in Willowbrook. Plaintiff's allegations do not address, at all, what acts or omissions actually attributable to GTCR potentially caused Plaintiff's claimed injuries. This failure is fatal to any claim of actual liability against GTCR and plainly reveals this Defendant was fraudulently joined. The most Plaintiff asserts in her allegations against GTCR is that it has an agreeable business relationship with Sterigenics. This is insufficient to apprise GTCR of the nature of the charges against it and to allow it to prepare its defense as required.

34. Further, Plaintiff could *never* even state a claim against GTCR as it cannot be held liable for the claims asserted. Under the direct participant theory of liability for tortious acts of a subsidiary, a parent corporation may be held liable only if "there is sufficient evidence to show that the parent corporation directed or authorized the manner in which an activity is undertaken." *Grady v. Ocwen Loan Servicing, LLC*, 2012 WL 929928, at *2 (N.D. Ill. Mar. 19, 2012) (citing *Forsythe v. Clark USA, Inc.*, 864 N.E.2d 227, 237 (Ill. 2007)). In other words, direct participant liability exists only where a parent corporation engages in actions "surpassing the control exercised as a normal incident of ownership." *Nathan v. Morgan Stanley Renewable Dev. Fund, LLC*, 2012 WL 1886440, at *10 (N.D. Ill. May 22, 2012) (internal quotation marks omitted). Notably, the First Amended Complaint makes no attempt to allege facts surpassing that of a normal ownership relationship. Additionally, however, there are several layers of control separating GTCR's ownership from Sterigenics. As described above, Sterigenics is a Delaware limited liability company whose sole member is Sotera Health LLC, whose sole member is Sotera Health Holdings, LLC, whose sole member is Sotera Health Topco, Inc. Sotera Health Topco, Inc. is, in turn, owned by Sotera Health Topco Parent, L.P., which is owned by

14

dozens of limited partners.  Among those dozens of limited partners are a few funds indirectly affiliated with GTCR.  (Neumann Decl. ¶ 8.)  Thus, there are four companies separating GTCR's partial and indirect ownership interest from Sterigenics U.S. LLC.  (*Id.* at ¶ 9.)  Sterigenics, meanwhile, allegedly owns several facilities across different countries, one of which is the Willowbrook facility.  (Compl. at ¶¶ 1, 45, 67, 68.)  As is evidenced by this corporate structure, GTCR does not direct or authorize the manner in which Sterigenics U.S., LLC operates, let alone direct or authorize the activities at the Willowbrook facility.  The only facts alleged demonstrate nothing more than ownership of one limited liability company by another.  This indirect and partial ownership is legally insufficient to ever establish liability for Plaintiff's claims.

35.     Because Plaintiff makes no specific allegations regarding GTCR's actions or omissions that caused Plaintiff's injuries, nor could she ever truthfully make any such allegations, she cannot demonstrate that GTCR owed any legal duty to Plaintiff or could be otherwise personally liable to her.

36.     Because Plaintiff has not made **any** substantive allegations against GTCR regarding any of her actual claims, there is "no possibility that a plaintiff can state a cause of action against [this] nondiverse defendant[] in state court."  *Gottlieb v. Westin Hotel Co.*, 990 F.2d 323, 327 (7th Cir. 1993).  Given all of these facts, GTCR has obviously only been added to the First Amended Complaint in a blatant attempt to defeat diversity.

37.     Because no possibility exists, much less any *reasonable* possibility, that Plaintiff could state **any** claim against GTCR, this Defendant was fraudulently joined to this Action.  As such, GTCR's presence as a Defendant should be ignored for purposes of determining diversity jurisdiction. *See Hernandez*, 2006 WL 1647438, at *2 (removal based on diversity of citizenship

was proper where there was "no possibility" that plaintiff could state a cause of action for negligence as alleged in the complaint against the in-state defendant).

              b.      <u>Bob Novak and Roger Clark are Fraudulently Joined.</u>

      38.    Bob Novak and Roger Clark are also clearly fraudulently joined given the dearth of any factual allegations asserted against them.  Indeed, in the actual body of the First Amended Complaint, Plaintiff spends just three sentences each on Bob Novak and Roger Clark.  (Compl. at ¶¶ 30, 31.)  Significantly, those three sentences do nothing more than provide their alleged job descriptions.  (*Id.* at ¶ 30 (alleging that Bob Novak "is the Operations Manager at the" Willowbrook facility, "has worked in that capacity since August 2003," and is "responsible for the operation of the facility, coordinating and overseeing all activities in plant operations, and overall plant safety"); *id.* at ¶ 31 (alleging that Roger Clark was "the Maintenance Supervisor at the" Willowbrook facility, "held that position for nearly 30 years from the late 1980s until approximately 2015," and "was responsible for calibrating the internal [ethylene oxide] monitors and overseeing the maintenance activities at the" Willowbrook facility).)  Even within these job descriptions, Plaintiff does not specifically assert the necessary allegation that either Defendant had any control or discretion over the Willowbrook facility's ethylene oxide emissions—the alleged cause of Plaintiff's injuries.

      39.    Other than asserting generalized boilerplate job descriptions for Roger Clark and Bob Novak, Plaintiff does not mention them again until the First Amended Complaint's claims sections.  In those sections, Plaintiff asserts that Bob Novak and Roger Clark are individually liable for their negligence (Counts IX and XI) and willful and wanton conduct (Counts X and XII) claims.  Plaintiff makes these unsupported claims even though she asserted absolutely no factual allegations regarding either Roger Clark or Bob Novak's acts or omissions that allegedly

actually caused Plaintiff's claimed injuries. As such, Roger Clark and Bob Novak were clearly fraudulently joined and their presence as Defendants should be ignored for purposes of determining diversity jurisdiction. *See Hernandez*, 2006 WL 1647438, at *2.

## IV.    FEDERAL QUESTION JURISDICTION.

40.    Federal-question jurisdiction exists where a plaintiff's cause of action "arises under the Constitution, laws, or treatises of the United States." 28 U.S.C. § 1331. In order to arise under federal law, a claim must either plead a cause of action under federal law or plead a state-law claim that implicates significant federal issues. *See Grable & Sons Metal Prod., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 312 (2005). A state-law claim implicates significant federal issues if it "necessarily raise[s] a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." *Id.* at 314. In other words, a state-law claim may satisfy the "arising under" jurisdictional test if a federal issue is: "(1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn v. Minton*, 568 U.S. 251, 258 (2013) (citing *Grable*, 545 U.S. at 314); *see also Evergreen Square of Cudahy v. Wisconsin Hous. & Econ. Dev. Auth.,* 776 F.3d 463, 466 (7th Cir. 2015). A federal issue is substantial if it requires more than the routine application of settled federal law to a particular set of facts. *See Behrens v. BMO Harris Bank, N.A.*, No. 16-CV-09949, 2017 WL 3234373, at *6 (N.D. Ill. July 31, 2017).

### A.    Plaintiff's First Amended Complaint Necessarily Raises a Disputed Issue of Federal Law.

41.    The entire substance of Plaintiff's First Amended Complaint is founded on the federal government's ATSDR report entitled "Evaluation of the Inhalation Carcinogenicity of

Ethylene Oxide," which, in turn, used *another* federal government agency's report (the 2016 USEPA IRIS) as the basis for its analysis and findings. In that 2016 report, USEPA changed ethylene oxide's cancer weight-of-evidence descriptor from "probably carcinogenic to humans" to "carcinogenic to humans" and "determined that there is sufficient evidence of a causal relationship between [ethylene oxide] exposure and breast cancer in women." (Ex. B, p. 1, 8, 9.)

42.     Nonetheless, at the time the report was released, and at all times before and after the report's release, Sterigenics has been in compliance with all state and federal regulatory emission requirements, most importantly the federal Clean Air Act.

43.     The Clean Air Act, 42 U.S.C. § 7401 *et seq*., is the primary mechanism through which the federal government manages air emissions from industrial facilities in the United States. Among many regulatory provisions, the Clean Air Act requires USEPA to identify sources of and set national emission standards for a specific list of nearly 200 hazardous air pollutants. 42 U.S.C. § 7412. Ethylene oxide is one of those chemicals, and pursuant to that mandate, USEPA has directly regulated ethylene oxide emissions since 1994. *See* 40 C.F.R. § 63, Subpart O (Ethylene Oxide Emissions Standards for Sterilization Facilities); National Emission Standards for Hazardous Air Pollutants for Ethylene Oxide Commercial Sterilization and Fumigation Operations, 59 Fed. Reg. 62585-01 (Dec. 6, 1994). The emission standards (known as "NESHAPs") are directly applicable to facilities such as Sterigenics and enforceable by USEPA. 40 C.F.R. § 63.368. If the standards are violated, the United States has the authority to seek civil penalties of up to $97,229 per day and may obtain temporary or permanent injunctive relief. 42 U.S.C. § 7413(b); *see also* Civil Monetary Penalty Inflation Adjustment Rule, 83 Fed. Reg. 1190 (Jan. 10, 2018).

18

44.     The Clean Air Act also creates a nationally-uniform system of permits, known as "Title V permits," for major industrial sources to ensure that emission standards are identified and met.  40 C.F.R. § 70.1.  USEPA sets the substantive requirements for the Title V permitting program.  It also has the power to authorize individual states to administer the permitting program on USEPA's behalf.  40 C.F.R. § 70 *et seq.*  USEPA has approved Illinois's Title V permitting program, 415 ILCS 5/39.5 (known in Illinois as the Clean Air Act Permit Program ("CAAPP"); Illinois, 66 Fed. Reg. 62946 (Dec. 4, 2001) (Clean Air Act Final Full Approval of the Operating Permits Program).  Pursuant to this grant of authority, IEPA issued Sterigenics a CAAPP permit.  (Permit attached as Exhibit I.)

45.     Together, the dual regulations set by USEPA and IEPA limit Sterigenics' overall use of ethylene oxide and require most sources of ethylene oxide at the facility to be connected to pollution control devices, which are required to remove at least 99% of the ethylene oxide before it can be emitted to the air, pursuant to the federal NESHAP.  40 C.F.R. § 63.362(a).  Sterigenics is in compliance with its CAAPP permit and the federal NESHAP and, in fact, emits far less than the permitted amount of ethylene oxide.

46.     Nonetheless, Plaintiff argues that Sterigenics breached its duty to Plaintiff by "emitting [ethylene oxide] into the air from its Willowbrook facility," "using [ethylene oxide] as part of its sterilization process when safer alternatives could accomplish the same or similar business purpose without presenting the same level of risk to human health and well-being," and "emitting excessive, unnecessary, and/or dangerous volumes of [ethylene oxide] into air from its Willowbrook facility," amongst other claims.  (Compl. at ¶ 77.)

47.     In alleging this duty, Plaintiff seeks to substitute a different standard of care for the carefully-designed emission standard for ethylene oxide that was authorized by Congress,

established by USEPA, and implemented in a federally-approved CAAPP permit. Plaintiff's

First Amended Complaint is a direct challenge to both the Clean Air Act's ethylene oxide

standards as well as IEPA's implementation of those standards. Plaintiff asks the state court to

ignore these uniform federal standards, and impose new and different standards primarily based

on the ATSDR report. Thus, not only does Plaintiff ask the state court to rewrite a federal

regulation, she seeks to do that based on a report generated by one federal agency—ATSDR—at

the behest of another federal agency—USEPA.

48.     Further, IEPA, the state regulatory agency, relies on USEPA for the proper

regulation of emissions in Illinois. According to Alec Messina, IEPA Director, "States,

including Illinois, do not have the resources or experience to develop and promulgate emissions

standards" for facilities like Sterigenics. (Ex. H at p. 97.) Instead, State EPA departments rely

on USEPA, which has superior resources such as "the ability to analyze and make risk

assessments." (*Id.*) Thus, the ultimate authority on emissions standards is USEPA and State

involvement is secondary. Allowing a State judge to adjudicate a matter that effectively

challenges USEPA authority on emissions improperly fails to acknowledge USEPA's vital role

in this case.

49.     Given Plaintiff's direct challenge to federal standards, regulations, enforcement,

and authority, as well as her reliance on federal agency opinions to state a claim, the First

Amended Complaint necessarily raises a disputed issue of federal law as to the governing

standards for ethylene oxide emissions.

**B.     Plaintiff's First Amended Complaint Raises a Substantial Federal Issue.**

50.     Plaintiff's claims are substantial because their resolution is important to the

federal system as a whole. *See Gunn*, 568 U.S. at 260 ("The substantiality inquiry

20

under *Grable* looks instead to the importance of the issue to the federal system as a whole."). The federal government has a strong interest in ensuring uniformity in national air quality standards. This interest is evidenced by the highly comprehensive and detailed regulatory system the federal government has set forth through the Clean Air Act. Sterigenics is in compliance with this comprehensive and detailed federal regulatory system. Plaintiff, however, is attempting to bypass this federal system and separately regulate Sterigenics' conduct, conduct that is in conformance with federal and state environmental laws. Curiously, Plaintiff's proposed regulations are taken from assessments issued by federal bodies—ATSDR and USEPA's IRIS program.

51. Notably, the standard of care outlined in both the ATSDR report and the IRIS assessment is at odds with USEPA's federal regulations. Perhaps most troubling is the fact that USEPA created the IRIS risk assessment. Ethylene oxide emitters are receiving inconsistent messages from *the same federal agency*.[12] Thus, Plaintiff's case presents an issue that cries out for federal, not state, jurisdiction. Overall, the federal government's direct and substantial interest in this matter demonstrates it is an important issue of federal law that belongs in this Court.

**C.     Resolution of this Substantial Federal Issue in This Court Is Not Disruptive.**

52. Finally, this case does not present issues traditionally regulated by the States. *See Gunn*, 568 U.S. at 264 (denying removal of a legal malpractice case based, in part, on the fact that States "have a special responsibility for maintaining standards among members of the

---

[12] Note also that according to Alec Messina, IEPA Director, "there is some question as to [even] whether there is complete agreement within U.S. EPA, frankly, as . . . [to] what those studies show, whether the studies were designed in such a fashion as to have something that was valuable and worthwhile and could be conveyed." (Ex. H at p. 104.)

licensed professions") (internal quotation mark omitted). Instead, Plaintiff's case is premised on

inconsistent *federal* messages, which the State of Illinois has no particular interest in resolving.

In fact, IEPA acknowledged Illinois does not even have the resources to get involved in

promulgating emissions standards, and therefore is wholly reliant on USEPA to act as the expert

in this area. (Ex. H at p. 97.) Consequently, Plaintiff's claims are "capable of resolution in

federal court without disrupting the federal-state balance approved by Congress." *Gunn*, 568

U.S. at 258.

53.    Because this case meets the arising under standards set by the Supreme Court in

*Grable*, this Court has federal question jurisdiction under 28 U.S.C. § 1331.

## V.    THE PROCEDURAL REQUIREMENTS FOR REMOVAL ARE SATISFIED.

54.    This Court is the proper venue for this Action, because it is pending in the Circuit

Court for Cook County, Illinois, and the United States District Court for the Northern District of

Illinois is the federal court district embracing the geographic place where the Action is pending.

28 U.S.C. §§ 93(a)(1), 1441(a), 1446(a).

55.    The original Complaint and summons were served on Sterigenics on October 31,

2018. Accordingly, this Notice of Removal is timely under 28 U.S.C. § 1446(b). *See Murphy*

*Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 354 (1999) (30-day time limit for

removal runs from date of formal service of the complaint).

56.    In compliance with 28 U.S.C. § 1446(a), this Notice is signed pursuant to Rule 11

of the Federal Rules of Civil Procedure.

57.    No consent is needed from Defendants GTCR, Bob Novak, and Roger Clark

because they are fraudulently joined. *Hernandez*, 2006 WL 1647438, at *2 (fraudulently joined

defendants do not need to consent to removal); *see also* 28 U.S.C. § 1446(b)(2)(A) (only

22

"defendants who have been properly joined and served must join in or consent to the removal"). Nonetheless, GTCR, Bob Novak, and Roger Clark consent to removal.

58.     No Defendant properly joined to this case is a citizen of the State of Illinois, the state where the Action was initially filed.  28 U.S.C. § 1441(b)(2); *Midland Mgmt. Co.*, 132 F. Supp. 3d at 1023–24 (presence of fraudulently joined in-state defendant did not "compromise the parties' complete diversity" and did not violate the forum defendant rule).

59.     Pursuant to 28 U.S.C. § 1446(d), Sterigenics will promptly file a removal notice with the Clerk of the Circuit Court of Cook County, Illinois, and will serve written notice of the same upon counsel of record for Plaintiff.

60.     If any questions arise about this removal, Sterigenics respectfully requests the opportunity to present briefing and oral argument in support of removal, and to conduct jurisdictional discovery, if needed.

61.     By filing this notice of removal, Sterigenics does not waive, either expressly or implicitly, its rights to assert any defense or other objection that it could have asserted in the Circuit Court of Cook County of Illinois, including, without limitation, those related to personal jurisdiction, inconvenience of the forum, venue, or joinder.

## REQUESTED RELIEF

WHEREFORE, Defendant Sterigenics U.S., LLC ("Sterigenics"), respectfully requests that this Court assume jurisdiction over this action.

Date:   November 19, 2018                    Respectfully submitted,

                                             By:   _/s/ *Maja C. Eaton*_____
                                                     Maja C. Eaton

                                                   Maja C. Eaton
                                                   meaton@sidley.com
                                                   Gerard D. Kelly
                                                   gkelly@sidley.com
                                                   Elizabeth M. Chiarello
                                                   echiarello@sidley.com
                                                   Michael L. Lisak
                                                   mlisak@sidley.com
                                                   Stephanie C. Stern
                                                   sstern@sidley.com
                                                   SIDLEY AUSTIN LLP
                                                   Firm ID No. 42418
                                                   One South Dearborn Street
                                                   Chicago, Illinois  60603
                                                   Telephone: (312) 853-7000
                                                   Facsimile:  (312) 853-7036

                                                   ***ATTORNEYS FOR***
                                                   ***STERIGENICS US, LLC, BOB***
                                                   ***NOVAK, ROGER CLARK, AND***
                                                   ***GTCR, LLC***



IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

SHAWN FORNEK,

          Plaintiff,

    v.

STERIGENICS U.S. LLC;
GTCR LLC. and
ROBERT D. NOVAK,

          Defendants.

No: 2018 L 011004

### ROUTINE ORDER

    This matter Coming to be heard on Plaintiff's Motion for Leave to File Her First Amended Complaint, Instanter, no parties having appeared and the Court being fully advised in the premises;

    IT IS HEREBY ORDRED:

    IT IS HEREBY ORDRED that Plaintiff be, and hereby is, granted leave to file her First Amended Complaint at Law. Summons shall issue accordingly against additional named party ROGER CLARK.

    FURTHER ORDERED that previously served Defendants STERIGENICS U.S. LLC, GTCR LLC and ROBERT D. NOVAK are granted twenty-eight days to answer or otherwise plead.

ENTER:

_____
Judge

Associate Judge
Melissa A. Durkin

NOV 1 2018

Circuit Court - 2110

Todd A. Smith
Brian LaCien
POWER ROGERS & SMITH, LLP (31444)
70 W. Madison Street, 55th Floor
Chicago, IL 60602-4212
Telephone: (312) 236-9381
tsmith@prslaw.com
blacien@prslaw.com

FILED
11/1/2018 10:35 AM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2018L011004

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

SHAWN FORNEK,

        Plaintiff,

      v.                               No: 2018 L 011004

STERIGENICS U.S. LLC;
GTCR LLC.; and
ROBERT D. NOVAK,

        Defendants.               Hearing Date: No hearing scheduled

## ROUTINE MOTION FOR LEAVE TO FILE HER
## FIRST AMENDED COMPLAINT INSTANTER

    Now comes the Plaintiff SHAWN FORNEK, by and through her attorneys, POWER

ROGERS & SMITH, LLP, and moves this Honorable Court for an Order allowing Plaintiff to

amend her complaint amending allegations and adding Roger Clark as a party Defendant. A copy

of said First Amended Complaint is attached hereto and made a part of this Motion.

                        Respectfully submitted,

                       By:   s/Brian LaCien
                              Attorney for Plaintiff

Todd A. Smith
Brian LaCien
POWER ROGERS & SMITH, LLP #31444
70 W. Madison Street, 55th Floor
Chicago, Illinois 60602
Telephone: (312) 236-9381
tsmith@prslaw.com
blacien@prslaw.com

FILED
11/1/2018 10:35 AM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2018L011004

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

SHAWN FORNEK,

        Plaintiff,

    v.

        No: 2018 L 011004

STERIGENICS U.S. LLC;
GTCR LLC. and
ROBERT D. NOVAK,

        Defendants.

## ROUTINE ORDER

    This matter Coming to be heard on Plaintiff's Motion for Leave to File Her First Amended Complaint, Instanter, no parties having appeared and the Court being fully advised in the premises;

    IT IS HEREBY ORDRED:

    Plaintiff's Motion for Leave to File Her First Amended Complaint Instanter amending is granted.

                    _____

ENTER:

                    _____
                        Judge

Todd A. Smith
Brian LaCien
POWER ROGERS & SMITH, LLP
70 W. Madison Street, 55th Floor
Chicago, IL 60602-4212
Telephone: (312) 236-9381
tsmith@prslaw.com
blacien@prslaw.com
31444

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

FILED
11/1/2018 5:01 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2018L011004

| | | |
|---|---|---|
| SHAWN FORNEK | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 2018 L 011004 |
| | ) | |
| STERIGENICS U.S. LLC; BOB NOVAK; | ) | |
| ROGER CLARK; and GTCR, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

**NOTICE OF FILING**

TO:  No Parties Have Appeared

    I hereby certify that on November 1, 2018, at or before the hour of 5:00 PM, I electronically filed this Notice of Filing and Plaintiff's First Amended Complaint with the Clerk of the Circuit Court of Cook County by using the Odyssey eFile IL system.

                    s/ Brian LaCien

Name:         POWER ROGERS & SMITH, LLP (Brian LaCien)
Atty for:     Plaintiff
Address:    70 W. Madison Street, 55th Floor
City:         Chicago, Illinois 60601
Telephone:  236-9381
Atty. No.:    31444

FILED DATE: 11/1/2018 5:01 PM   2018L011004

FILED
11/1/2018 10:35 AM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2018L011004

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

| | | |
|---|---|---|
| SHAWN FORNEK | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 2018 L 011004 |
| | ) | |
| STERIGENICS U.S. LLC; | ) | |
| GTCR LLC; and | ) | |
| ROBERT NOVAK, | ) | |
| | ) | |
| Defendants. | ) | Hearing Date: No hearing scheduled |

## NOTICE OF FILING

TO:  No Parties Have Appeared

    I hereby certify that on November 1, 2018, at or before the hour of 5:00 PM, I electronically filed this Notice of Filing and Routine Motion for Leave to File Her First Amended Complaint Instanter with the Clerk of the Circuit Court of Cook County by using the Odyssey eFile IL system.

                        s/ Brian LaCien

| | |
|---|---|
| Name: | POWER ROGERS & SMITH, LLP (Brian LaCien) |
| Atty for: | Plaintiff |
| Address: | 70 W. Madison Street, 55th Floor |
| City: | Chicago, Illinois 60601 |
| Telephone: | 236-9381 |
| Atty. No.: | 31444 |

FILED
11/1/2018 5:01 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2018L011004

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

|  |  |  |
|---|---|---|
| SHAWN FORNEK, | ) | |
| | ) | |
| | ) | Case No. 2018 L 011004 |
| Plaintiff, | ) | |
| | ) | **JURY DEMANDED** |
| v. | ) | |
| | ) | |
| STERIGENICS U.S., LLC; BOB | ) | |
| NOVAK; ROGER CLARK; and GTCR, | ) | |
| LLC; | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## FIRST AMENDED COMPLAINT AT LAW

Plaintiff, SHAWN FORNEK, by and through counsel, POWER ROGERS &

SMITH, LLP, states as follows for her complaint against Defendants STERIGENICS

U.S. LLC ("Sterigenics"), BOB NOVAK, ROGER CLARK, and GTCR, LLC:

## INTRODUCTION

For decades, tens of thousands of people have lived in Willowbrook, Burr Ridge, Darien, and Hinsdale, the quiet suburbs of Cook and DuPage Counties Willowbrook, Burr Ridge, Darien, and Hinsdale with the false belief that they had found a sanctuary from the busy streets of Chicago. Just 25 miles southwest of Chicago, the third largest city in America, the area is a disaster zone. It is America's Chernobyl. In 1984, a company called Sterigenics infiltrated the Willowbrook community and began emitting an invisible, cancer causing toxin, ethylene oxide. In 2011, this company was purchased by a Cook County hedge fund, GTCR, LLC. The emissions continued. It was not until August 21, 2018, when the United States Department of Health & Human Services released a report, that the veil was finally lifted on the staggering cancer statistics and other ailments running rampant in these quiet communities. With the cancer-causing effects of ethylene oxide having been studied since the 1940s, America's Chernobyl has been nearly 80 years in the making and it affects our children, our parents, and our grandparents. This is about the children our community may never have, the lives cut short, the dreams destroyed, and the memories never made.

## OVERVIEW

1.    Since 1984, Sterigenics has been emitting ethylene oxide (hereinafter "EtO"), a known carcinogen, into the air from its facility located in Willowbrook, Illinois. As a result, for the last 34 years, those who live and work in Willowbrook and

the surrounding area have unknowingly been inhaling EtO in the air they breathe on a routine and continuous basis.

2. Sterigenics neither informed the residents of the Willowbrook community or those who live or work nearby that it systematically emits EtO into the air, nor warned residents that they were routinely and constantly breathing and are continuing to routinely and constantly breathe in a known carcinogen.

3. On or about August 21, 2018, an "Evaluation of Potential Health Impacts for Ethylene Oxide Emissions" prepared by the U.S. Department of Health and Human Services, Agency for Toxic Substances and Disease Registry (hereinafter "ATSDR"), was released to the general public.[1] The ATSDR report was based upon air measurements of EtO collected in May 2018 from 29 discrete locations near the Sterigenics facility in Willowbrook.

4. Relative to the Sterigenics facility in Willowbrook, the ATSDR concluded that "residents and workers are exposed to elevated airborne EtO concentrations from facility emissions." The ATSDR further concluded that "*an elevated cancer risk exists* for residents and off-site workers in the Willowbrook community surrounding the Sterigenics facility," and that "[t]hese elevated risks *present a public health hazard to these populations*." Among other things, the ATSDR Evaluation "recommends that Sterigenics take *immediate action* to reduce EtO emissions at this facility."

---

[1] https://www.atsdr.cdc.gov/HAC/pha/sterigenic/Sterigenics_International_Inc-508.pdf

5.      According to the EPA, the upper limit of acceptable cancer risk for airborne toxins, such as EtO, is 1 in 10 thousand (or 100 in 1 million). In other words, according to the EPA, it "will generally presume that if the risk to that individual is no higher than approximately 1 in 10 thousand, that risk level is considered acceptable. . . ."[2]

6.      Based upon the EPA's 2014 National Air Toxics Assessment, there are 106 census tracts in the United States with cancer risk scores greater than the acceptable limits. Most of those 106 tracts are located in "Cancer Alley," which is a notorious area along the Mississippi River between Baton Rouge and New Orleans with numerous industrial plants.

7.      According to the EPA's 2014 measurements, the immediate area in DuPage County surrounding the Sterigenics facility in Willowbrook, referred to as Tract 17043845902, has a cancer risk of 281.8075 in 1 million—which is nearly three times higher than the EPA's acceptable limits.

8.      To put this into further context, the EPA's 2014 National Air Toxics Assessment documented cancer risks in **76,727** census tracts across the country. The Willowbrook Tract, 1704385902, has the highest cancer risk in Illinois and the nineteenth (19th) highest cancer risk in the United States. In other words, the Willowbrook Tract is in the top 99.98% tracts in terms of cancer risk in the country.

9.      Figure 1, below, identifies the nineteen census tracts in the United States with the highest cancer risk. Twelve are located along Cancer Alley. Five tracts

---

[2] https://www.epa.gov/national-air-toxics-assessment/nata-frequent-questions

4

have sterilization plants, such as Sterigenics, that emit massive amounts of EtO. In fact, sterilization plants are almost entirely responsible for causing the extraordinarily high cancer risks in DuPage County, Illinois, Jefferson County, Colorado, and Lehigh County, Pennsylvania.

### Figure 1

| | A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|---|
| 1 | State | EPA Region | County | FIPS | Tract | Population | Total Cancer Risk (per million) |
| 2 | LA | EPA Region 6 | St. John the Baptist | 22095 | 22095070800 | 2,537 | 1,505.1167 |
| 3 | LA | EPA Region 6 | St. Charles | 22089 | 22089060100 | 1,937 | 808.7227 |
| 4 | LA | EPA Region 6 | St. John the Baptist | 22095 | 22095070900 | 3,115 | 616.6193 |
| 5 | PA | EPA Region 3 | Lehigh | 42077 | 42077005902 | 1,571 | 596.4609 |
| 6 | CO | EPA Region 8 | Jefferson | 08059 | 08059010902 | 2,310 | 525.5596 |
| 7 | LA | EPA Region 6 | St. John the Baptist | 22095 | 22095070700 | 4,348 | 511.3240 |
| 8 | LA | EPA Region 6 | St. John the Baptist | 22095 | 22095070900 | 2,840 | 490.2785 |
| 9 | LA | EPA Region 6 | St. John the Baptist | 22095 | 22095000000 | 45,924 | 413.3152 |
| 10 | WV | EPA Region 3 | Kanawha | 54039 | 54039013400 | 2,222 | 366.6597 |
| 11 | LA | EPA Region 6 | St. John the Baptist | 22095 | 22095071100 | 3,398 | 363.1912 |
| 12 | TX | EPA Region 6 | Harris | 48201 | 48201343100 | 4,629 | 348.2016 |
| 13 | PA | EPA Region 3 | Lehigh | 42077 | 42077000101 | 3,661 | 346.5181 |
| 14 | LA | EPA Region 6 | St. John the Baptist | 22095 | 22095070500 | 6,229 | 329.2657 |
| 15 | LA | EPA Region 6 | St. John the Baptist | 22095 | 22095070100 | 2,685 | 303.0079 |
| 16 | LA | EPA Region 6 | St. John the Baptist | 22095 | 22095070300 | 6,258 | 296.3112 |
| 17 | TX | EPA Region 6 | Harris | 48201 | 48201343200 | 4,944 | 296.1831 |
| 18 | LA | EPA Region 6 | St. John the Baptist | 22095 | 22095070400 | 4,381 | 286.5417 |
| 19 | LA | EPA Region 6 | St. Charles | 22089 | 22089062700 | 4,753 | 284.5145 |
| 20 | IL | EPA Region 5 | DuPage | 17043 | 17043845902 | 3,411 | 281.8075 |

10.     With respect to the Willowbrook Tract, 88.98% of the elevated cancer risk is attributed to EtO emissions; and the only facility in the Willowbrook Tract emitting EtO is Sterigenics. As a result, Sterigenics alone is almost entirely responsible for the Willowbrook Tract having the 19th highest cancer risk in the country.

11.     Only one facility in the entire country emits more EtO than the Sterigenics facility in Willowbrook.

12.     The data cited in Paragraphs 6 through 11, above, is based on sampling from 2014. More recent data, however, reveals that the cancer risk in Willowbrook is far higher than previously determined. In May 2018, air samples were taken and analyzed from the area surrounding the Sterigenics facility in Willowbrook. Those samples revealed a **current** cancer risk of 6,400 in 1 million (or 64 in 10 thousand), which is **64 times the acceptable limit**.

13.     As a direct and proximate result of Sterigenics' emissions of EtO over the course of the last 34 years, the Willowbrook community has become one of the most toxic and one of the most dangerous communities from a health and well-being standpoint in the entire country. Those who live and work in the Willowbrook area have been victimized by Sterigenics' negligent acts and omissions, as well as its conscious disregard and utter indifference to human life and the health and well-being of those in the community.

14.     Neither the extent of Sterigenics' EtO emissions nor the impact of those emissions on the health and well-being of those who live and work in the Willowbrook area was known by the general public until the August 21, 2018 release of the ATSDR report and the August 22, 2018 release of EPA's 2014 National Air Toxics Assessment.

## PARTIES

15.     This is an Illinois action. It is brought on behalf of an Illinois citizen, for an injury that occurred in Illinois, as a result of ongoing negligence that took place in Illinois. All of the actions that caused Plaintiff's injuries were a direct result of

actions orchestrated by an entity managed out of Illinois, Sterigenics, U.S., LLC, which is now overseen by another Illinois entity, GTCR, LLC.

16.     Plaintiff, SHAWN FORNEK, is a citizen of Illinois. SHAWN FORNEK has lived within 1.5 miles from the Sterigenics facility in Willowbrook, Illinois since 1990. In 2004, SHAWN FORNEK was officially diagnosed with Sjogren's syndrome and in 2006, she was diagnosed with lobular carcinoma breast cancer in Cook County, Illinois at Loyola University Medical Center

17.     All of SHAWN FORNEK's treatment has occurred, and continues to occur, in Cook County, Illinois at Loyola University Medical Center.

18.     SHAWN FORNEK did not have notice that her Sjogren's syndrome or lobular carcinoma breast cancer were wrongfully caused or that they were caused by Sterigenics' emissions of EtO until the recent ATSDR report was released in August 2018.

19.     Defendant Sterigenics U.S., LLC is a limited liability company organized under the laws of Delaware and having its headquarters and principal place of business at 2015 Spring Road, Suite 650, Oak Brook, Illinois 60523. Sterigenics does regular and substantial business in Cook County, Illinois. Sterigenics owns, operates, manages, controls and/or maintains the Sterigenics facilities and operations in Willowbrook, Illinois.

20.     Sterigenics U.S., LLC, is a wholly owned subsidiary of Sotera Health LLC, formerly known as Sterigenics International, Inc.   In or around 2011,

Sterigenics International, Inc. became and/or was converted to Sterigenics International LLC.

21.     In 2011, Sterigenics International LLC was purchased for $675 million by the Chicago-based private equity firm, GTCR, LLC (hereinafter "GTCR"). From 2011 until the present, GTCR, LLC, with its principal place of business at 300 N. LaSalle Street, Suite 5600, Chicago, Cook County, IL, owned, operated, managed, controlled and/or maintained Sterigenics. The Chairman of GTCR in 2011 was Governor Bruce Rauner.

22.     In 2017, Sterigenics International LLC announced that it had changed its parent company name to Sotera Health LLC.

23.     The core of GTCR's investment strategy is—as repeated frequently on its website and other promotional material—"finding and partnering with management leaders in core domains to identify, acquire and build market-leading companies through transformational acquisitions and organic growth."[3]

24.     GTCR's approach of "creating partnerships with exceptional leaders" is so fundamental to its business that GTCR has trademarked "The Leaders Strategy" to describe its collaborative approach to investing in companies.[4]

25.     GTCR has described its involvement with Sterigenics as a partnership from the beginning: "As part of the Sterigenics transaction, GTCR partnered with Michael Mulhern, who joined as CEO shortly after closing. Together, GTCR and Mr. Mulhern identified several initiatives to improve Sterigenics' operational and growth

---

[3] https://www.gtcr.com/the-leaders-strategy/
[4] *Id.*

initiatives, enhance its market leadership and drive incremental earnings growth."[5] GTCR's close relationship with Sterigenics has also frequently been mentioned in GTCR's own material[6] and in the media.[7]

26.    A video featured prominently on GTCR's website homepage at https://www.gtcr.com/ further highlights the integrated nature of GTCR's relationship with Sterigenics. In the video, which is transcribed below, GTCR Managing Director Dean Mihas and the then-CEO of Sterigenics discuss GTCR's significant involvement in and control over Sterigenics:

> MIHAS (GTCR Managing Director): We believe very strongly at GTCR that domain expertise is pretty critical.
>
> MULHERN (Sterigenics then-CEO): When you combine that knowledge, that analysis, prudent risk-taking, I think that leads to – has the potential to lead to – great health outcomes.
>
> MIHAS: Take the healthcare group in particular. We spent a lot of time doing proactive research, picking niches within the healthcare industry, to explore, to really understand the trends.
>
> MULHERN: The amount of diligence they do to really understand a sector, the companies within the sector, the management teams, is unlike anything I've seen.
>
> MIHAS: It was probably a year before we even acquired Sterigenics that we started digging around the contract sterilization space, trying to understand who the key companies are, who the leaders are, what the industry growth profile looks like, how large it is.

---

[5] https://www.gtcr.com/leadership-stories/sterigenics-transformation-through-organic-growth-and-strategic-acquisitions/
[6] See, e.g., https://www.gtcr.com/gtcr-closes-the-acquisition-of-sterigenics-international-inc/
[7] *See, e.g.,* https://www.pehub.com/2011/03/gtcr-completes-sterigenics-buy/

MULHERN: It came to our knowledge that a company was about to come to market to be sold. If that company got into the wrong hands, it would put at risk our source of supply. GTCR just kicked it into high gear and said we must own this asset, and today we're the only vertically integrated sterilization company in the world and in large part because GTCR made the decision and committed the resources to get it done.

MIHAS: So there's a lot of effort and R&D really that goes into having this domain expertise. It's not just about working on a deal when it comes in.

MULHERN: Beyond the obvious, which is that they're extremely talented at what they do, I have enormous trust in them. And I think trust is a critical part when you partner with a private equity firm.

27.     GTCR's partnership with Sterigenics also included playing an active role in expanding Sterigenics' geographic footprint: "In addition to organic initiatives, GTCR and management also strategically repositioned the business through three acquisitions, including two sterilization facility add-ons and the transformative acquisition of Nordion, a key supplier to Sterigenics."[8]

28.     The close partnership between GTCR and Sterigenics is also reflected in GTCR's substantial involvement on Sterigenics' board of directors. According to GTCR's website, at least four of its ten managing directors currently serve, or have served, on the board of directors of Sterigenics or Sotera.[9]

---

[8] https://www.gtcr.com/leadership-stories/sterigenics-transformation-through-organic-growth-and-strategic-acquisitions/

[9] See https://www.gtcr.com/team-member/sean-l-cunningham/; https://www.gtcr.com/gtcr-promotes-aaron-d-cohen-and-sean-l-cunningham-to-principal/; https://www.gtcr.com/team-member/benjamin-j-daverman/;
https://www.bloomberg.com/research/stocks/private/person.asp?personId=66077&privcapId=20801;
https://www.gtcr.com/team-member/david-a-donnini/;
https://www.bloomberg.com/research/stocks/private/person.asp?personId=1155789&privcapId=20801
; https://www.gtcr.com/team-member/constantine-s-mihas/

29.    Publicly available documents reveal that principals of GTCR, acting in their capacity as members of the board of directors of Sterigenics, have been actively involved in Sterigenics acquisition of other companies.[10]

30.    Upon information and belief, Defendant Bob Novak is an individual who resides the state of Illinois.  Novak is the Operations Manager at the Sterigenics facility in Willowbrook, and has worked in that capacity since August 2003. He is responsible for the operation of the facility, coordinating and overseeing all activities in plant operations, and overall plant safety.

31.    Defendant Roger Clark is an individual who resides in Chicago, Cook County, Illinois.  Clark was the Maintenance Supervisor at the Sterigenics facility in Willowbrook and held that position for nearly 30 years from the late 1980s until approximately 2015.  He was responsible for calibrating the internal EtO monitors and overseeing the maintenance activities at the Sterigenics' facility.

### VILLAGE OF WILLOWBROOK

32.    The Village of Willowbrook is a suburban community located roughly 20 miles southwest of Chicago. Its population is approximately 8,500. The Village owns and operates over 54 acres of parks on 10 separate sites throughout the Village.

33.    Sterigenics operates two buildings in Willowbrook. Building One is located at 7775 S. Quincy Street and Building Two is located at 830 Midway Drive.

---

[10]http://news.nordion.com/mobile.view?c=68761&v=202&d=3&id=aHR0cDovL2FwaS50ZW5rcd2l6YXJkLmNvbS9maWxpbmcG1sP2lwYWdlPTk1NTE5NzMmRFNFUT0yJlNFUT0mU1FERVNDPVNFQ1RJT05fRVhhISUJJVCZleHA9JnN1YnNpZD01Nw%3D%3D

11

Upon information and belief, Sterigenics operated a third building at 7827 Quincy Street for a brief period of time.

34.     During the times relevant for the time period referenced herein, Sterigenics operated another facility at 711 Cooper Court, Schaumburg, Cook County, Illinois.

35.     The three Sterigenics buildings in Willowbrook are all located in a densely populated metropolitan area with 19,271 people living within one mile.

36.     Gower Middle School in Burr Ridge is located 0.7 miles from the Sterigenics facility and has an enrollment of approximately 400 students. Gower West Elementary School is 0.9 miles from the Sterigenics facility. Conev's Cradle Infant Care, Inc., is a daycare center located 0.7 miles from the Sterigenics facility. Hinsdale South High School, with an enrollment of 1,500 students, is located 1.1 miles from the Sterigenics facility.

37.     The Willowbrook Police Department, with its 23 full-time sworn police officers and three civilian employees, is located a mere 495 feet from the Sterigenics facility. Willowbrook's Village Office and City Hall is located 0.2 miles from the Sterigenics facility.

38.     The Willowbrook Community Park is 0.6 miles from the Sterigenics facility. And there are highly dense residential areas to the immediate west of the Sterigenics facility within 0.3 miles, to the southeast within 0.6 miles, to the southwest within 0.9 miles, to the north within 0.7 miles, to the northeast within 0.8 miles, and to the east within 1.0 mile.

39.    Willowbrook Town Center, which is located 1.1 miles from the Sterigenics facility, has nearly 200,000 square feet of retail stores, restaurants, and other businesses. There are 91,000 residents within a three-mile radius of the Willowbrook Town Center, and an additional 33,000 people employed in the area's 3,000-plus businesses.

40.    Figure 2, below, depicts the area within a 1.5 mile radius of the Sterigenics facility.

***

Figure 2



ETHYLENE OXIDE

41.     The DNA damaging properties of EtO have been studied since the 1940s, and for more than 40 years it has been consistently recognized as dangerous, toxic, and carcinogenic.

42.     In a 1977 report, the National Institute for Occupational Safety and Health (hereinafter "NIOSH") concluded that occupational exposure to EtO may increase the frequency of genetic mutations in human populations and recommended that EtO be considered as mutagenic and potentially carcinogenic to humans. Given EtO's carcinogenic potential, the 1977 NIOSH report also recommended that alternative sterilization processes be used whenever available.

43.     In 1981, NIOSH released a new bulletin focusing on new evidence of carcinogenic, mutagenic, and reproductive hazards associated with EtO. It also reiterated that EtO was a potential occupational carcinogen and reported that no safe levels of EtO exposure have been demonstrated.

44.     In 1985, the U.S. Department of Health and Human Services published the Fourth Annual Report on Carcinogens and classified EtO as reasonably anticipated to be a human carcinogen.

45.     In 1987, the state of California (home to two Sterigenics EtO sterilizing plants) officially designated EtO a carcinogen.

46.     In the early 1990s, the first high quality, long-term research on ethylene oxide's carcinogenic impacts on humans was published. This research was undertaken based on a NIOSH study tracking the mortality of 18,254 U.S. workers who had been exposed to EtO between the 1940s and 1980s at sterilizer plants much

like the Sterigenics Willowbrook facility. In fact, according to Kathleen Hoffman, the NIOSH study actually included a few Sterigenics facilities.[11] The NIOSH study ultimately found causal links between exposure to EtO and increased mortality from lymphatic, hematopoietic, and breast cancers. The research on the NIOSH study has since been heavily cited and relied upon by major regulatory organizations, including the World Health Organization (hereinafter "WHO") and the United States Environmental Protection Agency (hereinafter "EPA").

47.     In 1994 the WHO's International Agency for Research on Cancer (hereinafter "IARC") listed EtO as a Group 1 human carcinogen, the agency's highest risk classification, finding "Ethylene Oxide is carcinogenic to humans."

48.     In 2000, the U.S. Department of Health and Human Services published the Ninth Annual Report on Carcinogens and revised its classification for EtO to known to be a human carcinogen.

49.     The U.S. Department of Labor's Occupational Safety and Health Administration (hereinafter "OSHA") 2002 fact sheet on EtO indicates that "[b]oth human and animal studies show that EtO is a carcinogen" and requires employers to provide clear signs and labels notifying workers of EtO's "carcinogenic and reproductive hazards."[12]

---

[11] https://yosemite.epa.gov/Sab/Sabproduct.nsf/B839FA45582C200185257D9500496B0E/$File/EPA-+Sterigenics+Speaking+Points+for+IRIS+SAB+Review-Nov+2014.pdf *accessed 9.25.2018.*
[12] https://www.osha.gov/OshDoc/data_General_Facts/ethylene-oxide-factsheet.pdf *accessed 9.25.2018.*

50. In 2016, the EPA's Integrated Risk Information System (hereinafter "IRIS") reclassified EtO as "carcinogenic to humans," and increased the cancer potency of EtO by 30 times.

51. The half-life of EtO in the atmosphere has been reported in certain circumstances to be two-hundred eleven (211) days. Neither rain nor absorption into aqueous aerosols is capable of removing ethylene oxide from the atmosphere.

52. Acute exposure to EtO can result in nausea, vomiting, neurological disorders, bronchitis, pulmonary edema, and emphysema.

53. Chronic exposure to EtO can irritate the eyes, skin, nose, throat, lungs, and can cause harm to the brain and nervous system leading to headaches, nausea, memory loss, and numbness.

54. Chronic inhalation exposure to EtO can also cause reproductive and developmental impairments. Evidence recognized by the EPA indicates that inhalation exposure to EtO can cause an increased rate of miscarriages in females. Evidence also indicates that EtO inhalation exposure can cause decreased sperm concentration and testicular degeneration in males.

55. Additionally, inhalation exposure to EtO can cause mutations and chromosomal damage that can lead to birth defects and cancer. Even when exposure to EtO diminishes or ceases, the frequency of sister chromatid exchanges (mutations/chromosomal alterations) have been found to remain elevated for at least six months.

16

56.     Chronic inhalation exposure to EtO also causes cancer. Evidence recognized by the EPA indicates that inhalation exposure to EtO causes various cancers including but not limited to lymphatic cancers, leukemia, and breast cancer. There is also evidence that EtO causes tumors in the body and reproductive issues in both men and women. **As a result, the EPA has concluded that EtO is carcinogenic to humans by the inhalation route of exposure.** The stated confidence in this classification is "HIGH."

## STERIGENICS' OPERATIONS

57.     Sterigenics has been releasing EtO into the air in the Willowbrook area since 1984. The facility stores EtO and sprays it into gas chambers to sterilize medical equipment and pharmaceuticals. Building One of the Sterigenics facility, which was constructed in 1984, holds fifteen gas chambers, while Building Two, which was constructed in 1999, holds four gas chambers which were built in 1999 and 2012. Upon information and belief, there were periods of time where no pollution controls were in place. Additionally, even where there have been certain pollution controls in place they have been ineffective and/or lacking due to the acts and omissions of the defendants. Further, upon information and belief, some ethylene oxide used by Sterigenics does not go through any pollution control but rather is emitted into the air through back vents.

58.     The Sterigenics facility operates 24 hours per day, which means toxic, cancerous gas is emitted from the Sterigenics facility on a steady and continuous

basis. As a result, EtO is a constant element in the air breathed by those who live and work near the Willowbrook facility.

59.     From 1995 through 2016, the reported EtO emissions from the Sterigenics facility are depicted in Figure 3, below:

Figure 3

| Year | Pounds | Year | Pounds |
|------|--------|------|--------|
| 1995 | 18,213 lbs. | 2006 | 3,985 lbs. |
| 1996 | 22,000 lbs. | 2007 | 3,698 lbs. |
| 1997 | 26,000 lbs. | 2008 | 3,597 lbs. |
| 1998 | 31,000 lbs. | 2009 | 3,429 lbs. |
| 1999 | 1,440 lbs. | 2010 | 6,869 lbs. |
| 2000 | 7,341 lbs. | 2011 | 6,878 lbs. |
| 2001 | 7,848 lbs. | 2012 | 6,811 lbs. |
| 2002 | 6,686 lbs. | 2013 | 5,892 lbs. |
| 2003 | 6,630 lbs. | 2014 | 5,036 lbs. |
| 2004 | 5,039 lbs. | 2015 | 4,706 lbs. |
| 2005 | 2,621 lbs. | 2016 | 4,009 lbs. |

60.     No data on ambient air emissions was kept before 1995. However, the ATSDR notes that the available data suggest that "substantially higher ambient releases prior to 1995 were likely." Indeed, a lone 1988 report on Sterigenics' Willowbrook facility's EtO emissions accessed through the EPA's TRI Explorer

Database supports this contention.[13] The 1988 report indicates that the Willowbrook facility emitted 97,518 pounds of EtO into the air.[14] This is over three times greater than the highest amount recorded in the contiguous 1995-2016 data set (31,000 pounds in 1998) and over 20 times greater than emissions levels in 2016 (4,009 pounds).

61.    Without discovery from Sterigenics, it is impossible to know precisely how many pounds of EtO Sterigenics released into the air from 1984 to 1994, but it is reasonable to infer that the pre-1995 emissions of EtO were at best, similar to those from 1995 to 1998, and at worst, closer to the colossal emissions in 1988.

62.    Notably, the historical EPA emission reports from the Willowbrook Sterigenics facility demonstrate that the amounts of EtO released from the plant over the last decade are significantly lower than the amounts released during prior decades.  Total air releases in the 1990s were up to **7.7 times higher** than present levels. Sterigenics' EtO releases in the 1980s were even higher than this, with available data suggesting that Sterigenics released **over 20 times more** EtO into the air in 1988 than it did in 2016, the most recent date for which emissions data is publicly available.  As a result, the ATSDR report's current estimate of Willowbrook

---

[13]

https://iaspub.epa.gov/triexplorer/release_trends?tri=60521GRFFT7775Q&p_view=TRYR&trilib=TRIQ1&sort=_VIEW_&sort_fmt=1&state=All+states&county=All+counties&chemical=000075218&industry=ALL&core_year=&tab_rpt=1&FLD=AIRLBY&FLD=E1&FLD=E2&FLD=E3&FLD=E4&FLD=E41&FLD=E42&FLD=E5&FLD=E52&FLD=E53&FLD=E53A&FLD=E53B&FLD=E54&FLD=E51&FLD=E51A&FLD=E51B&FLD=TSFDSP&FLD=m10&FLD=m41&FLD=m62&FLD=potwmetl&FLD=m71&FLD=m81&FLD=m82&FLD=m72&FLD=m63&FLD=m64&FLD=m65&FLD=m66&FLD=m67&FLD=m73&FLD=m79&FLD=m90&FLD=m94&FLD=m99&FLD=RELLBY

[14]

https://ofmpub.epa.gov/enviro/tri_formr_partone_v2.get_thisone?rpt_year=1988&dcn_num=1388025024213&ban_flag=Y

area residents' cancer risk (which is based on sampling conducted this year) must drastically underestimate of the levels of risk faced by those exposed to the Sterigenics facility's emissions in the 1980s and 1990s

63.    Sterigenics' air emissions were not the only manner in which Sterigenics exposed area residents, workers, and students to EtO. Sterigenics reported at least one mass "uncontrolled release" of EtO. On or about October 7, 2013, Sterigenics released ethylene glycol (a byproduct of EtO) into the soil and groundwater at its Willowbrook facility. In addition, on October 21, 2013, Sterigenics reported the uncontrolled release of 30 pounds of ethylene oxide into the air from its Willowbrook facility. The Illinois Attorney General filed a lawsuit against Sterigenics for its water and air pollution and alleged numerous violations of environmental statutes and regulations. Sterigenics entered into a consent order whereby it agreed to pay a $50,000.00 fine.

64.    Upon information and belief, Sterigenics also released ethylene glycol into the soil and groundwater at its Willowbrook facility on a regular and continuing basis via drain pits that collected excess ethylene glycol from the EtO chambers.

65.    At all relevant times, Sterigenics knew or should have known that EtO is toxic and dangerous to human health and well-being. In addition, at all relevant times, Sterigenics knew or should have known that EtO is classified as a carcinogen and has been determined to cause various illnesses and ailments including, but not limited to, cancer.

66.     Notwithstanding Sterigenics' knowledge concerning the dangers of operation, it has been emitting EtO from its facility in Willowbrook on a routine and constant basis for 34 years. Further, notwithstanding Sterigenics' knowledge that chronic inhalation exposure to EtO causes adverse conditions to the eyes, skin, nose, throat, lungs, and nervous system, reproductive and developmental impairments, mutations, chromosomal damage, birth defects, and cancer, it has failed to warn those who live and work in the Willowbrook area that they are being exposed to and breathing in EtO on a routine and constant basis.

## STERIGENICS' PATTERN OF BEHAVIOR

67.     Sterigenics has been the subject of regulatory and administrative enforcement relative to its EtO emissions in Europe. Beginning in 1992, Sterigenics operated a sterilization facility in Zoetermeer, a city in the western Netherlands. The Zoetermeer facility was located in an area with residential housing and numerous small business. In 2009, it was determined that Sterigenics had been knowingly releasing amounts of EtO that exceeded the local Maximum Permissible Risk concentration into the air for a number of years and was penalized. Sterigenics, however, continued with its excessive emissions until it ultimately relocated its facility in 2010. According to the Public Prosecutor in Zoetermeer, Sterigenics knew of the unauthorized emissions, but failed to act and did not warn local residents about the emissions or the dangers associated therewith.

68.     Sterigenics has also exhibited a pattern of neglecting safety in its facilities in the U.S. Sterigenics failed to properly train employees in the safe use of

EtO at its sterilizing plant in Ontario, California, which resulted in a major EtO explosion on August 19, 2004 that injured four employees and forced the evacuation of the plant and neighboring facilities. The U.S. Chemical Safety and Hazard Investigation Board (hereinafter "CSB") investigation into the incident found that Sterigenics had failed to ensure its maintenance employees understood the hazards associated with EtO-based processes, which led them to manually override safety devices, causing the explosion. The CSB faulted Sterigenics management for not implementing "company-wide engineering control recommendations that could have prevented this explosion" and failing to follow recommendations on EtO concentrations disseminated by NIOSH.

69.     Further evidencing Sterigenics' disregard for safety, OSHA records show that Sterigenics has paid thousands of dollars in fines for safety violations at its Willowbrook facility.[15]  Specifically, Sterigenics paid $5,062 in fines in 2006 for several "Serious" violations that left workers exposed to unspecified "highly hazardous chemicals."[16]  Given the work undertaken at the Willowbrook facility, these "highly hazardous chemicals" likely included EtO.

70.     Current and former Sterigenics employees have also raised concerns about company safety practices around EtO. For instance, on the company's Glassdoor page, one former employee noted on June 25, 2013 that "[t]here is a

---

[15] E.g. https://www.osha.gov/pls/imis/establishment.inspection_detail?id=308153717 *accessed 9.25.2018.*
[16] https://www.osha.gov/pls/imis/establishment.inspection_detail?id=308153717 &
https://www.osha.gov/pls/imis/establishment.violation_detail?id=308153717&citation_id=01001 *accessed 9.25.2018.*

22

minimum attention to quality & safety which will backfire eventually."[17] Another stated on October 9, 2015 that "you're working with Ethylene Oxide which is extremely dangerous and the company seems to cut corners around safety at times."[18] Perhaps most concerning, an "EtO A Operator" in the Charlotte, North Carolina facility reported on February 24, 2015 that "Safety is an issue sometimes regarding procedures. The maintenance team cuts a lot of corners." This employee advised management to "Lock out the overrides for equipment. Fire any maintenance manager that shows operators how to manually operate equipment without it showing on the computer system."[19] Notably, this comment comes after the 2004 Ontario, California explosion. As discussed above, the CSB identified maintenance cutting corners and manually overriding equipment as factors leading to that incident. This employee review suggests that the safety and management failures that caused the California explosion were not addressed system-wide and continued to be in evidence at other Sterigenics facilities over a decade later.

71.     Taken together, these elements demonstrate a pattern of Sterigenics consistently failing to implement company-wide safety measures across all its facilities, despite research, NIOSH bulletins, regulatory interventions, and problematic incidents demonstrating their need. This willingness to "cut corners" and lack of oversight may explain why Sterigenics failed for decades to install emission mitigation technology to limit passive venting of EtO from its Willowbrook facility.

---

[17] https://www.glassdoor.com/Reviews/Employee-Review-Sterigenics-RVW2768416.htm *accessed 9.25.2018.*
[18] https://www.glassdoor.com/Reviews/Employee-Review-Sterigenics-RVW8236300.htm *accessed 9.25.2018.*
[19] https://www.glassdoor.com/Reviews/Employee-Review-Sterigenics-RVW5987616.htm *accessed 9.25.2018.*

## COUNT I
### Negligence – Sterigenics U.S., LLC

72. Plaintiff incorporates by reference all allegations contained in Paragraphs 1 through 71 as if fully set forth as Paragraph 72.

73. Sterigenics U.S., LLC owned and operated the Sterigenics facility in Willowbrook, Illinois, during a material portion of time since 1984.

74. Sterigenics U.S., LLC managed, controlled, and supervised sterilization operations at the Sterigenics facility in Willowbrook, Illinois, during a material portion of time since 1984.

75. Sterigenics U.S., LLC had and continues to have a duty to exercise ordinary care for the health, safety, and well-being of Plaintiff and those living and working in the area surrounding its Willowbrook facility.

76. At all relevant times, Sterigenics U.S., LLC knew or should have known that the EtO gas emitting from its Willowbrook facility would have a toxic, poisonous, and highly deleterious effect upon the health, safety, and well-being of persons breathing it.

77. Sterigenics U.S., LLC breached its duty and failed to exercise ordinary care of the health and well-being of Plaintiff in one or more of the following ways:

    a. By emitting EtO into the air from its Willowbrook facility;

    b. By emitting excessive, unnecessary, and/or dangerous volumes of EtO into air from its Willowbrook facility;

    c. By using EtO as part of its sterilization process when safer alternatives could accomplish the same or similar business purpose without presenting the same level of risk to human health and well-being;

    d.  By placing its own economic interests above the health and well-being of those who live or work in the Willowbrook community;

    e.  By failing to warn or advise Plaintiff, as well as those who live or work in the Willowbrook community, that they were being exposed to EtO;

    f.  By failing to warn or advise Plaintiff, as well as those who live or work in the Willowbrook community, that they were breathing in EtO;

    g.  By failing to warn or advise Plaintiff, as well as those who live or work in the Willowbrook community, that it was emitting a known carcinogen into the air from its facility in Willowbrook;

    h.  By failing to employ safe methods to adequately control, reduce, minimize, and/or mitigate EtO emissions from its Willowbrook facility;

    i.  By failing to adequately study and test the effect of its EtO emissions from its Willowbrook facility on the quality of air;

    j.  By failing to adequately study and test the effect of its EtO emissions from its Willowbrook facility on the health and well-being of those who live and work in the Willowbrook community; and

    k.  By subjecting Plaintiff and those who live and work nearby its Willowbrook facility to an elevated cancer risk.

78.    As a direct and proximate result of one or more of the foregoing acts or omissions, Plaintiff was exposed to and inhaled great amounts of EtO while living in the Willowbrook community.

79.    As a direct and proximate result of Plaintiff's inhalation of EtO from Sterigenics facility, she developed Sjogren's syndrome and lobular carcinoma breast cancer which has caused and will continue to cause Plaintiff to incur and endure

medical bills, lost wages, pain and suffering, mental anguish, disability, disfigurement, reduced life expectancy, and a loss of her normal life.

WHEREFORE Plaintiff, SHAWN FORNEK, respectfully requests that judgment be entered in her favor and against Sterigenics U.S., LLC in an amount be determined by a trier of fact.

## COUNT II
### Negligent Training – Sterigenics U.S., LLC

80.     Plaintiff incorporates by reference all allegations contained in Paragraphs 1 through 71 and 73 and 74 as if fully set forth as Paragraph 80.

81.     Sterigenics U.S., LLC had and continues to have a duty to properly train its employees to control and dispose of hazardous substances including EtO and its byproducts, including but not limited to ethylene glycol.

82.     At all relevant times, Sterigenics U.S., LLC knew or should have known that failing to properly train its employees to control, monitor, and dispose of hazardous materials would have a toxic, poisonous, and highly deleterious effect upon the health, safety, and well-being of persons breathing it.

83.     Sterigenics U.S., LLC breached its duty to properly train its employees in one or more of the following ways:

    a.  By failing to train its employees about the carcinogenic effects of EtO;

    b.  By failing to train its employees about the proper procedures to control and store EtO and its byproducts, including by not limited to ethylene glycol, such that it would prevent unintended leaks, spills or emissions;

c. By failing to train its employees about the proper procedures to monitor EtO emissions;

d. By failing to train its employees about the proper procedures for recording EtO emissions;

e. By failing to train its employees about the proper procedures to adequately control, reduce, minimize, and/or mitigate EtO emissions from its Willowbrook facility;

f. By failing to train its employees about the proper procedures for repairing and/or replacing defective EtO emissions equipment;

g. By failing to train its employees about the proper procedures for reporting uncontrolled emissions; and

h. By failing to properly train its employees about the proper procedures for disposing of EtO or its products, including by not limited to ethylene glycol.

84. As a direct and proximate result of one or more of the foregoing acts or omissions, Plaintiff was exposed to and inhaled great amounts of EtO while living in the Willowbrook community.

85. As a direct and proximate result of Plaintiff's inhalation of EtO from Sterigenics facility, she developed Sjogren's syndrome and lobular carcinoma breast cancer which has caused and will continue to cause Plaintiff to incur and endure medical bills, lost wages, pain and suffering, mental anguish, disability, disfigurement, reduced life expectancy, and a loss of her normal life.

WHEREFORE Plaintiff, SHAWN FORNEK, respectfully requests that judgment be entered in her favor and against Sterigenics U.S., LLC in an amount be determined by a trier of fact.

## COUNT III
### Negligent Supervision – Sterigenics U.S., LLC

86.    Plaintiff incorporates by reference all allegations contained in Paragraphs 1 through 71 and 73 and 74 as if fully set forth as Paragraph 86.

87.    Sterigenics U.S., LLC had and continues to have a duty to properly supervise its employees to prevent a creation of danger or harm to third persons.

88.    At all relevant times, Sterigenics U.S., LLC knew or should have known that failing to properly supervise its employees in their control, monitoring and disposal hazardous materials including EtO and its by products, including but not limited to ethylene glycol, would have a toxic, poisonous, and highly deleterious effect upon the health, safety, and well-being of persons breathing it.

89.    Sterigenics U.S., LLC breached its duty to supervise its employees in one or more of the following ways:

     a. By failing to recognize when the proper procedures to control and store EtO and its byproducts, including by not limited to ethylene glycol, were violated resulting in unintended leaks, spills or emissions;

     b. By failing to reprimand and/or discipline employees when the proper procedures to control and store EtO and its byproducts, including by not limited to ethylene glycol, were violated resulting in unintended leaks, spills or emissions;

     c. By retaining employees who repeatedly violated the proper procedures to control and store EtO and its byproducts, including by not limited to ethylene glycol, resulting in unintended leaks, spills or emissions;

     d. By failing to recognize when the proper procedures to adequately control, reduce, minimize, and/or mitigate EtO emissions from its Willowbrook facility were violated resulting in unintended leaks, spills, or emissions;

e. By failing to reprimand and/or discipline employees when the proper procedures to adequately control, reduce, minimize, and/or mitigate EtO emissions from its Willowbrook facility were violated resulting in unintended leaks, spills, or emissions;

f. By retaining employees who repeatedly violated the proper procedures to adequately control, reduce, minimize, and/or mitigate EtO emissions from its Willowbrook facility resulting in unintended leaks, spills, or emissions;

g. By failing to recognize when the proper procedures for repairing and/or replacing defective EtO emissions equipment were violated;

h. By failing to reprimand and/or discipline employees when the proper procedures for repairing and/or replacing defective EtO emissions equipment were violated;

i. By retaining employees who repeatedly violated the proper procedures for repairing and/or replacing defective EtO emissions equipment;

j. By failing to recognize when the proper procedures for reporting uncontrolled emissions were violated;

k. By failing to reprimand and/or discipline employees when the proper procedures for reporting uncontrolled emissions were violated;

l. By retaining employees who repeatedly violated the proper procedures for reporting uncontrolled emissions;

m. By failing to recognize when the proper procedures for disposing of EtO or its products, including by not limited to ethylene glycol were violated;

n. By failing to reprimand and/or discipline employees when the proper procedures for disposing of EtO or its products, including by not limited to ethylene glycol were violated;

29

o. By retaining employees who repeatedly violated the proper procedures for disposing of EtO or its products, including by not limited to ethylene glycol;

p. By failing recognize when the proper procedures to monitor EtO emissions were violated;

q. By failing to reprimand and/or discipline employee when the proper procedures to monitor EtO emissions were violated;

r. By retaining employees who repeatedly violated the proper procedures to monitor EtO emissions;

s. By failing to recognize when the proper procedures for recording EtO emissions were violated;

t. By failing to reprimand and/or discipline employees when the proper procedures for recording EtO emissions were violated; and

u. By retaining employees who repeatedly violated the proper procedures for recording EtO emissions.

90. As a direct and proximate result of one or more of the foregoing acts or omissions, Plaintiff was exposed to and inhaled great amounts of EtO while living in the Willowbrook community.

91. As a direct and proximate result of Plaintiff's inhalation of EtO from Sterigenics facility, she developed Sjogren's syndrome and lobular carcinoma breast cancer which has caused and will continue to cause Plaintiff to incur and endure medical bills, lost wages, pain and suffering, mental anguish, disability, disfigurement, reduced life expectancy, and a loss of her normal life.

WHEREFORE Plaintiff, SHAWN FORNEK, respectfully requests that judgment be entered in her favor and against Sterigenics U.S., LLC in an amount be determined by a trier of fact.

## COUNT IV
### Willful and Wanton Conduct – Sterigenics U.S., LLC

92.    Plaintiff incorporates by reference all allegations contained in Paragraphs 1 through 71 and 73 and 74 as if fully set forth as Paragraph 92.

93.    Sterigenics U.S., LLC had and continues to have a duty to refrain from willful and wanton conduct and/or conduct that exhibits an utter indifference and/or conscious disregard to the health, safety, and well-being of Plaintiff and those living and working in the area surrounding Sterigenics Willowbrook facility.

94.    At all relevant times, Sterigenics U.S., LLC knew that EtO gas emitting from its Willowbrook facility would have a toxic, poisonous, and highly deleterious effect upon the health, safety, and well-being of persons breathing it.

95.    Sterigenics U.S., LLC breached its duty and was guilty of willful and wanton conduct in one or more of the following ways:

   a.  By emitting EtO into the air from its Willowbrook facility notwithstanding its knowledge that EtO is toxic, poisonous, and causes adverse medical issues including, but not limited to, cancer;

   b.  By placing its own economic interests above the health, safety, and well-being of those who live or work in the Willowbrook community;

   c.  By failing to warn or advise Plaintiff, as well as those who live or work in the Willowbrook community, that they were being exposed to EtO notwithstanding its knowledge that EtO is toxic, poisonous, and causes adverse medical issues including, but not limited to, cancer;

   d.  By failing to a warn or advise Plaintiff, as well as those who live or work in the Willowbrook community, that they were breathing in EtO notwithstanding its knowledge that EtO is

31

toxic, poisonous, and causes adverse medical issues including, but not limited to, cancer;

e. By emitting EtO, a known carcinogen, into the air from its Willowbrook facility before fully studying, researching, or understanding the deleterious impact that EtO inhalation exposure has on the health, safety, and well-being of those in the surrounding area;

f. Deliberately concealing its knowledge concerning the deleterious impact that EtO inhalation exposure has on those who live or work in the Willowbrook community;

g. By subjecting Plaintiff and those who live and work nearby its Willowbrook facility to an elevated cancer risk without warning them of the same.

96. As a direct and proximate result of one or more of the foregoing acts or omissions, Plaintiff was exposed to and inhaled great amounts of EtO while living in the Willowbrook community.

97. As a direct and proximate result of Plaintiff's inhalation of EtO from Sterigenics facility, she developed Sjogren's syndrome and lobular carcinoma breast cancer which has caused and will continue to cause Plaintiff to incur and endure medical bills, lost wages, pain and suffering, mental anguish, disability, disfigurement, reduced life expectancy, and a loss of her normal life.

WHEREFORE Plaintiff, SHAWN FORNEK, respectfully requests that judgment be entered in her favor and against Sterigenics U.S., LLC in an amount be determined by a trier of fact.

### COUNT V
### Ultrahazardous Activity / Strict Liability – Sterigenics U.S., LLC

98.     Plaintiff incorporates by reference all allegations contained in Paragraphs 1 through 71 and 73 and 74 as if fully set forth as Paragraph 98.

99.     Sterigenics U.S., LLC's use and emission of EtO from its Willowbrook facility constitutes an ultra-hazardous activity.

100.    Sterigenics U.S., LLC's use and emission of EtO created a high degree of risk to those who live and work and the surrounding area. Further, the likelihood of cancer caused by its use and emission of EtO is as much as 64 times the level of acceptable risk.

101.    Sterigenics U.S., LLC's use and emission of EtO is especially inappropriate given the area in which it is located; namely, within a densely populated residential area, and among schools, municipal buildings, and parks.

102.    While the activities conducted by Sterigenics U.S., LLC are exceedingly dangerous, it offers little to no value to the surrounding community.

103.    Because the activities of Sterigenics U.S., LLC are ultrahazardous, it is strictly liable for any injuries proximately resulting therefrom.

104.    As a direct and proximate result of Sterigenics U.S., LLC's ultrahazardous activities, Plaintiff was exposed to and inhaled great amounts of EtO while living in the Willowbrook community.

105.    As a direct and proximate result of Plaintiff's inhalation of EtO from Sterigenics facility, she developed Sjogren's syndrome and lobular carcinoma breast cancer which has caused and will continue to cause Plaintiff to incur and endure

medical bills, lost wages, pain and suffering, mental anguish, disability, disfigurement, reduced life expectancy, and a loss of her normal life.

WHEREFORE Plaintiff, SHAWN FORNEK, respectfully requests that judgment be entered in her favor and against Sterigenics U.S., LLC in an amount be determined by a trier of fact.

## COUNT VI
### Civil Battery – Sterigenics U.S., LLC

106. Plaintiff incorporates by reference all allegations contained in Paragraphs 1 through 71 and 73 and 74 as if fully set forth as Paragraph 106.

107. At all relevant times, Sterigenics U.S., LLC knew or should have known that the EtO gas emitting from its Willowbrook facility would have a toxic, poisonous, and highly deleterious effect upon the health, safety, and well-being of persons breathing it.

108. Notwithstanding this knowledge, Sterigenics U.S., LLC caused and/or set in motion events that caused EtO to come in contact with Plaintiff.

109. Plaintiff's contact with EtO was offensive and harmful.

110. Sterigenics U.S., LLC intended to emit EtO into the air with knowledge that it would contact those who live and work in the area surrounding its Willowbrook facility.

111. Plaintiff did not consent to contact with EtO emitted from the Sterigenics facility.

34

112.     As a direct and proximate result of Sterigenics U.S., LLC's emission of EtO, Plaintiff was contacted by EtO without her consent and was thereby exposed to and inhaled great amounts of EtO while living in the Willowbrook community.

113.     As a direct and proximate result of Plaintiff's inhalation of EtO from Sterigenics facility, she developed Sjogren's syndrome and lobular carcinoma breast cancer which has caused and will continue to cause Plaintiff to incur and endure medical bills, lost wages, pain and suffering, mental anguish, disability, disfigurement, reduced life expectancy, and a loss of her normal life.

WHEREFORE Plaintiff, SHAWN FORNEK, respectfully requests that judgment be entered in her favor and against Sterigenics U.S., LLC in an amount be determined by a trier of fact.

## COUNT VII
### Public Nuisance – Sterigenics U.S., LLC

114.     Plaintiff incorporates by reference all allegations contained in Paragraphs 1 through 71 and 73 and 74 as if fully set forth as Paragraph 114.

115.     The general public has a common right to breathe clean air without dangerous levels of carcinogens such as EtO. The Illinois Constitution guarantees these rights to its citizens. Article XI of the Illinois Constitution of 1970, Environment, Section 1, Public Policy - Legislative Responsibility, provides that:

> The public policy of the State and the duty of each person is to provide and maintain a healthful environment for the benefit of this and future generations. The General Assembly shall provide by law for the implementation and enforcement of this public policy.

Article XI of the Illinois Constitution of 1970, Environment, Section 2, Rights of Individuals, provides that:

> Each person has the right to a healthful environment. Each person may enforce this right against any party, governmental or private, through appropriate legal proceedings subject to reasonable limitation and regulation as the General Assembly may provide by law.

116.   Sterigenics U.S., LLC's use and emission of EtO from its Willowbrook facility substantially and unreasonably infringes upon and/or transgresses this public right. In particular, the activities of Sterigenics U.S., LLC has caused those who live and work in the area surrounding its Willowbrook facility to breathe air containing high levels of EtO on a routine and constant basis, and further, to be exposed to air causing a substantially elevated risk of cancer.

117.   Sterigenics U.S., LLC's use and emission of EtO is especially inappropriate given the area in which it is located; namely, within a densely populated residential area, and among schools, municipal buildings, and parks.

118.   As a result of Sterigenics U.S., LLC's use and emission of EtO, Plaintiff was exposed to and inhaled great amounts of EtO while living in the Willowbrook community.

119.   As a direct and proximate result of Plaintiff's inhalation of EtO from Sterigenics facility, she developed Sjogren's syndrome and lobular carcinoma breast cancer which has caused and will continue to cause Plaintiff to incur and endure medical bills, lost wages, pain and suffering, mental anguish, disability, disfigurement, reduced life expectancy, and a loss of her normal life.

WHEREFORE Plaintiff, SHAWN FORNEK, respectfully requests that judgment be entered in her favor and against Sterigenics U.S., LLC in an amount be determined by a trier of fact.

## COUNT IX
### Negligence – Bob Novak

120. Plaintiff incorporates by reference all allegations contained in Paragraphs 1 through 71 as if fully set forth as Paragraph as if fully set forth as Paragraph 120.

121. Since August 2003, Bob Novak has been the Operations Manager at the Sterigenics facility in Willowbrook.

122. In that capacity, Bob Novak has been responsible for the operation of the facility, coordinating and overseeing all activities in plant operations, which would include testing and analysis to determine the nature and extent of EtO emissions.

123. At all relevant times, Bob Novak had and continues to have a duty to exercise ordinary care for the health, safety, and well-being of Plaintiff and those living and working in the area surrounding the Sterigenics facility in Willowbrook.

124. At all relevant times, Bob Novak knew or should have known that the EtO gas emitting from the Sterigenics facility in Willowbrook facility would have a toxic, poisonous, and highly deleterious effect upon the health, safety, and well-being of persons breathing it.

125. Bob Novak breached his duty and failed to exercise ordinary care of the health and well-being of Plaintiff in one or more of the following ways:

a. Permitting chamber doors to remain open during and/or after the sterilization process and thereby allowing dangerous amounts of ethylene oxide to escape the chamber area in the Sterigenics facility in Willowbrook;

b. Permitting products that have been sterilized and are still off-gassing to be placed and stored in areas without pollution control and/or adequate ventilation system in the Sterigenics facility in Willowbrook;

c. Allowing at least six chambers to run at the same time and thereby overloading the vacuum system such that pollution control for one or more chambers was inoperable and/or ineffective in the Sterigenics facility in Willowbrook;

d. Allowing exterior doors in the warehouse to remain open for unreasonable lengths of time in the Sterigenics facility in Willowbrook;

e. Failing to timely order and/or replace filters for the dry system and thereby allowing excess amounts of ethylene oxide emissions therefrom in the Sterigenics facility in Willowbrook;

f. Failing to properly monitor EtO emissions and/or document EtO emissions resulting in an inaccurate report on pollution relating to the Sterigenics facility in Willowbrook;

g. By failing to employ safe methods to adequately control, reduce, minimize, and/or mitigate EtO emissions from its Willowbrook facility;

h. By permitting emissions of excessive, unnecessary, and/or dangerous volumes of EtO into air from the Sterigenics facility in Willowbrook; and

i. By subjecting Plaintiff and those who live and work nearby the Sterigenics facility in Willowbrook to an elevated cancer risk.

126. As a direct and proximate result of one or more of the foregoing acts or omissions, Plaintiff was exposed to and inhaled great amounts of EtO while living in the Willowbrook community.

127.   As a direct and proximate result of Plaintiff's inhalation of EtO from Sterigenics facility, she developed Sjogren's syndrome and lobular carcinoma breast cancer which has caused and will continue to cause Plaintiff to incur and endure medical bills, lost wages, pain and suffering, mental anguish, disability, disfigurement, reduced life expectancy, and a loss of her normal life.

WHEREFORE Plaintiff, SHAWN FORNEK, respectfully requests that judgment be entered in her favor and against BOB NOVAK in an amount be determined by a trier of fact.

### COUNT X
### Willful and Wanton Conduct – Bob Novak

128.   Plaintiff incorporates by reference all allegations contained in Paragraphs 1 through 71 and 121 and 122 as if fully set forth as Paragraph as if fully set forth as Paragraph 128.

129.   At all relevant times, Bob Novak had and continues to have a duty to refrain from willful and wanton conduct and/or conduct that exhibits an utter indifference and/or conscious disregard to the health, safety, and well-being of Plaintiff and those living and working in the area surrounding Sterigenics Willowbrook facility.

130.   At all relevant times, Bob Novak knew that EtO gas emitting from Sterigenics Willowbrook facility would have a toxic, poisonous, and highly deleterious effect upon the health, safety, and well-being of persons breathing it.

131.   Bob Novak breached his duty and was guilty of willful and wanton conduct in one or more of the following ways:

a. By approving test results and/or monitoring systems which provided misleading and inaccurate report on pollution relating to the Sterigenics facility in Willowbrook;

b. By permitting emissions of EtO into the air from Sterigenics Willowbrook facility notwithstanding his knowledge that EtO is toxic, poisonous, and causes adverse medical issues including, but not limited to, cancer;

c. By failing to warn or advise Plaintiff, as well as those who live or work in the Willowbrook community, that they were being exposed to EtO notwithstanding his knowledge that EtO is toxic, poisonous, and causes adverse medical issues including, but not limited to, cancer;

d. By failing to a warn or advise Plaintiff, as well as those who live or work in the Willowbrook community, that they were breathing in EtO notwithstanding his knowledge that EtO is toxic, poisonous, and causes adverse medical issues including, but not limited to, cancer;

e. Deliberately concealing his knowledge concerning the deleterious impact that EtO inhalation exposure has on those who live or work in the Willowbrook community;

f. By subjecting Plaintiff and those who live and work nearby Sterigenics Willowbrook facility to an elevated cancer risk without warning them of the same.

132. As a direct and proximate result of one or more of the foregoing acts or omissions, Plaintiff was exposed to and inhaled great amounts of EtO while living in the Willowbrook community.

133. As a direct and proximate result of Plaintiff's inhalation of EtO from Sterigenics facility, she developed Sjogren's syndrome and lobular carcinoma breast cancer which has caused and will continue to cause Plaintiff to incur and endure medical bills, lost wages, pain and suffering, mental anguish, disability, disfigurement, reduced life expectancy, and a loss of her normal life.

WHEREFORE Plaintiff, SHAWN FORNEK, respectfully requests that judgment be entered in her favor and against BOB NOVAK in an amount be determined by a trier of fact.

## COUNT XI
### Negligence – Roger Clark

134.   Plaintiff incorporates by reference all allegations contained in Paragraphs 1 through 71 as if fully set forth as Paragraph 134.

135.   Roger Clark was the Maintenance Supervisor at the Sterigenics facility in Willowbrook from the late 1980s until approximately 2015.

136.   In that capacity, Roger Clark was responsible for calibrating the internal EtO monitors and overseeing the sterilization process at the Sterigenics facility in Willowbrook.

137.   At all relevant times, Roger Clark had a duty to exercise ordinary care for the health, safety, and well-being of Plaintiff and those living and working in the area surrounding the Sterigenics facility in Willowbrook.

138.   At all relevant times, Roger Clark knew or should have known that the EtO gas emitting from the Sterigenics facility in Willowbrook facility would have a toxic, poisonous, and highly deleterious effect upon the health, safety, and well-being of persons breathing it.

139.   Roger Clark breached his duty and failed to exercise ordinary care of the health and well-being of Plaintiff in one or more of the following ways:

      a. Inaccurately calibrating internal EtO monitors to allow for erroneous monitoring results;

41

b. Failing to properly monitor EtO emissions and/or document EtO emissions resulting in an inaccurate report on pollution relating to the Sterigenics facility in Willowbrook;

c. Permitting chamber doors to remain open during and/or after the sterilization process and thereby allowing dangerous amounts of ethylene oxide to escape the chamber area in the Sterigenics facility in Willowbrook;

d. Permitting products that have been sterilized and are still off-gassing to be placed and stored in areas without pollution control and/or adequate ventilation system in the Sterigenics facility in Willowbrook;

e. Allowing at least six chambers to run at the same time and thereby overloading the vacuum system such that pollution control for one or more chambers was inoperable and/or ineffective in the Sterigenics facility in Willowbrook;

f. Allowing exterior doors in the warehouse to remain open for unreasonable lengths of time in the Sterigenics facility in Willowbrook;

g. Failing to timely order and/or replace filters for the dry system and thereby allowing excess amounts of ethylene oxide emissions therefrom in the Sterigenics facility in Willowbrook;

h. By failing to employ safe methods to adequately control, reduce, minimize, and/or mitigate EtO emissions from its Willowbrook facility;

i. By permitting emissions of excessive, unnecessary, and/or dangerous volumes of EtO into air from the Sterigenics facility in Willowbrook; and

j. By subjecting Plaintiff and those who live and work nearby the Sterigenics facility in Willowbrook to an elevated cancer risk.

140. As a direct and proximate result of one or more of the foregoing acts or omissions, Plaintiff was exposed to and inhaled great amounts of EtO while living in the Willowbrook community.

42

141. As a direct and proximate result of Plaintiff's inhalation of EtO from Sterigenics facility, she developed Sjogren's syndrome and lobular carcinoma breast cancer which has caused and will continue to cause Plaintiff to incur and endure medical bills, lost wages, pain and suffering, mental anguish, disability, disfigurement, reduced life expectancy, and a loss of her normal life.

WHEREFORE Plaintiff, SHAWN FORNEK, respectfully requests that judgment be entered in her favor and against ROGER CLARK in an amount be determined by a trier of fact.

## COUNT XII
### Willful and Wanton Conduct – Roger Clark

142. Plaintiff incorporates by reference all allegations contained in Paragraphs 1 through 71 and 135 and 136 as if fully set forth as Paragraph 142.

143. At all relevant times, Roger Clark had a duty to refrain from willful and wanton conduct and/or conduct that exhibits an utter indifference and/or conscious disregard to the health, safety, and well-being of Plaintiff and those living and working in the area surrounding Sterigenics Willowbrook facility.

144. At all relevant times, Roger Clark knew that EtO gas emitting from Sterigenics Willowbrook facility would have a toxic, poisonous, and highly deleterious effect upon the health, safety, and well-being of persons breathing it.

145. Roger Clark breached his duty and was guilty of willful and wanton conduct in one or more of the following ways:

    a. By deliberately falsifying test results and/or inaccurately calibrating monitoring systems to provide a misleading and

43

inaccurate report on pollution relating to the Sterigenics facility in Willowbrook;

b. By permitting emissions of EtO into the air from Sterigenics Willowbrook facility notwithstanding his knowledge that EtO is toxic, poisonous, and causes adverse medical issues including, but not limited to, cancer;

c. By failing to warn or advise Plaintiff, as well as those who live or work in the Willowbrook community, that they were being exposed to EtO notwithstanding his knowledge that EtO is toxic, poisonous, and causes adverse medical issues including, but not limited to, cancer;

d. By failing to a warn or advise Plaintiff, as well as those who live or work in the Willowbrook community, that they were breathing in EtO notwithstanding his knowledge that EtO is toxic, poisonous, and causes adverse medical issues including, but not limited to, cancer;

e. Deliberately concealing his knowledge concerning the deleterious impact that EtO inhalation exposure has on those who live or work in the Willowbrook community;

f. By subjecting Plaintiff and those who live and work nearby Sterigenics Willowbrook facility to an elevated cancer risk without warning them of the same.

146. As a direct and proximate result of one or more of the foregoing acts or omissions, Plaintiff was exposed to and inhaled great amounts of EtO while living in the Willowbrook community.

147. As a direct and proximate result of Plaintiff's inhalation of EtO from Sterigenics facility, she developed Sjogren's syndrome and lobular carcinoma breast cancer which has caused and will continue to cause Plaintiff to incur and endure medical bills, lost wages, pain and suffering, mental anguish, disability, disfigurement, reduced life expectancy, and a loss of her normal life.

WHEREFORE Plaintiff, SHAWN FORNEK, respectfully requests that judgment be entered in her favor and against ROGER CLARK in an amount be determined by a trier of fact.

## COUNT XIII
### Negligence – GTCR, LLC

148. Plaintiff incorporates by reference all allegations contained in Paragraphs 1 through 71 as if fully set forth as Paragraph 148.

149. GTCR, LLC owned and operated the Sterigenics facility in Willowbrook, Illinois, during a material portion of time since 2011.

150. Sterigenics U.S., LLC managed, controlled, and supervised sterilization operations at the Sterigenics facility in Willowbrook, Illinois, during a material portion of time since 1984.

151. GTCR, LLC had and continues to have a duty to exercise ordinary care for the health, safety, and well-being of Plaintiff and those living and working in the area surrounding its Willowbrook facility.

152. At all relevant times, GTCR, LLC knew or should have known that the EtO gas emitting from its Willowbrook facility would have a toxic, poisonous, and highly deleterious effect upon the health, safety, and well-being of persons breathing it.

153. GTCR, LLC breached its duty and failed to exercise ordinary care of the health and well-being of Plaintiff in one or more of the following ways:

   a. By emitting EtO into the air from its Willowbrook facility;

b. By emitting excessive, unnecessary, and/or dangerous volumes of EtO into air from its Willowbrook facility;

c. By using EtO as part of its sterilization process when safer alternatives could accomplish the same or similar business purpose without presenting the same level of risk to human health and well-being;

d. By placing its own economic interests above the health and well-being of those who live or work in the Willowbrook community;

e. By failing to warn or advise Plaintiff, as well as those who live or work in the Willowbrook community, that they were being exposed to EtO;

f. By failing to warn or advise Plaintiff, as well as those who live or work in the Willowbrook community, that they were breathing in EtO;

g. By failing to warn or advise Plaintiff, as well as those who live or work in the Willowbrook community, that it was emitting a known carcinogen into the air from its facility in Willowbrook;

h. By failing to employ safe methods to adequately control, reduce, minimize, and/or mitigate EtO emissions from its Willowbrook facility;

i. By failing to adequately study and test the effect of its EtO emissions from its Willowbrook facility on the quality of air;

j. By failing to adequately study and test the effect of its EtO emissions from its Willowbrook facility on the health and well-being of those who live and work in the Willowbrook community; and

k. By subjecting Plaintiff and those who live and work nearby its Willowbrook facility to an elevated cancer risk.

154. As a direct and proximate result of one or more of the foregoing acts or omissions, Plaintiff was exposed to and inhaled great amounts of EtO while living in the Willowbrook community.

46

155.     As a direct and proximate result of Plaintiff's inhalation of EtO from Sterigenics facility, she developed Sjogren's syndrome and lobular carcinoma breast cancer which has caused and will continue to cause Plaintiff to incur and endure medical bills, lost wages, pain and suffering, mental anguish, disability, disfigurement, reduced life expectancy, and a loss of her normal life.

WHEREFORE Plaintiff, SHAWN FORNEK, respectfully requests that judgment be entered in her favor and against GTCR, LLC in an amount be determined by a trier of fact.

## COUNT XIV
### Willful and Wanton Conduct – GTCR, LLC

156.     Plaintiff incorporates by reference all allegations contained in Paragraphs 1 through 71 and 149 and 150 as if fully set forth as Paragraph 156.

157.     At all relevant times, GTCR, LLC had and continues to have a duty to refrain from willful and wanton conduct and/or conduct that exhibits an utter indifference and/or conscious disregard to the health, safety, and well-being of Plaintiff and those living and working in the area surrounding Sterigenics Willowbrook facility.

158.     At all relevant times, GTCR, LLC knew that EtO gas emitting from Sterigenics Willowbrook facility would have a toxic, poisonous, and highly deleterious effect upon the health, safety, and well-being of persons breathing it.

159.     GTCR, LLC breached its duty and was guilty of willful and wanton conduct in one or more of the following ways:

47

a. By permitting emissions of EtO into the air from Sterigenics Willowbrook facility notwithstanding his knowledge that EtO is toxic, poisonous, and causes adverse medical issues including, but not limited to, cancer;

b. By failing to warn or advise Plaintiff, as well as those who live or work in the Willowbrook community, that they were being exposed to EtO notwithstanding his knowledge that EtO is toxic, poisonous, and causes adverse medical issues including, but not limited to, cancer;

c. By failing to a warn or advise Plaintiff, as well as those who live or work in the Willowbrook community, that they were breathing in EtO notwithstanding his knowledge that EtO is toxic, poisonous, and causes adverse medical issues including, but not limited to, cancer;

d. By permitting emissions of EtO, a known carcinogen, into the air from its Willowbrook facility before fully studying, researching, or understanding the deleterious impact that EtO inhalation exposure has on the health, safety, and well-being of those in the surrounding area;

e. Deliberately concealing his knowledge concerning the deleterious impact that EtO inhalation exposure has on those who live or work in the Willowbrook community;

f. By subjecting Plaintiff and those who live and work nearby Sterigenics Willowbrook facility to an elevated cancer risk without warning them of the same.

160. As a direct and proximate result of one or more of the foregoing acts or omissions, Plaintiff was exposed to and inhaled great amounts of EtO while living in the Willowbrook community.

161. As a direct and proximate result of Plaintiff's inhalation of EtO from Sterigenics facility, she developed Sjogren's syndrome and lobular carcinoma breast cancer which has caused and will continue to cause Plaintiff to incur and endure

48

medical bills, lost wages, pain and suffering, mental anguish, disability, disfigurement, reduced life expectancy, and a loss of her normal life.

WHEREFORE Plaintiff, SHAWN FORNEK, respectfully requests that judgment be entered in her favor and against GTCR, LLC in an amount be determined by a trier of fact.

## COUNT XV
### Ultrahazardous Activity / Strict Liability – GTCR, LLC

162. Plaintiff incorporates by reference all allegations contained in Paragraphs 1 through 71 and 149 and 150 as if fully set forth as Paragraph 162.

163. GTCR, LLC's use and emission of EtO from its Willowbrook facility constitutes an ultra-hazardous activity.

164. GTCR, LLC's use and emission of EtO created a high degree of risk to those who live and work and the surrounding area. Further, the likelihood of cancer caused by its use and emission of EtO is as much as 64 times the level of acceptable risk.

165. GTCR, LLC's use and emission of EtO is especially inappropriate given the area in which it is located; namely, within a densely populated residential area, and among schools, municipal buildings, and parks.

166. While the activities conducted by GTCR, LLC are exceedingly dangerous, it offers little to no value to the surrounding community.

167. Because the activities of GTCR, LLC are ultrahazardous, it is strictly liable for any injuries proximately resulting therefrom.

49

168.    As a direct and proximate result of GTCR, LLC's ultrahazardous activities, Plaintiff was exposed to and inhaled great amounts of EtO while living in the Willowbrook community.

169.    As a direct and proximate result of Plaintiff's inhalation of EtO from Sterigenics facility, she developed Sjogren's syndrome and lobular carcinoma breast cancer which has caused and will continue to cause Plaintiff to incur and endure medical bills, lost wages, pain and suffering, mental anguish, disability, disfigurement, reduced life expectancy, and a loss of her normal life.

WHEREFORE Plaintiff, SHAWN FORNEK, respectfully requests that judgment be entered in her favor and against GTCR, LLC in an amount be determined by a trier of fact.

## COUNT XVI
### Civil Battery – GTCR, LLC

170.    Plaintiff incorporates by reference all allegations contained in Paragraphs 1 through 71 and 149 and 150 as if fully set forth as Paragraph 170.

171.    At all relevant times, GTCR, LLC knew or should have known that the EtO gas emitting from its Willowbrook facility would have a toxic, poisonous, and highly deleterious effect upon the health, safety, and well-being of persons breathing it.

172.    Notwithstanding this knowledge, GTCR, LLC caused and/or set in motion events that caused EtO to come in contact with Plaintiff.

173.    Plaintiff's contact with EtO was offensive and harmful.

50

174. GTCR, LLC intended to emit EtO into the air with knowledge that it would contact those who live and work in the area surrounding its Willowbrook facility.

175. Plaintiff did not consent to contact with EtO emitted from the Sterigenics facility.

176. As a direct and proximate result of GTCR, LLC's emission of EtO, Plaintiff was contacted by EtO without her consent and was thereby exposed to and inhaled great amounts of EtO while living in the Willowbrook community.

177. As a direct and proximate result of Plaintiff's inhalation of EtO from Sterigenics facility, she developed Sjogren's syndrome and lobular carcinoma breast cancer which has caused and will continue to cause Plaintiff to incur and endure medical bills, lost wages, pain and suffering, mental anguish, disability, disfigurement, reduced life expectancy, and a loss of her normal life.

WHEREFORE Plaintiff, SHAWN FORNEK, respectfully requests that judgment be entered in her favor and against GTCR, LLC in an amount be determined by a trier of fact.

## COUNT XVII
### Public Nuisance – GTCR, LLC

178. Plaintiff incorporates by reference all allegations contained in Paragraphs 1 through 71 and 149 and 150 as if fully set forth as Paragraph 178.

179. The general public has a common right to breathe clean air without dangerous levels of carcinogens such as EtO.

180.    GTCR, LLC's use and emission of EtO from its Willowbrook facility substantially and unreasonably infringes upon and/or transgresses this public right. In particular, the activities of Sterigenics U.S., LLC has caused those who live and work in the area surrounding its Willowbrook facility to breathe air containing high levels of EtO on a routine and constant basis, and further, to be exposed to air causing a substantially elevated risk of cancer.

181.    GTCR, LLC's use and emission of EtO is especially inappropriate given the area in which it is located; namely, within a densely populated residential area, and among schools, municipal buildings, and parks.

182.    As a result of GTCR, LLC's use and emission of EtO, Plaintiff was exposed to and inhaled great amounts of EtO while living in the Willowbrook community.

183.    As a direct and proximate result of Plaintiff's inhalation of EtO from Sterigenics facility, she developed Sjogren's syndrome and lobular carcinoma breast cancer which has caused and will continue to cause Plaintiff to incur and endure medical bills, lost wages, pain and suffering, mental anguish, disability, disfigurement, reduced life expectancy, and a loss of her normal life.

WHEREFORE Plaintiff, SHAWN FORNEK, respectfully requests that judgment be entered in her favor and against GTCR, LLC in an amount be determined by a trier of fact.

Dated: November 1, 2018

Respectfully submitted

By: s/Brian LaCien
Attorneys for Plaintiff

Todd A. Smith, tsmith@prslaw.com
Brian LaCien, blacien@prslaw.com
POWER, ROGERS & SMITH, LLP
70 West Madison Street, 55th Floor
Chicago, IL 60602-4212
Phone: (312) 236-9381
Fax: (312) 236-0920

53

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

SHAWN FORNEK,

        Plaintiff,

        v.

STERIGENICS U.S., LLC; BOB NOVAK; ROGER CLARK;
AND GTCR LLC,

        Defendants.

No: 2018 L 010744

## AFFIDAVIT REGARDING DAMAGES SOUGHT

Plaintiff SHAWN FORNEK, by her attorneys, Brian LaCien, being first duly sworn under oath, states as follows:

1.     That the affiant is one of the attorneys of record for the Plaintiff in this matter.

2.     That the total money damages sought in this civil action exceed the amount of $50,000.00.

Further Affiant Sayeth Not.

_____
BRIAN LACIEN

SUBSCRIBED AND SWORN to before me
this 1st day of __November__, 2018.

_____
NOTARY PUBLIC

DONNA L SYMANSKI
Official Seal
Notary Public - State of Illinois
My Commission Expires Jun 13, 2020

POWER ROGERS & SMITH, LLP
70 W. Madison Street, 55th Floor
Chicago, IL  60602-4212
312-236-9381
31444

FILED DATE: 11/1/2018 5:01 PM  2018L011004

DONNA L SYMANSKI
Official Seal
Notary Public - State of Illinois
My Commission Expires Jun 13, 2020

**12-Person Jury**

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS                    12/14/92 CCL-0520
COUNTY DEPARTMENT - LAW DIVISION

SHAWN FORNEK,
          V.                                                          FILED
STERIGENICS U.S. LLC, et al.,                    No.                  10/10/2018 5:12 PM
                                                                      DOROTHY BROWN
                                                                      CIRCUIT CLERK
                                                                      COOK COUNTY, IL
                              CIVIL ACTION COVER SHEET                2018L011004

A Civil Action Cover Sheet shall be filed with the complaint in all civil actions in the Law Division. The information contained herein is for administrative purposes only and cannot be introduced into evidence. Please check the box in front of the appropriate general category and then check the sub-category thereunder, if applicable, which best characterizes your action.

[X] Jury Demand - Fee Paid
[ ] Jury Demand - No Fee Required

[X] PERSONAL INJURY/WRONGFUL DEATH          [ ] COMMERCIAL LITIGATION

   [ ] 027 Motor Vehicle                          [ ] 002 Breach of Contract
   [ ] 040 Medical Malpractice                     [ ] 070 Professional Malpractice
   [ ] 047 Asbestos                                (other than legal or medical)
   [ ] 048 Dram Shop                               [ ] 071 Fraud
   [ ] 049 Product Liability                       [ ] 072 Consumer Fraud
   [ ] 051 Construction Injuries                   [ ] 073 Breach of Warranty
     (including Structural Work Act, Road        [ ] 074 Statutory Action
     Construction Injuries Act and negligence)        (Please Specify)
   [ ] 052 Railroad/FELA                           _____
   [X] 061 Other Personal Injury/Wrongful Death
   [ ] 063 Intentional Tort
   [ ] 064 Miscellaneous Statutory Action          [ ] 075 Other Commercial Litigation
     (Please Specify)                               (Please Specify)

   _____                        _____

   [ ] 065 Premises Liability
                                                   [ ] 076 Retaliatory Discharge

[ ] 062 PROPERTY DAMAGE

[ ] 066 LEGAL MALPRACTICE                        [ ] 077 LIBEL/SLANDER

[ ] MISCELLANEOUS REMEDIES
   [ ] 007 Confession of Judgment
   [ ] 008 Replevin
   [ ] 009 Tax
   [ ] 015 Condemnation
   [ ] 017 Detinue
   [ ] 018 Distress for Rent
   [ ] 036 Administrative Review Action
   [ ] 041 Class Action
   [ ] 084 Petition to Issue Subpoena            By:  s/Brian LaCien
   [ ] 085 Petition to Register Foreign Judgment    _____
   [ ] 099 All other Extraordinary Remedies          (Attorney)     (Pro-Se)
   [ ] 100 Petition for Discovery                   70 W. Madison Street, 55th Floor
                                                   Chicago, IL 60602-4212
                                                   312-236-9381

                    [ ] PLEASE CHECK IF THIS IS A SUBROGATION ACTION

1910 - No Fee Paid
1919 - Fee Paid
JURY DEMAND                                           CCG-67 (2-81)

---

### IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
### COUNTY DEPARTMENT, LAW DIVISION

FILED
10/10/2018 5:12 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2018L011004

| | | |
|---|---|---|
| SHAWN FORNEK, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No.   2018L011004 |
| | ) | |
| STERIGENICS U.S. LLC; | ) | |
| GTCR LLC; and | ) | |
| ROBERT D. NOVAK, | ) | |
| | ) | |
| Defendant. | ) | |

### JURY DEMAND

The undersigned demands a jury trial.

s/Brian LaCien
Attorney for Plaintiff(s)

| | |
|---|---|
| Name | POWER ROGERS & SMITH, LLP |
| | Todd A. Smith and Brian LaCien |
| Attorney for | Plaintiff(s) |
| Address | 70 West Madison Street, 55th Floor |
| City | Chicago, Illinois  60602 |
| Telephone | 312-236-9381 |
| Atty. No. | 31444 |

---

DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

FILED DATE: 10/10/2018 5:12 PM   2018L011004

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

SHAWN FORNEK

          Plaintiff,

    v.

STERIGENICS U.S. LLC;
GTCR LLC; and
ROBERT D. NOVAK.

          Defendants.

No.

## COMPLAINT AT LAW

Plaintiff, SHAWN FORNEK, by and through her attorneys, POWER ROGERS & SMITH, LLP, state as follows for her complaint against Defendants STERIGENICS U.S. LLC ("Sterigenics"); GTCR LLC ("GTCR"); and ROBERT D. NOVAK.

### NATURE OF THE ACTION

1.      This cause of action arises out of Sterigenics' decades long emissions of ethylene oxide ("EtO") from its facility in Willowbrook, Illinois. The Sterigenics plant is used to sterilize medical devices, pharmaceuticals, and food products by placing them into sealed chambers, which are then sprayed with EtO, a powerful sterilizing agent. EtO is a highly flammable, colorless gas and has been a known human carcinogen for decades.

2.      Since 1984, Sterigenics has willfully and negligently released hazardous levels of EtO from its Willowbrook facility into the air, where it has drifted into homes, workplaces, and schools.

1

3.      Both the Environmental Protection Agency (EPA) and the World Health Organization (WHO) classify EtO as a "'carcinogenic to humans' by the inhalation route of exposure" and find sufficient evidence to establish a causal relationship between EtO exposure and breast, lymphatic, and hematopoietic cancers in humans.[1]

4.      On August 21, 2018, the U.S. Department of Health and Human Services' (HHS) Agency for Toxic Substances and Disease Registry (ATSDR) publicly released an "Evaluation of Potential Impacts for Ethylene Oxide Emissions" analyzing whether the emissions of the Sterigenics Willowbrook facility "pose a public health problem." (See U.S. H.H.S.' "Evaluation of Potential Health Impacts from Ethylene Oxide Emissions," attached as Exhibit A).

5.      The ATSDR's evaluation found that Sterigenics' EtO emissions were not merely a public health problem, **they posed a high enough cancer risk to qualify as a "public health hazard."** (Ex. A, pg. 2). The ATSDR arrived at this conclusion based on air sampling it conducted in areas immediately surrounding the Willowbrook Sterigenics facility to estimate current EtO exposures. As a result of this finding, the ATSDR urged that "Sterigenics take immediate action to reduce EtO emissions at this facility" (Ex. A, pg. 12).

6.      Sterigenics' EtO emissions have exposed Plaintiff to unacceptable levels of cancer risk. The EPA generally considers the maximum "acceptable risk" for air toxics to be roughly 100 per million (i.e., for every one million people exposed, 100 will develop cancer over their lifetimes).[2] However, the 2014 EPA National Air Toxics Assessment (NATA) released on August 22, 2018 found the lifetime cancer risk in the tract of land upon which the Sterigenics

---

[1] https://cfpub.epa.gov/ncea/iris/iris_documents/documents/subst/1025_summary.pdf &
https://monographs.iarc.fr/wp-content/uploads/2018/06/mono100F-28.pdf *(both accessed 9.25.2018)*.
[2] https://www.epa.gov/national-air-toxics-assessment/nata-frequent-questions *accessed 9.25.2018.*

2

facility sits (Tract ID # 17043845902) to be 281.8075 per million, almost three times the maximum acceptable level.

7.     But the August 21, 2018 ATSDR report found that even these concerning estimates of cancer risk were too low. The ATSDR used its 2018 air sampling to calculate that Sterigenics' EtO emissions caused "an additional lifetime risk of 6.4 cancers in a population of 1,000 residents who could be exposed to EtO emissions from Sterigenics." (Ex. A., pg. 10). This is equivalent to 6,400 per million, placing the Willowbrook area's cancer risk at **64 times the EPA's maximum acceptable risk level.**

8.     Moreover, historical EPA emission reports from the Willowbrook Sterigenics facility demonstrate that the amounts of EtO released from the plant over the last decade are significantly lower than the amounts released during prior decades. Total air releases in the 1990s were up to **7.7 times higher** than present levels. Sterigenics' EtO releases in the 1980s were even higher than this, with available data suggesting that Sterigenics released **over 20 times more** EtO into the air in 1988 than it did in 2016, the most recent date for which emissions data is publicly available. As a result, the ATSDR report's current estimate of Willowbrook area residents' cancer risk (which is based on sampling conducted this year) must drastically underestimate of the levels of risk faced by those exposed to the Sterigenics facility's emissions in the 1980s and 1990s.

9.     Prior to the ATSDR evaluation's release on August 21, 2018 and the 2014 NATA release on August 22, 2018, the risks and impacts associated Sterigenics' EtO emissions were not generally known to the public. As a result, Willowbrook area residents and workers were not apprised of the unique dangers Sterigenics had exposed them to until this time.

FILED DATE: 10/10/2018 5:12 PM   2018L011004

10.     Willowbrook is a southwestern suburb of the city of Chicago with approximately 8,500 residents. The area where the Sterigenics facility is located is in a densely populated metropolitan area, with 19,271 people living within one mile of the facility boundary and tens of thousands more living within a six mile radius. In addition, there are four schools and one daycare facility within a one-mile radius. (U.S. Census, 2016). (Ex. A, pg. 3).

## PARTIES

11.     On and before October 8, 2018, and at all times material, Plaintiff SHAWN FORNEK, has resided at 6645 Wedgewood Lane, Willowbrook, Illinois consistently from 1990 until present day. Prior to that, Plaintiff resided at 415 Wipple Drive, Westmont, Illinois consistently from 1980 until 1990.

12.     Plaintiff SHAWN FORNEK was diagnosed with sjogren's syndrome in 2004 and lobular carcinoma breast cancer in March of 2006.

13.     Sterigenics US LLC is a business specializing in sterilizing medical devices, pharmaceuticals, food and high-performance materials with a headquarters and principal place of business at 2015 Spring Road, Suite 650, Oak Brook, Illinois.

14.     Sterigenics operates two facilities in Willowbrook, Illinois, one at 7775 S. Quincy St. and one at 830 Midway Drive.

15.     GTCR LLC has been an owner of Sterigenics since 2011. GTCR's principal place of business is at 300 N. LaSalle Street, Suite 5600, Chicago, Illinois.

16.     Robert Novak is the Operations Manager at the Sterigenics facility in Willowbrook, and has worked in that capacity since August 2003. He is responsible for the operation of the facility, coordinating and overseeing all activities in plant operations, and overall plant safety.

17.     Robert Novak currently resides at 144 Ridgewood Court, Bolingbrook, Illinois.

4

FILED DATE: 10/10/2018 5:12 PM    2018L011004

## JURISDICTION AND VENUE

18.     This Court has jurisdiction over all Defendants because they are domiciled with their principal place of business in Illinois, and do regular and continuous business in Cook County, Illinois.

19.     Plaintiff currently resides in Illinois.

20.     Venue is proper pursuant to 735 ILCS 5/2-101 because GTCR's principal place of business is at 300 N. LaSalle Street, Suite 5600 Chicago, Illinois and Sterigenics does regular and substantial business in Cook County, Illinois.

## FACTUAL ALLEGATIONS

### A. Ethylene Oxide Exposure Carries a High Risk of Cancer in Humans

21.     The causal link between EtO and human cancer has been documented for decades. EtO is well-known mutagen – the EPA reports that the "DNA-damaging properties of EtO have been studied since the 1940s."[3] Meanwhile, U.S. sterilizer companies became broadly aware of EtO's potential carcinogenic effects in 1977, with most sterilizing companies taking steps to lower worker exposure though better venting in 1978.[4]

22.     Numerous studies have been published demonstrating that EtO causes lymphatic, hematopoietic, brain, lung, connective tissue, uterus, and mammary gland cancers in mice and rats.[5]

---

[3] https://cfpub.epa.gov/ncea/iris/iris_documents/documents/subst/1025_summary.pdf *accessed 9.25.2018.*
[4] Kyle Steenland, et al., "Mortality among workers exposed to ethylene oxide," *The New England Journal of Medicine* 324, no. 20 (1991): 1403.
[5] Kyle Steenland, et al., "Mortality among workers exposed to ethylene oxide," *The New England Journal of Medicine* 324, no. 20 (1991): 1403.

FILED DATE: 10/10/2018 5:12 PM    2018LO11004

23.     The National Institute of Occupational Safety and Health (NIOSH) first raised awareness of the dangers of EtO in a 1977 bulletin aimed at facilities using EtO as a sterilant.[6] NIOSH recommended "that ETO be considered as mutagenic and potentially carcinogenic to humans and that occupational exposure to it be minimized," with alternate sterilization procedures used wherever feasible.[7]

24.     In 1981, NIOSH released a follow-up bulletin titled "Ethylene Oxide (EtO): Evidence of Carcinogenicity," recommending that workplaces regard EtO as "a potential occupational carcinogen" based on the results of an industry-sponsored study.[8]

25.     In 1985, the U.S. HHS National Toxicology Program classified EtO as "reasonably anticipated to be a human carcinogen."[9]

26.     In 1987, the state of California (home to two Sterigenics EtO sterilizing plants)[10] officially designated EtO a carcinogen.[11]

27.     In the early 1990s, the first high quality, long-term research on ethylene oxide's carcinogenic impacts on humans was published. This research was undertaken based on a NIOSH study tracking the mortality of 18,254 U.S. workers who had been exposed to EtO between the 1940s and 1980s at sterilizer plants much like the Sterigenics Willowbrook facility. In fact, according to a Sterigenics employee, the NIOSH study actually included "a couple" of Sterigenics facilities.[12] The NIOSH study ultimately found causal links between exposure to EtO and increased mortality from lymphatic, hematopoietic, and breast cancers. The research

[6] https://www.cdc.gov/niosh/docs/77-200/ accessed 9.25.2018.
[7] https://www.cdc.gov/niosh/pdfs/77-200a.pdf?id=10.26616/NIOSHPUB77200 accessed 9.25.2018.
[8] https://www.cdc.gov/niosh/docs/81-130/ accessed 9.25.2018.
[9] https://ntp.niehs.nih.gov/ntp/roc/content/profiles/ethyleneoxide.pdf accessed 9.25.2018.
[10] https://web.archive.org/web/20180210142202/https://www.sterigenics.com/About_Us/Facilities.php accessed 9.25.2018.
[11] http://articles.latimes.com/1991-03-05/local/me-66_1_toxic-gas accessed 9.25.2018.
[12] https://yosemite.epa.gov/Sab/Sabproduct.nsf/B839FA45582C200185257D9500496B0E/$File/EPA-+Sterigenics+Speaking+Points+for+IRIS+SAB+Review-Nov+2014.pdf accessed 9.25.2018.

on the NIOSH study has since been heavily cited and relied upon by major regulatory organizations, including the WHO and EPA.

28.     The first publication based on this cohort came out in May 1991, finding a "slight but significant increase among men" for hematopoietic cancer with risk of death increasing over time since first exposure to EtO (the study also noted that men were more likely to be exposed to higher amounts of EtO).[13]

29.     In 1994, based in part on this research, the WHO's International Agency for Research on Cancer (IARC) listed EtO as a Group 1 human carcinogen, the agency's highest risk classification[14]

30.     The U.S. HHS National Toxicology Program in turn reclassified EtO as "known to be a human carcinogen" in 2000, updating its previous designation as "reasonably anticipated to be a human carcinogen" from 1985.[15]

31.     The U.S. Department of Labor's Occupational Safety and Health Administration (OSHA) 2002 fact sheet on EtO indicates that "[b]oth human and animal studies show that EtO is a carcinogen" and requires employers to provide clear signs and labels notifying workers of EtO's "carcinogenic and reproductive hazards."[16]

32.     Follow-up research on the NIOSH cohort was published in 2003 and found that EtO was associated with breast cancer in women, with a positive trend of increased cancer risk with increased EtO exposure.[17]

---

[13] Kyle Steenland, et al., "Mortality among workers exposed to ethylene oxide," *The New England Journal of Medicine* 324, no. 20 (1991): 1402.
[14] World Health Organization, "Ethylene Oxide" (2003): 35. *Accessed at* http://www.who.int/ipcs/publications/cicad/en/cicad54.pdf *on 9.25.2018.*
[15] https://ntp.niehs.nih.gov/ntp/roc/content/profiles/ethyleneoxide.pdf *accessed 9.25.2018.*
[16] https://www.osha.gov/OshDoc/data_General_Facts/ethylene-oxide-factsheet.pdf *accessed 9.25.2018.*
[17] Kyle Steenland, et al., "Ethylene oxide and breast cancer incidence in a cohort study of 7576 women (United States)," *Cancer Causes and Control* 14, no. 6 (2003): 531.

FILED DATE: 10/10/2018 5:12 PM    2018L011004

33.     Additional NIOSH cohort research came out the following year (2004), finding increased incidence of hematopoietic cancer with greater EtO exposure among men, particularly in the case of lymphoid tumors. The study also found "a significant excess of bone cancer compared to the US population," a finding supported by some animal studies, but drew no conclusions from this finding due to this finding being based on a small number of deaths.[18]

34.     Subject to extensive lobbying from sterilization companies, the EPA continued to define EtO as "probably carcinogenic to humans" until 2016. Sterigenics took part in these efforts, submitting comments in 2014 seeking to influence the EPA's draft Integrated Risk Information System (IRIS) reassessment of EtO's risks. In a November 12, 2014 letter, Sterigenics' Senior Vice President of Global Environmental, Health & Safety, Kathleen Hoffman, expressed "significant concerns regarding the [EPA's] cancer risk estimates for E[t]O" and argued that "the current assessment [which raised the risks associated with EtO] results in the risk of E[t]O being inappropriately magnified."[19] According to Hoffman, an IRIS assessment closely linking ethylene oxide to cancer risks was problematic because it could "lead to the further regulation of E[t]O exposure." As a result, Hoffman argued that the EPA should not rely too heavily on the NIOSH cohort study that made these causal linkages, even though these conclusions were based in part on the health outcomes of former Sterigenics employees.

---

[18] Kyle Steenland, et al., "Mortality analyses in a cohort of 18 235 ethylene oxide exposed workers: follow up extended from 1987 to 1998," *Occupational & Environmental Medicine* 61, no. 1 (2004): 6-7.

[19] https://yosemite.epa.gov/sab/sabproduct.nsf/BC3AE563588248BC85257D8E00785A32/$File/sterigenics+comments.pdf *accessed 9.25.2018.*

FILED DATE: 10/10/2018 5:12 PM    2018L011004

35.    Kathleen Hoffman is also the President of the Ethylene Oxide Sterilization Association, another group that has lobbied to EPA to maintain lower ethylene oxide cancer risk estimates.[20]

36.    The EPA ultimately rejected industry arguments against increasing the cancer risk associated with EtO. The final IRIS assessment released in 2016 reclassified EtO as "carcinogenic to humans,"[21] representing a "30-fold increase in cancer potency" (Ex. A, pg. 1). This finding brought the EPA assessment in line with other federal agencies' findings.

37.    Based on the foregoing, Sterigenics knew or should have known about the human cancer risks associated with EtO when it first began operating its Willowbrook facility in 1984. Sterigenics took part in and was familiar with the results of the NIOSH cohort study. Moreover, Sterigenics was exposed to NIOSH and OSHA industry guidance on occupational EtO risks as well as regulatory classifications of EtO as a human carcinogen. The company was well aware of existing research and regulation demonstrating that EtO could cause cancer in those who breathed it in.

38.    Yet, as will be detailed below, while Sterigenics took steps to protect its workers by venting EtO from its Willowbrook facility, in so doing it recklessly and negligently released EtO into the air breathed by Plaintiff. Sterigenics failed to take reasonable steps to limit emissions from its Willowbrook plant, exposing those working, residing, and studying nearby to dramatically increased cancer risks.

**B. Sterigenics Has Been Emitting Ethylene Oxide for Decades**

---

[20] https://www.sterigenics.com/services/steripro_consulting/specialization/CV_-_Environmental_Safety.pdf *accessed 9.25.2018.*
[21] https://cfpub.epa.gov/ncea/iris/iris_documents/documents/subst/1025_summary.pdf *accessed 9.25.2018.*

FILED DATE: 10/10/2018 5:12 PM   2018L011004

39.     Sterigenics has operated, maintained, and used its Willowbrook sterilizing facility at 7775 Quincy Street since 1984. The Willowbrook facility consists of two buildings, Building 1 and Building 2, with fifteen and four sterilization chambers respectively. Building 1's chambers were built in 1984 and Building 2's chambers were built in 1999 and 2012 (Ex. A, pg. 2).

40.     Each chamber stores various medical devices, pharmaceuticals, and food products contained on 40" x 48" pallets, which are then sprayed with EtO and other chemical compounds, such as gamma, Ebeam, and x-ray sterilization. (Ex. A, pg. 2). Figure 1, below, roughly illustrates an EtO sterilization process:

**Figure 1: Ethylene Oxide Sterilization Process[22]**



41.     From 1984 to present, the back vents on the Willowbrook plant's sterilization chambers were uncontrolled, allowing uninhibited passive release of EtO into the surrounding environment.

42.     This situation persisted in spite of Sterigenics Vice President of Global Environmental, Health & Safety Kathleen Hoffman's 2014 assertion to the EPA that the EtO

---

[22] https://www.csb.gov/assets/1/20/sterigenics_report.pdf?13828

FILED DATE: 10/10/2018 5:12 PM    2018L011004

sterilizing industry "has utilized emission controls to significantly reduce environmental E[t]O emissions during the past several years."[23] Kathleen Hoffman made this statement in order to convince the EPA there was no reason to raise the cancer risk EtO posed to the public, even as her own company had not implemented such emission controls at its Willowbrook facility and was exposing the public to elevated cancer risks.

43.    Only now, after the ATSDR's recent investigation finding hazardous levels of EtO around its plant, has Sterigenics reportedly begun to install pollution controls to limit passive EtO release (Ex. A, pg. 2).

44.    Therefore, Sterigenics has been passively emitting EtO from its Willowbrook facility into the surrounding community for the past 34 years (Ex. A, pg. 2).

45.    Emissions data from the United States Environmental Protection Agency's Toxic Release Inventory (TRI) show large amounts of EtO emissions in the late-1990s (see Figure 3 and Figure 4, below).

46.    No continuous data exist before 1995 on ambient air releases. However, the ATSDR notes that the available data suggest that "substantially higher ambient releases prior to 1995 were likely." (Ex. A, pg. 2). Indeed, a lone 1988 report on Sterigenics' Willowbrook facility's EtO emissions accessed through the EPA's TRI Explorer Database supports this contention.[24] The 1988 report indicates that the Willowbrook facility emitted 97,518 pounds of

---

[23]
https://yosemite.epa.gov/sab/sabproduct.nsf/BC3AE563588248BC85257D8E00785A32/$File/sterigenics+comments.pdf *accessed 9.25.2018.*
[24]
https://iaspub.epa.gov/triexplorer/release_trends?tri=60521GRFFT7775Q&p_view=TRYR&trilib=TRIQ1&sort=_VIEW_&sort_fmt=1&state=All+states&county=All+counties&chemical=000075218&industry=ALL&core_year=&tab_rpt=1&FLD=AIRLBY&FLD=E1&FLD=E2&FLD=E3&FLD=E4&FLD=E41&FLD=E42&FLD=E5&FLD=E52&FLD=E53&FLD=E53A&FLD=E53B&FLD=E54&FLD=E51&FLD=E51A&FLD=E51B&FLD=TSFDSP&FLD=m10&FLD=m41&FLD=m62&FLD=potwmetl&FLD=m71&FLD=m81&FLD=m82&FLD=m72&FLD=m63&FL

FILED DATE: 10/10/2018 5:12 PM   2018L011004

EtO into the air.[25] This is over three times greater than the highest amount recorded in the contiguous 1995-2016 data set (32,200 pounds in 1998) and over 20 times greater than emissions levels in 2016 (4,205 pounds).

47.    Figure 2 and Figure 3 illustrate available data on the total EtO air emissions released from the Willowbrook Sterigenics Facility:

**Figure 2: TRI total air emissions (in pounds), by Sterigenics Willowbrook – Ethylene Oxide. 1988, 1995-2016[26]**

| Year | Pounds EtO |
|------|-----------|
| 1988 | 97,518 |
| 1989 | - |
| 1990 | - |
| 1991 | - |
| 1992 | - |
| 1993 | - |
| 1994 | - |
| 1995 | 18,373 |
| 1996 | 22,420 |
| 1997 | 27,020 |

| Year | Pounds EtO |
|------|-----------|
| 1998 | 32,200 |
| 1999 | 2,640 |
| 2000 | 7,628 |
| 2001 | 8,113 |
| 2002 | 6,957 |
| 2003 | 6,909 |
| 2004 | 5,312 |

| Year | Pounds EtO |
|------|-----------|
| 2005 | 2,910 |
| 2006 | 4,274 |
| 2007 | 3,966 |
| 2008 | 3,858 |
| 2009 | 3,690 |
| 2010 | 7,151 |
| 2011 | 7,160 |

D=m64&FLD=m65&FLD=m66&FLD=m67&FLD=m73&FLD=m79&FLD=m90&FLD=m94&FLD=m99&FLD=RELLBY

25
https://ofmpub.epa.gov/enviro/tri_formr_partone_v2.get_thisone?rpt_year=1988&dcn_num=1388025024213&ban_flag=Y

26
https://iaspub.epa.gov/triexplorer/release_trends?tri=60521GRFFT7775Q&p_view=TRYR&trilib=TRIQ1&sort=_VIEW_&sort_fmt=1&state=All+states&county=All+counties&chemical=000075218&industry=ALL&core_year=&tab_rpt=1&FLD=AIRLBY&FLD=E1&FLD=E2&FLD=E3&FLD=E4&FLD=E41&FLD=E42&FLD=E5&FLD=E52&FLD=E53&FLD=E53A&FLD=E53B&FLD=E54&FLD=E51&FLD=E51A&FLD=E51B&FLD=TSFDSP&FLD=m10&FLD=m41&FLD=m62&FLD=potwmetl&FLD=m71&FLD=m81&FLD=m82&FLD=m72&FLD=m63&FLD=m64&FLD=m65&FLD=m66&FLD=m67&FLD=m73&FLD=m79&FLD=m90&FLD=m94&FLD=m99&FLD=RELLBY

FILED DATE: 10/10/2018 5:12 PM   2018L011004

| 2012 | 7,091 |
|------|-------|
| 2013 | 6,133 |

| 2014 | 5,241 |
|------|-------|
| 2015 | 4,899 |

| 2016 | 4,205 |
|------|-------|

**Figure 3: TRI total air emissions reported (in pounds), by Sterigenics Willowbrook – Ethylene Oxide, 1995-2016.** [27] [28]



48.    Nor was passive venting the only manner in which Sterigenics exposed area residents, workers, and students to EtO. Sterigenics has also made at least one mass "uncontrolled release" of EtO. In 2015, Sterigenics signed a consent order with the State of Illinois in response to an October 7, 2013 release of ethylene glycol (an EtO byproduct) into the soil and groundwater surrounding the Willowbrook plant and another uncontrolled release of EtO into the atmosphere (See "Consent Order," attached as Exhibit B). Sterigenics initially reported that it had released 30 pounds of EtO into the atmosphere in this incident, but

---

[27] Source: Toxic Release Inventory (TRI): https://www.epa.gov/enviro/tri-overview.
[28] Exhibit A, page 2.

subsequently revised its estimate to 12 pounds. Sterigenics ultimately paid a $50,000 civil penalty for these uncontrolled releases.

49.      Notably, even after this incident, Sterigenics did not install control measures on the vents that freely allowed EtO to disperse into the atmosphere.

50.      Nor did Sterigenics' EtO emissions, once released, disperse far. The half-life of EtO in the atmosphere is roughly 211 days. According the IARC, "[n]either rain nor absorption of aqueous aerosols is capable of removing ethylene oxide from the atmosphere."[29] In addition, EtO is heavier than air, meaning that it can linger and travel along the ground.[30] Consequently, Sterigenics' releases of EtO are likely to have lingered at breathing level in the area around its facility for a considerable time, causing ongoing harm the Plaintiff.

**C. Sterigenics' Activity in Willowbrook Is Part of a Broader Pattern of Behavior**

51.      Sterigenics' behavior in Willowbrook fits into a broader pattern of recklessness related to its EtO facilities.

52.      Between 2004 and 2009, Sterigenics released excessive amounts of EtO into the atmosphere from its sterilizing facility in the Dutch town of Zoetermeer. The excess EtO was reportedly due to Sterigenics failure to replace broken filters.[31] Like the Willowbrook plant, the Zoetermeer facility was set amidst a residential neighborhood, meaning that approximately 2,000 residents were potentially exposed.[32] Sterigenics ultimately shut down and demolished the Zoetermeer plant.[33]

---

[29] https://monographs.iarc.fr/wp-content/uploads/2018/06/mono100F-28.pdf *accessed 9.25.2018.*
[30] http://www.inchem.org/documents/icsc/icsc/eics0155.htm *accessed 9.25.2018.*
[31] https://www.omroepwest.nl/nieuws/3574491/Rechtszaak-tegen-gifuitstoter-Sterigenics-na-jaren-van-start-Hoe-zat-het-ook-alweer *accessed 9.25.2018.*
[32] https://www.omroepwest.nl/nieuws/2648769/Niet-vaker-kanker-rondom-Sterigenics-in-Zoetermeer *accessed 9.25.2018.*
[33] https://www.dutchnews.nl/news/2010/07/zoetermeer_shuts_firm_for_brea/ & https://www.zoetermeer.nl/inwoners/uitstoot-schadelijke-stoffen-bij-sterigenics_46553?pk_campaign=Redirects&pk_kwd=sterigenics *accessed 9.25.2018.*

14

FILED DATE: 10/10/2018 5:12 PM   2018L011004

53.    In the U.S., Sterigenics' California facilities have a history of regulatory problems. Sterigenics was investigated and fined $450,000 by the U.S. Department of Justice (DOJ) in 2015 for failing "to keep and maintain adequate records pertaining to controlled substances." Specifically, the DOJ found that between April 4, 2011 and April 4, 2013, Sterigenics failed compliance with the Controlled Substance Act at least 156 times.[34]

54.    More seriously, Sterigenics failed to properly train employees in the safe use of EtO at its sterilizing plant in Ontario, California, causing a major EtO explosion on August 19, 2004 that injured four employees and forcing the evacuation of the plant and neighboring facilities. The U.S. Chemical Safety and Hazard Investigation Board (CSB) investigation into the incident found that Sterigenics had failed to ensure its maintenance employees understood the hazards associated with EtO-based processes, which led them to manually override safety devices, causing the explosion. The CSB faulted Sterigenics management for not implementing "company-wide engineering control recommendations that could have prevented this explosion" and failing to follow recommendations on EtO concentrations disseminated by NIOSH.[35]

55.    At Sterigenics' Willowbrook, Illinois facility, OSHA records several safety violations for which the company has paid thousands of dollars in fines.[36] Specifically, Sterigenics paid $5,062 in fines in 2006 for several "Serious" violations that left workers exposed to unspecified "highly hazardous chemicals." [37] Given the work undertaken at the Willowbrook facility, these "highly hazardous chemicals" likely included EtO.

---

[34] https://www.justice.gov/usao-ndca/pr/bay-area-company-agrees-pay-450000-settle-claims-failing-maintain-adequate-records *accessed 9.25.2018.*
[35] https://www.csb.gov/assets/1/20/sterigenics_report.pdf?13828 *accessed 9.25.2018.*
[36] E.g. https://www.osha.gov/pls/imis/establishment.inspection_detail?id=308153717 *accessed 9.25.2018.*
[37] https://www.osha.gov/pls/imis/establishment.inspection_detail?id=308153717 &
https://www.osha.gov/pls/imis/establishment.violation_detail?id=308153717&citation_id=01001 *accessed 9.25.2018.*

FILED DATE: 10/10/2018 5:12 PM    2018L011004

FILED DATE: 10/10/2018 5:12 PM  2018L011004

56.     Current and former Sterigenics employees have also raised concerns about company safety practices around EtO. For instance, on the company's Glassdoor page, one former employee noted on June 25, 2013 that "[t]here is a minimum attention to quality & safety which will backfire eventually."[38] Another stated on October 9, 2015 that "you're working with Ethylene Oxide which is extremely dangerous and the company seems to cut corners around safety at times."[39] Perhaps most concerning, an "EtO A Operator" in the Charlotte, North Carolina facility reported on February 24, 2015 that "Safety is an issue sometimes regarding procedures. The maintenance team cuts a lot of corners." This employee advised management to "Lock out the overrides for equipment. Fire any maintenance manager that shows operators how to manually operate equipment without it showing on the computer system."[40] Notably, this comment comes after the 2004 Ontario, California explosion. As discussed above, the CSB identified maintenance cutting corners and manually overriding equipment as factors leading to that incident. This employee review suggests that the safety and management failures that caused the California explosion were not addressed system-wide and continued to be in evidence at other Sterigenics facilities over a decade later.

57.     Taken together, these elements demonstrate a pattern of Sterigenics consistently failing to implement company-wide safety measures across all its facilities, despite research, NIOSH bulletins, regulatory interventions, and problematic incidents demonstrating their need. This willingness to "cut corners" and lack of oversight may explain why Sterigenics failed for decades to install emission mitigation technology to limit passive venting of EtO from its Willowbrook facility.

---

[38] https://www.glassdoor.com/Reviews/Employee-Review-Sterigenics-RVW2768416.htm *accessed 9.25.2018.*
[39] https://www.glassdoor.com/Reviews/Employee-Review-Sterigenics-RVW8236300.htm *accessed 9.25.2018.*
[40] https://www.glassdoor.com/Reviews/Employee-Review-Sterigenics-RVW5987616.htm *accessed 9.25.2018.*

16

FILED DATE: 10/10/2018 5:12 PM   2018L011004

## D. Willowbrook Air Quality and the Health Implications

58.     Scientific analysis demonstrates that Sterigenics failure to install appropriate emissions mitigation technology has exposed residents, workers, and students to hazardous levels of EtO for the last 34 years.

59.     The 2014 EPA NATA database already demonstrated unacceptably high levels of cancer risk in the area surrounding the Willowbrook plant. The database places the cancer risks of the land tracts measured in Willowbrook as the highest in Illinois and among the highest in the country (the tract upon which the Sterigenics facility sits is in the 99.98th percentile for cancer risk level in the U.S.).[41] These risk levels are comparable to those of "Cancer Alley," an area along the Mississippi River famous for high incidences of cancer.[42]

60.     The NATA database also makes clear that the elevated cancer risks around Willowbrook are primarily due to EtO emissions, attributing 88.98% of the risk to this source. Sterigenics is the only major emitter of EtO in this area. Notably, this data was collected **before** the EPA revised the way it calculated the carcinogenicity of EtO to accommodate "a 30-fold increase in cancer potency" (Ex. A, pg. 2).

61.     As discussed earlier, the EPA generally considers the maximum "acceptable risk" for air toxics to be roughly a 100 per million (i.e., for every one million people exposed, 100 develop cancer over their lifetimes).[43] However, a 2014 EPA National Air Toxics Assessment (NATA) found the lifetime cancer risk in the tract of land upon which the Sterigenics plant sits (Tract ID # 17043845902) to be 281.8075 per million, almost three times the maximum acceptable level.

---

[41] https://www.epa.gov/national-air-toxics-assessment *accessed 9.25.2018.*
[42] http://www.chicagotribune.com/news/local/breaking/ct-met-dupage-cancer-pollution-rauner-20180827-story.html *accessed 9.25.2018.*
[43] https://www.epa.gov/national-air-toxics-assessment/nata-frequent-questions *accessed 9.25.2018.*

17

62.      Figure 4 below depicts a 2014 NATA map demonstrating above-acceptable levels

(>100 per million) of cancer risk in the tracts surrounding the Willowbrook facility:

**Figure 4: 2014 NATA map depicting levels of lifetime cancer risk surrounding the Willowbrook Sterigenics facility**



63.      More recently, for the August 21, 2018 evaluation of the Willowbrook plant's EtO

emissions, the EPA modeled short and long-term ambient EtO concentrations around the

facility to determine the impact of site emissions. (See Figure 3 on Ex. A, pg. 4).

64.      Figure 5 shows large amounts of EtO emissions surrounding both Sterigenics

buildings and pervading the community up to a one-mile radius.

65.      Figure 5 also depicts a 5-year average to represent chronic exposures and maximum

1- and 8-hour averages to represent acute exposures at 882 community receptor points.

18

FILED DATE: 10/10/2018 5:12 PM 2018L011004

**Figure 5. AERMOD modeling output: 5-year average exposure estimates**



66.     The U.S. EPA collected 39 air samples from 26 discrete locations in the Willowbrook community on May 16 and 17, 2018 using SUMMA canisters. (Ex. A, pg. 5).

67.     SUMMA canisters are "airtight, stainless-steel containers with an inner surface that has been electro-polished and chemically deactivated," ensuring an accurate air sample is collected. (Ex. A, pg. 5).

19

68.     Based on the samples collected, "chronic upper bound residential (2.1 µg/m3) and occupational (9.1 µg/m3) exposures in the community" existed, with higher concentrations during the nighttime. (Ex. A, pg. 7).

**Figure 6. Site-specific ADAF calculations for residential exposure**

| Age Range | ADAF | U.S. EPA unadiusted | EPC (µg/m$^3$) | Duration Adjustment | Partial Risk |
|---|---|---|---|---|---|
| 0 to <2 yrs | 10 | $2.99 \times 10^{-3}$ | 2.1 | 2 years/78 years | $1.6 \times 10^{-3}$ |
| 2 to <16 yrs | 3 | $2.99 \times 10^{-3}$ | 2.1 | 14 years/78 years | $3.4 \times 10^{-3}$ |
| 16 to 33 yrs | 3 | $2.99 \times 10^{-3}$ | 2.1 | 17 years/78 years | $1.4 \times 10^{-3}$ |
| | | | | Lifetime Risk | $6.4 \times 10^{-3}$ |

69.     Ultimately, the August 21, 2018 report calculated that Sterigenics' EtO emissions caused "an additional lifetime risk of 6.4 cancers in a population of 1,000 residents who could be exposed to EtO emissions from Sterigenics," equivalent to 6,400 per million (Ex. A., pg. 10). These updated calculations place the area's cancer risk at 64 times the EPA's maximum acceptable risk level.

70.     It should also be noted that, if anything, the EPA samples and models are a massive underestimate for the ambient levels of EtO the area has been exposed to in the last 34 years. As noted earlier, total EtO air releases from the Willowbrook facility were over 20 times higher in 1988 than in 2016 (2016 levels are presumably comparable to present release levels). In addition, release levels in the late 1990s were still up to 7.7 times higher than 2016 levels.

71.     Throughout the period of exposure, the area immediately around the Willowbrook plant has contained numerous homes and businesses, as well as four schools and a daycare facility (See Figure 2 on Ex. A, pg. 3). As a result, thousands of residents, workers, and students have been exposed to elevated levels of EtO. Figure 7 demonstrates the proximity of these facilities to the Willowbrook plant:

20

**Figure 7. Aerial map of the community surrounding Sterigenics Corporation**[44]



Source: Tribune reporting                                        @ChiTribGraphics

72.     One of the schools near the Sterigenics facility is Gower West Elementary School, with recent enrollment of almost 500 students.[45] Another is Hinsdale South High School, with enrollment of over 1,500 students.[46] Hinsdale South High School has been open and active at its present locations since prior to the Sterigenics facility's opening in 1984. Consequently, thousands of minors have been exposed to unsafe levels of EtO over the years both in classrooms and outdoor athletic facilities.

73.     The EPA notes that EtO exposure could have especially deleterious effects on children, as "the immaturity of *detoxifying* enzymes in very young children may increase

[44] http://www.chicagotribune.com/news/local/breaking/ct-met-sterigenics-cancer-risks-politics-20180919-story.amp.html *accessed 9.25.2018.*

[45] http://webprod.isbe.net/ereportcard/publicsite/getReport.aspx?year=2017&code=1902206202002_e.pdf *accessed 9.25.2018.*

[46] http://webprod.isbe.net/ereportcard/publicsite/getReport.aspx?year=2017&code=1902208600002_e.pdf *accessed 9.25.2018.*

21

FILED DATE: 10/10/2018 5:12 PM   2018L011004

children's susceptibility because children may clear EtO at a slower rate than adults... In the absence of data on the relative susceptibility associated with EtO exposure in early life, increased early-life susceptibility is assumed."[47] Thus it is likely that students at schools within a one-mile radius of the Willowbrook facility in the 1980s and 1990s were particularly vulnerable to the mutagenic effects of EtO.

74.     Although apprised of the severe dangers associated with EtO, Sterigenics nonetheless willfully and negligently emitted large amounts of this toxic gas from its Willowbrook facility for 34 years. Moreover, Sterigenics failed to warn those near its plant of their exposure to EtO and the risks to their health this exposure entailed.  Consequently, Sterigenics exposed Plaintiff and thousands like them to devastating health consequences.

<u>COUNT I</u>
(Negligence)

75.     Plaintiff realleges and incorporates herein by reference all allegations into this claim as if fully set forth herein, and further alleges as follows:

76.     Defendants owed a duty to Plaintiff to operate, maintain, control, and use its Willowbrook facility, including the emitting of ethylene oxide, in a manner that would not cause harm to the Platintiff.

77.     Defendants breached that duty by emitting ethylene oxide in a dangerous and negligent way so as to cause the formation of cancer in Plaintiff and/or place her at a higher risk of acquiring cancer related to ethylene oxide. Specifically, Defendants breached their duty in that they:

> a.  Failed to notify residents, workers, and visitors of the highly carcinogenetic nature of ethylene oxide; or

---

[47] https://cfpub.epa.gov/ncea/iris/iris_documents/documents/toxreviews/1025tr.pdf at pg. 3-71. *Accessed 9.25.2018.*

22

b. Failed to notify residents, workers, and visitors of the elevated airborne ethylene oxide concentrations; or

c. Failed to notify residents, workers, and visitors of the elevated cancer risk that ethylene oxide emissions pose; or

d. Failed to adopt or construct modern technology to aid in the prevention of ethylene oxide emissions in the surrounding area; or

e. Allowed excess levels of ethylene oxide to emit into the community; or

f. Failed to use/seek reasonable alternatives to ethylene oxide when they knew of the dangers associated with it; or

g. Failed to control emissions of ethylene oxide from their facility; or

h. Were otherwise negligent.

78. As a direct and proximate result of Defendants' negligence, as set forth above, Plaintiff has suffered severe and permanent health problems and has endured and will in the future endure pain and suffering; has suffered a loss of the enjoyment of a normal life; has endured and will in the future endure emotional distress; has incurred and will in the future incur expenses for medical and rehabilitative care; has suffered a loss of earnings; and has been damaged in her capacity to earn a living.

Wherefore Plaintiff demands judgment against Defendants in an amount in excess of $50,000, as shall represent fair and just compensation.

## COUNT II
(Strict Liability)

79. Plaintiff realleges and incorporates herein by reference all allegations into this claim as if fully set forth herein, and further alleges as follows:

23

80.     Defendants engaged in ultra-hazardous or abnormally dangerous activities by continuously emitting ethylene oxide, a known human carcinogen.

81.     As a direct and proximate result of Defendants' ultra-hazardous or abnormally dangerous activities, Plaintiff has suffered severe and permanent health problems and has endured and will in the future endure pain and suffering; has suffered a loss of the enjoyment of a normal life; has endured and will in the future endure emotional distress; has incurred and will in the future incur expenses for medical and rehabilitative care; has suffered a loss of earnings; and has been damaged in her capacity to earn a living.

        Wherefore Plaintiff demands judgment against Defendants in an amount in excess of $50,000, as shall represent fair and just compensation.

## COUNT III
(Fraudulent Concealment)

82.     Plaintiff realleges and incorporates herein by reference all allegations into this claim as if fully set forth herein, and further alleges as follows:

83.     Since 1984, Defendants had actual or constructive knowledge of the highly carcinogenetic nature of ethylene oxide and deliberately hid and/or suppressed information pertaining to the highly carcinogenetic nature of ethylene oxide from Willowbrook residents, workers, and visitors.

84.     As a direct and proximate result of Defendants' deliberate hiding and/or suppression of information pertaining to the highly carcinogenetic nature of ethylene oxide, Plaintiff has suffered severe and permanent health problems and has endured and will in the future endure pain and suffering; has suffered a loss of the enjoyment of a normal life; has endured and will in the future endure emotional distress; has incurred and will in the future

24

incur expenses for medical and rehabilitative care; has suffered a loss of earnings; and has been damaged in her capacity to earn a living.

Wherefore Plaintiff demands judgment against Defendants in an amount in excess of $50,000, as shall represent fair and just compensation.

## JURY DEMAND

Plaintiff demands trial by jury.

Respectfully Submitted,

By: /Brian LaCien
One of Their Attorneys

Todd A. Smith, tsmith@prslaw.com
Brian LaCien, blacien@prslaw.com
POWER, ROGERS & SMITH, LLP
70 West Madison Street, 55th Floor
Chicago, IL 60602-4212
Phone: (312) 236-9381
Fax: (312) 236-0920

25

FILED DATE: 10/10/2018 5:12 PM  2018L011004

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

SHAWN FORNEK,

        Plaintiffs,

      v.                             No:

STERIGENICS U.S., LLC;
GTCR LLC.; and
ROBERT D. NOVAK,

        Defendants.

## AFFIDAVIT REGARDING DAMAGES SOUGHT

Plaintiff SHAWN FORNEK, by and through her attorneys, Brian LaCien, being first duly sworn under oath, states as follows:

1.    That the affiant is one of the attorneys of record for the Plaintiff in this matter.

2.    That the total money damages sought in this civil action exceed the amount of $50,000.00.

Further Affiant Sayeth Not.

_____
BRIAN LACIEN

SUBSCRIBED AND SWORN to before me
this __10__ day of __October__, 2018.

_____
NOTARY PUBLIC

WANDA A KALLAS
Official Seal
Notary Public - State of Illinois
My Commission Expires Aug 30, 2022

POWER ROGERS & SMITH, LLP
70 W. Madison Street, 55th Floor
Chicago, IL 60602-4212
312-236-9381
31444

FILED DATE: 10/10/2018 5:12 PM    2018L011004

# Letter Health Consultation

"Evaluation of Potential Health Impacts from Ethylene Oxide Emissions"

STERIGENICS INTERNATIONAL, INC.

WILLOWBROOK, ILLINOIS

AUGUST 21, 2018

U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES

Agency for Toxic Substances and Disease Registry

Division of Community Health Investigations

Atlanta, Georgia  30333



EXHIBIT

A

## Health Consultation: A Note of Explanation

An ATSDR health consultation is a verbal or written response from ATSDR to a specific request for information about health risks related to a specific site, a chemical release, or the presence of hazardous material. In order to prevent or mitigate exposures, a consultation may lead to specific actions, such as restricting use of or replacing water supplies; intensifying environmental sampling; restricting site access; or removing the contaminated material.

In addition, consultations may recommend additional public health actions, such as conducting health surveillance activities to evaluate exposure or trends in adverse health outcomes; conducting biological indicators of exposure studies to assess exposure; and providing health education for health care providers and community members. This concludes the health consultation process for this site, unless additional information is obtained by ATSDR which, in the Agency's opinion, indicates a need to revise or append the conclusions previously issued.

You May Contact ATSDR TOLL FREE at
1-800-CDC-INFO
or
Visit our Home Page at: http://www.atsdr.cdc.gov

FILED DATE: 10/10/2018 5:12 PM   2018L011004

LETTER HEALTH CONSULTATION

"Evaluation of Potential Health Impacts from Ethylene Oxide Emissions"

STERIGENICS INTERNATIONAL, INC.

WILLOWBROOK, ILLINOIS

Prepared By:

U.S. Department of Health and Human Services
Agency for Toxic Substances and Disease Registry
Division of Community Health Investigations

FILED DATE: 10/10/2018 5:12 PM   2018L011004

FILED DATE: 10/10/2018 5:12 PM    2018L011004



**DEPARTMENT OF HEALTH & HUMAN SERVICES**
*Agency for Toxic Substances and Disease Registry,*
*Region 5*

*Public Health Service*
*77 W. Jackson Blvd., Room 413*
*Chicago, IL 60604*

July 26, 2018 *

Ed Nam
Director, Air and Radiation Division
United States Environmental Protection Agency, Region 5
77 W. Jackson Blvd., MS A-18J
Chicago, IL 60604

Dear Mr. Nam:

Since February 2018, ATSDR has met with U.S. EPA Region 5 Air and Radiation Division (ARD) staff regarding a change in the cancer risk basis for ethylene oxide (EtO) in the EPA Integrated Risk Information System (IRIS) and how that change affects general population risks estimated from EtO-emitting facilities in the draft 2014 National Air Toxics Assessment (NATA) update[1]. In December 2016, IRIS changed EtO's adult-based inhalation unit risk from 0.0001 per microgram per cubic meter ($\mu g/m^3$) to 0.003 per $\mu g/m^3$, a 30-fold increase in cancer potency. It also changed EtO's cancer weight-of-evidence descriptor from "probably carcinogenic to humans" to "carcinogenic to humans". These changes could result in many census tracts having estimated cancer risks that are greater than 1 in 10,000 from EtO exposure identified through the draft NATA modeling of air emissions across the United States.

Specifically, ARD decided to evaluate the implications of this change at two sites, Sterigenics International, Inc. (referred to in the letter as *"Sterigenics"*) in Willowbrook, IL and the Elé Corporation in McCook, IL. This letter addresses EtO emissions from the Sterigenics facility. In June 2018, after the monitoring results were received and reviewed, ARD requested that ATSDR review air measurements of EtO and modeling results of EtO emissions from Sterigenics and specifically answer the question: *If modeled and measured ethylene oxide concentrations represent long term conditions, would they pose a public health problem for people living and working in Willowbrook?*

The air modeling data that U.S. EPA provided to ATSDR estimated potential short-term and long-term concentrations of EtO in ambient air surrounding the Sterigenics Corporation. Follow-up air monitoring data confirm the presence of elevated EtO at concentrations within a similar range to those estimated by the air modeling of Sterigenics emissions. Based on these measured and modeled concentrations and the proximity to residences and other commercial structures, cancer risks higher than 1 in 10,000 people may exist for some community members and workers exposed to airborne EtO in this community. If these measured and estimated concentrations represent chronic exposures

---

* Minor edits to the reference list have been incorporated into the final posted ATSDR Letter Health Consultation.

[1] The 2014 NATA is expected to be publicly available in the fall of 2018.

FILED DATE: 10/10/2018 5:12 PM    2018L011004

in the surrounding community (with higher exposures likely for workers of the facility), EtO emissions from the Sterigenics Corporation poses a public health hazard.

**BACKGROUND**

Sterigenics provides sterilization processes using gamma, ethylene oxide, Ebeam, and X-ray sterilization and operates 46 facilities in 13 countries (Sterigenics, 2018). The facility stores ethylene oxide that is sprayed into sealed chambers to sterilize medical equipment, pharmaceuticals, and food/spice products contained on 40" x 48" pallets. The sterilization chambers are contained in two buildings. Building 1 has fifteen chambers that can hold 1 to 13 pallets, while Building 2 has four sterilization chambers that can hold 13 to 26 pallets (Illinois EPA, 2017). Building 1 chambers were constructed in 1984, while Building 2 chambers were built in 1999 and 2012. Pollution control technology includes acid water scrubbers and dry bed reactors that convert the ethylene oxide to ethylene glycol after the sterilization process (Illinois EPA, 2015). Although back vents on the units have historically been uncontrolled, Sterigenics is currently in the process of installing pollution controls to control passive releases (ATSDR, 2018).

Figure 1 illustrates the total reported emissions in pounds per year (lbs/yr) of EtO from Sterigenics.

**Figure 1. TRI Total Air Emissions Reported (in pounds), by Sterigenics Corporation for Ethylene Oxide, 1995-2016**



<sup>a</sup>Source: Toxic Release Inventory (TRI): https://www.epa.gov/enviro/tri-overview
<sup>b</sup>Dates for facility constructed and upgrades were identified according to Illinois EPA (2017) DRAFT/PROPOSED Clean Air
. Act Permit Program (CAAPP) Permit

The emissions data show a substantial reduction in total air releases after 1998. No data are available before 1995 on ambient air releases, but the available data suggests that substantially higher ambient releases prior to 1995 were likely. The Building 1 sterilization chambers were constructed in 1984, therefore EtO has been emitted over the past 34 years from the Willowbrook facility.

Willowbrook, Illinois is a small suburb of Chicago with approximately 8,500 residents (U.S. Census, 2016). The Willowbrook industrial complex where Sterigenics is located is in a densely populated metropolitan area, with 19,271 people living within 1 mile of the facility boundary. There are four schools and one daycare facility within 1 mile of the facility. According to 2016 Census estimates, Willowbrook residents are predominantly white (73.3%), non-Hispanic (66.6%), educated (97.7% graduate high school, and 48.9% graduated with a bachelor's degree or higher), and middle class (median household income was over $67,000 per year). Approximately 18.5% of the population is identified as Asian, and 6.3% as black.

**Figure 2. Aerial map of the community surrounding Sterigenics Corporation**



Source: Google Earth

ENVIRONMENTAL DATA

*Air Modeling*

U.S. EPA modeled short and long-term ambient EtO concentrations (AERMOD version 18081) to evaluate the potential impact of site emissions. These scenarios estimated a 5-year average to represent chronic exposures and maximum 1- and 8-hour averages to represent acute exposures at 882 community receptor points. An overlay of the modeling output is displayed in Figure 3, below. The statistical distributions of the modeled air concentrations are presented in Table 1.

**Figure 3. AERMOD modeling output: 5-year average exposure estimates**



*Source: U.S. EPA Air and Radiation Division, Region 5*
*Note: Source 1 is Sterigenics Willowbrook Building 1, and Source 2 is Sterigenics Willowbrook Building 2*

4

Table 1. Statistical distribution of EtO modeling*

| Statistics | Modeled 1-hour (µg/m³) | Modeled 8-hour (µg/m³) | Modeled 5-year (µg/m³) |
|---|---|---|---|
| Minimum | 2.17 | 1.02 | 0.03 |
| 25th Percentile | 4.62 | 2.26 | 0.09 |
| 50th Percentile | 9.72 | 4.07 | 0.17 |
| 75th Percentile | 18.88 | 7.29 | 0.31 |
| 90th Percentile | 33.90 | 12.62 | 0.57 |
| 95th Percentile | 45.22 | 18.83 | 0.91 |
| 99th Percentile | 134.73 | 61.39 | 2.97 |
| Maximum | 249.77 | 123.89 | 13.32 |
| Mean | 15.75 | 6.72 | 0.32 |
| Geometric Mean | 10.13 | 4.41 | 0.18 |

*N= 882 modeled receptors

*Air Measurements*

U.S. EPA collected 39 validated samples May 16th and May 17th, 2018. These samples were collected using SUMMA® canisters, and analyzed using U.S. EPA Compendium Method TO-15, Compendium of Methods for the Determination of Toxic Organic Compounds in Ambient Air. A SUMMA® canister is an airtight, stainless-steel container with an inner surface that has been electro-polished and chemically deactivated. The laboratory is required to clean each canister and evacuate it to a high vacuum prior to shipping it to the sampling location. A canister can hold the vacuum for up to 30 days. The air being sampled is "drawn" into the canister by the high vacuum, thus eliminating the need for a pump. While opening the inlet orifice fills the canister in less than a minute, yielding an instantaneous "grab" sample, regulators can be added to the inlet orifice to draw the air into the canister over a designated period, ranging from 1 to 24-hours.

Of the 39 samples collected at 26 discrete locations (Figure 4), 18 were 12-hour samples, and 21 were grab samples (Table 2). Three of the 12-hour samples were collocated duplicates, and three of the grab samples were collocated duplicates. Grab samples generally had lower EtO concentrations than 12-hour averaged samples (U.S. EPA, 2018). However, all grab samples were collected between 10:20 am and 3:05 pm. ARD staff noted that higher EtO concentrations were measured overnight than during the day, and 12-hour samples were collected overnight in some locations. Since Sterigenics is a 24-hour operation, this may be due to calm meteorological conditions overnight with a higher potential for inversions. Given the elevated detections over a limited duration, additional long-term sampling is warranted to better characterize residential exposure to EtO.

5

FILED DATE: 10/10/2018 5:12 PM   2018L011004

FILED DATE: 10/10/2018 5:12 PM   2018L011004

**Table 2. Statistical distribution of residential and commercial EtO air sampling\***

| Statistics | Grab samples (µg/m³) | 12-hour samples (µg/m³) |
|---|---|---|
| Min | 0.16 | 0.34 |
| 25th Percentile | 0.24 | 0.69 |
| 50th Percentile | 0.45 | 1.56 |
| 75th Percentile | 1.34 | 4.39 |
| 90th Percentile | 2.28 | 8.26 |
| 95th Percentile | 4.27 | 8.44 |
| 99th Percentile | 4.33 | 8.96 |
| Max | 4.34 | 9.09 |
| Mean | 1.07 | 3.02 |
| Geo Mean | 0.62 | 1.74 |

*\*N=21 grab samples, 18 12-hour samples*

**Figure 4. Ambient air samples near the Sterigenics facility, Willowbrook, IL**



*Source: U.S. EPA, Region 5*

6

FILED DATE: 10/10/2018 5:12 PM    2018L011004

Figure 4, shows the location of discrete samples collected in the community. Given limited measured data presented in Table 2, ATSDR used the maximum 12-hour residential sample concentration and the maximum 12-hour commercial sample concentration to represent chronic upper bound residential (2.1 µg/m³) and occupational (9.1 µg/m³) exposures in the community. These concentrations represent maximums identified during a very temporally and spatially limited sampling campaign and actual average long-term exposures may be higher or lower.

**HEALTH IMPLICATIONS**

***Overview for identifying contaminants of concern and evaluating risk***
To evaluate EtO exposures near Sterigenics, ATSDR considered its own health-based comparison values as well as those published by other agencies. ATSDR uses comparison values for screening purposes to determine whether a pollutant should be evaluated further. A CV was identified for both an intermediate exposure duration (for non-cancer evaluation) as well as for a long-term (chronic) exposure duration (for which we considered both cancer and non-cancer health effects). In this evaluation, the air sampling results were compared to the ATSDR Cancer Risk Evaluation Guide (CREG) and environmental media evaluation guide (EMEG) and California EPA Reference Exposure Level (REL) for EtO.

- *ATSDR CREGs* are estimates of the concentrations of a carcinogen at which there is an elevated risk for one additional case of cancer in one million people exposed over a lifetime. ATSDR's CREG for EtO is calculated from the current U.S. EPA's adult-based inhalation unit risk value (0.003 (µg/m³)⁻¹) and is based on U.S. EPA evaluations and assumptions about hypothetical cancer risks at low levels of exposure. ATSDR's CREG for EtO is 0.00021 µg/m³.
- *ATSDR inhalation minimal risk levels (MRL)/EMEGs* are estimates of the concentrations of pollutants calculated that anyone could be exposed to where health effects are unlikely, based on chronic, intermediate, and acute exposures (those occurring longer than 365 days, between 14-365 days, and 14 days of exposure or less, respectively). For EtO, ATSDR only has an intermediate EMEG of 160 µg/m³ (ATSDR, 1990).
- *California RELs* are concentrations that are unlikely to result in adverse non-cancer health effects. The chronic California REL for EtO is 30 µg/m³ (California EPA, 2008).

All 5-year modeled and 12-hour measured averages exceeded the ATSDR CREG. Only maximum modeled concentrations exceeded intermediate or chronic non-cancer screening values. The following sections evaluate chronic non-cancer and cancer risks further.

***Ethylene oxide properties***
Ethylene oxide is a highly flammable gas that is highly reactive with nucleophilic substances such as water, alcohols, halides, amines, and sulfhydryl compounds. It is used as an intermediate in the production of ethylene glycol and surfactants as well as a fumigant for sterilizing foods and heat-sensitive medical equipment.

EtO is highly reactive, readily absorbed, and easily distributed in the human body. The absolute odor threshold has been reported in several studies to be about 470 milligrams per cubic meter (mg/m³)

7

(or 470,000 µg/m³), with acute health effects possible in the range of the odor threshold (NRC, 2010). Chronic exposures can result somatic cell damage at much lower concentrations (California EPA, 2008). EtO is mutagenic and causes chromosome damage in many species, including humans. EtO exposure has widely been studied in scientific literature and its adverse health impacts are well understood. The carcinogenic effects of EtO have been documented in human and animal studies (U.S. EPA 2016).

### Acute and intermediate exposure and health effects
Acute and intermediate effects have mostly been documented in hospital workers or in other occupational settings that include sterilizing chambers. Short-term exposure (minutes to weeks or months) above the odor threshold of 470 mg/m³ (into the thousands of mg/m³) include primarily neurological effects (headache, dizziness, nausea, lethargy, fatigue, muscle weakness, numbness, memory loss, incoordination, etc.), respiratory irritation (irritation of the nasal cavity, sinuses, coughing, shortness of breath, wheezing, and bronchial constriction and hyperreactivity), excessive thirst and dry mouth, and gastrointestinal effects (vomiting, diarrhea, stomach spasms, etc.). Some studies reported skin rashes with short-term exposures (NRC, 2010).

All studies with documented health effects summarized above had substantially higher EtO concentrations than what was observed in measured and modeled data in this assessment. ATSDR does not have an acute health-based comparison value but does have an intermediate-duration health-based comparison value of 160 µg/m³. No measured data and only the maximum 1-hour modeled concentration of EtO exceeded this value and modeled and measured concentrations of EtO in this investigation were well below the odor threshold. Thus, it is unlikely that the non-cancer health effects noted above would occur in the general or off-site worker populations.

### Chronic exposure and health effects
#### Cancer effects
The U.S. EPA IRIS released an "Evaluation of the Inhalation Carcinogenicity of Ethylene Oxide" in December 2016. This evaluation summarizes the evidence that EtO is "carcinogenic to humans" through a mutagenic mode of action (MOA) and derives an inhalation unit risk value for EtO (U.S. EPA, 2016). Many studies have identified the genotoxic potential and mutagenic mode of action of EtO exposure via inhalation. There is clear evidence from multiple studies that EtO causes chromosomal aberrations, sister chromatic exchanges, and micronuclei in peripheral blood lymphocytes and bone marrow cells. Chromosomal aberrations and micronucleus frequency have been linked to increased risk of cancer in a number of large human studies (Jinot et al., 2017). Mice and rats exposed to EtO demonstrate cancers of the lymphohematopoietic system (cells involved in the production of lymphocytes and cells of blood, bone marrow, spleen, lymph nodes, and thymus), brain, lung, connective tissue, uterus, and mammary gland.

In humans, an increased incidence and mortality of breast and lymphohematopoietic system cancers have been observed in workers in the EtO manufacturing and in sterilizing facilities (U.S. EPA, 2016). U.S. EPA identified six studies evaluating breast cancer in women, with the largest being a study from the National Institute of Occupational Safety and Health (NIOSH) of over 18,000 workers (45% male, 55% female) in 14 commercial sterilization plants. The NIOSH study reported statistically significant

FILED DATE: 10/10/2018 5:12 PM    2018L011004

exposure-response relationships for breast cancer incidence and mortality (Steenland et al., 2003 and Steenland et al., 2004). From assessing these studies, U.S. EPA (2016) determined that there is sufficient evidence of a causal relationship between EtO exposure and breast cancer in women.

U.S. EPA used the cancer incidence data from the NIOSH study, using individual exposure estimates for 17,530 workers from 13 plants, to calculate an inhalation unit risk value. A linear low-dose extrapolation of the lowest effective concentration (LEC; defined here as the lower 95% confidence limit on the $EC_{01}$, the estimated effective concentration associated with 1% extra risk) for lymphoid cancer was calculated as $2.9 \times 10^{-3}$ per $\mu g/m^3$. Using the same approach, the lifetime unit risk for breast cancer was calculated as $8.1 \times 10^{-4}$ per $\mu g/m^3$. Combining the risk for lymphoid and breast cancers in females U.S. EPA adopted an inhalation unit risk of $2.99 \times 10^{-3}$ per $\mu g/m^3$ (rounded to $3.0 \times 10^{-3}$ per $\mu g/m^3$). These adult-exposure only unit risk estimates were then rescaled to a lifetime, using age-dependent adjustment factors (ADAF). ADAFs are used to incorporate the greater risk of early life exposure to chemicals that have a mutagenic MOA. When applying the ADAFs, EPA calculated an inhalation unit risk value over a 70-year lifetime of $5.0 \times 10^{-3}$ per $\mu g/m^3$ (U.S. EPA, 2016). Cancer risk from measured and modeled EtO concentrations are estimated by multiplying the IUR by the EtO concentrations.

*U.S. EPA Cancer Risk Estimates Reviewed by ATSDR*
U.S. EPA Region 5 air modelers estimated cancer risk assuming a 70-year lifetime from measured and modeled data. Based on modeled EtO concentrations at over 882 specific locations around the Sterigenics facility, U.S. EPA used the 5-year average EtO concentrations to calculate lifetime cancer risks between $1.3 \times 10^{-4}$ to $6.7 \times 10^{-2}$, with a geometric mean risk of $9.1 \times 10^{-4}$. Even though cancer risks are not generally calculated for short term exposures, the estimated cancer risks associated with the *measured* EtO air concentration (19 samples collected for 12 hours each) were similar (range: $7.9 \times 10^{-4}$ to $4.5 \times 10^{-2}$, geometric mean: $7.7 \times 10^{-3}$; Table 3). Note that these cancer risks were calculated using the lifetime ADAF-adjusted IUR of $5.0 \times 10^{-3}$ per $\mu g/m^3$.

**Table 3. Range of measured and modeled EtO concentrations: U.S. EPA Cancer Risk Estimates**

| Statistics | Modeled 5-year ($\mu g/m^3$) | Modeled cancer risk range | 12-hour samples ($\mu g/m^3$) | Measured cancer risk range* |
|---|---|---|---|---|
| Minimum | 0.03 | 1.3E-04 | 0.16 | 7.9E-04 |
| Maximum | 13.32 | 6.7E-02 | 4.34 | 4.5E-02 |
| Mean | 0.32 | 1.6E-03 | 1.04 | 1.4E-02 |
| Geometric Mean | 0.18 | 9.1E-04 | 0.61 | 7.7E-03 |

*Cancer risk was calculated to estimate what long term exposures to the 12-hour concentration could look like if sustained long term and does not represent actual exposures.*

*Cancer Risk Estimates Calculated by ATSDR*
For ATSDR assessments, the reasonable maximum exposure (RME) scenario for residential exposure duration is 33 years over a lifetime of 78 years, so ATSDR calculated an IUR based on 33-year residential exposure using ADAFs. As mentioned previously, ATSDR's RME exposure point concentration (EPC) of 2.1 $\mu g/m^3$ was used as a reasonable estimate of exposure for the most exposed individual in the community. This EPC is the maximum residential sample concentration of EtO in the May 2018 data collection period. Given these assumptions, the cancer risk for this residential sample

FILED DATE: 10/10/2018 5:12 PM    2018L011004

FILED DATE: 10/10/2018 5:12 PM    2018L011004

location is **6.4 x 10$^{-3}$**—an additional lifetime risk of 6.4 cancers in a population of 1,000 residents who could be exposed to EtO emissions from Sterigenics. This cancer risk exceeds U.S. EPA's decision-making cancer risk range of 1.0 x 10$^{-6}$ to 1.0 x 10$^{-4}$, and adds to the lifetime background cancer risk of an average American of 1 in 3 people (American Cancer Society, 2018).

**Table 4. Site-specific ADAF calculations for residential exposure\***

| Age Range | ADAF | U.S. EPA unadjusted IUR | EPC ($\mu g/m^3$) | Duration Adjustment | Partial Risk |
|-----------|------|-------------------------|-------------------|---------------------|--------------|
| 0 to <2 yrs | 10 | 2.99 x 10$^{-3}$ | 2.1 | 2 years/78 years | 1.6 x 10$^{-3}$ |
| 2 to <16 yrs | 3 | 2.99 x 10$^{-3}$ | 2.1 | 14 years/78 years | 3.4 x 10$^{-3}$ |
| 16 to 33 yrs | 3 | 2.99 x 10$^{-3}$ | 2.1 | 17 years/78 years | 1.4 x 10$^{-3}$ |
| | | | | Lifetime Risk | 6.4 x 10$^{-3}$ |

*\*Cancer risk was calculated to estimate what long term exposures to the 12-hour concentration could look like if sustained long term and does not represent actual exposures.*

Likewise, ATSDR assumed the maximum commercial 12-hour sample concentration in commercial sample locations of 9.1 $\mu g/m^3$ to represent RME occupational exposures to workers in nearby facilities. Note that workers at the Sterigenics facility would be covered under the Occupational Safety and Health Administration (OSHA) EtO standard (29 CFR 1910.1047). For the off-site worker scenario, ATSDR assumed an 8.5-hour workday, 250 days a year, for 25 years (ATSDR, 2016), yielding an exposure factor (EF) of 0.08.

$$EF_{cancer, chronic} = \frac{8.5 \frac{hr}{d} \times 5 \frac{d}{wk} \times 50 \frac{wk}{yr} \times 25\ yr}{24 \frac{hr}{d} \times 7 \frac{d}{wk} \times 52.14 \frac{wk}{yr} \times 78\ yr} = 0.08$$

Cancer risk for workers can be calculated by multiplying the long-term air concentration by the IUR, adjusting the duration of exposure as appropriate using the exposure factor calculation, above:

*Cancer risk= IUR x EPC ($\mu g/m^3$) x EF*

For the maximum commercial concentration of 9.1 $\mu g/m^3$, this risk equation yields a lifetime occupational cancer risk of 2.1 x 10$^{-3}$, or an increased risk of cancer for 2.1 people in a population of 1,000 workers from chronic exposures to Sterigenics emissions:

*Cancer risk$_{occupational}$ = 0.00299 x 9.1 $\mu g/m^3$ x 0.08 = **2.1 x 10$^{-3}$***

While a more complete database from which to characterize exposure is preferable, we used U.S. EPA's limited data for the Sterigenics investigation and applied the standard ATSDR evaluation process. Note that in both ATSDR calculations, we made a very conservative assumption that a 12-hour sample represents long term exposure. We felt this assumption was warranted because the measured and modeled concentrations demonstrated consistency and provided support that this range of exposure is possible in the area surrounding Sterigenics.

FILED DATE: 10/10/2018 5:12 PM    2018L011004

*Non-cancer effects*

Workers exposed to ethylene oxide over a long-term duration experienced similar health effects to those exposed over shorter durations (California EPA, 2008). Workers exposed to levels of EtO at 8,500 $\mu g/m^3$ and higher over an average of 5-6.5 years demonstrated cognitive and motor impairment compared to unexposed controls. At lower levels of EtO exposure (145-300 $\mu g/m^3$), studies have shown evidence of hemoglobin adducts, DNA damage effects (i.e. sister chromatid exchanges), and hematological effects (i.e. increases in leukocytes and decreases in neutrophil counts; decreases in hematocrit and hemoglobin) (California EPA, 2008). No measured EtO concentrations from the residential or occupational sampling approached or exceeded effect levels in the long-term modeling estimates or the 12-hour samples being used as chronic exposure surrogates, therefore, non-cancer health effects are not expected. However, air sampling in this effort was extremely limited.

**LIMITATIONS**

ATSDR made several assumptions as part of this assessment that could lead to the over or underestimation of risk. Some limitations of this assessment include:

1. To calculate risks, ATSDR assumed that the concentrations measured during this assessment will continue, unchanged if no actions are taken, over 33 years for residents, and 25 years for workers.
2. ATSDR assumed that the very limited sampling investigation of 26 discrete locations over 2 days throughout the community represents typical exposure conditions from Sterigenics EtO emissions. Only one 12-hour residential sample was collected, and that sample was used to represent the RME residential chronic exposure estimate. EtO concentrations from grab samples at one other residential location were slightly higher than the 12-hour averaged sample collected at this property.
3. ATSDR assumed that the highest EtO concentration in the commercial area surrounding Sterigenics represents worst case off-site worker exposures. This is likely underestimating worker exposures for some employees in this area.
4. Due to a lack of long term sampling, the temporal trends of EtO emissions could not be evaluated. Fluctuations of seasons that affect temperatures, barometric pressure, wind speed and direction, and other potential factors that could influence the transport of EtO into the surrounding community were not assessed.

Despite these limitations, ATSDR acknowledges that the U.S. EPA modeling demonstrates similar concentration ranges to community air measurements. Thus, ATSDR believes the exposure estimates assumed in this assessment are reasonable. Historical emissions were higher before a substantial drop in 1999 with the construction of aeration rooms in Building 1. EtO cancer risks may have been substantially greater for the 14 years the facility operated before these emission controls were implemented, but historical risk cannot be evaluated with available emissions data.

FILED DATE: 10/10/2018 5:12 PM    2018L011004

**Conclusions:**

U.S. EPA asked ATSDR to answer the following question: "*If modeled and measured ethylene oxide concentrations represent long term conditions, would they pose a public health problem for people living and working in Willowbrook?*" U.S. EPA provided modeled and measured data for ATSDR to evaluate and render a health opinion.

It is ATSDR's conclusion that the data U.S. EPA provided suggests that residents and workers are exposed to elevated airborne EtO concentrations from facility emissions. It is difficult to assess long-term public health implications from facility emissions because there has been no historical air monitoring in the community. ATSDR assumed that these data represent long term exposures for area residents and workers. Specifically, ATSDR concludes the following:

1) If measured and modeled data represent typical EtO ambient concentrations in ambient air, *an elevated cancer risk exists* for residents and off-site workers in the Willowbrook community surrounding the Sterigenics facility. These elevated risks *present a public health hazard to these populations.*
2) Measured and modeled ethylene oxide concentrations in ambient air indicate that non-cancer health effects are unlikely for residents and off-site workers in the Willowbrook community surrounding the Sterigenics facility.

**Recommendations:**

1) ATSDR recommends that Sterigenics take immediate action to reduce EtO emissions at this facility.
2) ATSDR recommends that U.S. EPA work with the Sterigenics facility to initiate long-term air monitoring as soon as possible to measure ambient air levels of EtO. Ongoing air monitoring can demonstrate the effectiveness of actions taken by the company to reduce emissions and subsequent exposures in the community.
3) ATSDR recommends that IDPH investigate whether there are elevated cancers in the population surrounding the Sterigenics facility that are consistent with those associated with chronic EtO exposures.

Please do not hesitate to contact ATSDR Region 5 to discuss this assessment further or to request further public health assistance.

Sincerely,

Michelle A Colledge

Michelle Colledge, MPH, PhD
Environmental Health Scientist
Agency for Toxic Substances and Disease Registry
Division of Community Health Investigations
Central Branch, Region 5

12

FILED DATE: 10/10/2018 5:12 PM    2018L011004

CC:
Ken Runkle, IDPH
Aaron Martin, IDPH
Kathryn Siegel, U.S. EPA
Margaret Sieffert, U.S. EPA
Alexis Cain, U.S. EPA
Mark Johnson, ATSDR/ DCHI/CB
Rick Gillig, ATSDR/ DCHI/CB
Tina Forrester, ATSDR/ DCHI/OD

FILED DATE: 10/10/2018 5:12 PM    2018L011004

**References:**

Agency for Toxic Substances and Disease Registry (ATSDR). 2018. Discussion between ATSDR and U.S. EPA Region 5 Air and Radiation Division on 7/23/2018.

Agency for Toxic Substances and Disease Registry (ATSDR). 2016. Exposure Dose Guidance for Determining Life Expectancy and Exposure Factor. Atlanta, GA: U.S. Department of Health and Human Services, Public Health Service.

Agency for Toxic Substances and Disease Registry (ATSDR). 1990. Toxicological Profile for Ethylene Oxide. Health and Human Services: Atlanta, GA. Accessed from: https://www.atsdr.cdc.gov/toxprofiles/tp.asp?id=734&tid=133

American Cancer Society (ACS). 2018. Lifetime probability of developing or dying of cancer. Accessed from: https://www.cancer.org/cancer/cancer-basics/lifetime-probability-of-developing-or-dying-from-cancer.html

California Environmental Protection Agency (California EPA). 2008. Determination of Noncancer Chronic Reference Exposure Levels, Appendix D3, Ethylene Oxide. Accessed from: https://oehha.ca.gov/chemicals/ethylene-oxide.

Illinois Environmental Protection Agency (Illinois EPA). 2017. DRAFT/PROPOSED Clean Air Act Permit Program (CAAPP) PERMIT. Permit No. 95120085. Bureau of Air, Permit Section. April 17, 2017.

Illinois Environmental Protection Agency (Illinois EPA). 2015. *Statement of Basis* for the DRAFT CAAPP Permit for: Sterigenics. Statement of Basis No.: 95120085. February 25, 2015.

Jinot, J., Fritz, J., Vulimiri, S., and Keshava, N. 2017. Carcinogenicity of ethylene oxide: key findings and scientific issues. *Toxicol Mech Methods*, Jun;28(5):386-396.

National Research Council (NRC). 2010. Committee on Acute Exposure Guideline Levels. Washington (DC): National Academies Press (US). ISBN: 978-0-309-15944-9.

Steenland, K; Stayner, L; Deddens, J. 2004. Mortality analyses in a cohort of 18 235 ethylene oxide exposed workers: Follow up extended from 1987 to 1998. Occup Environ Med 61: 2-7.

Steenland, K., Whelan, E., Deddens, J., Stayner, L., Ward, E. 2003. Ethylene oxide and breast cancer incidence in a cohort study of 7576 women (United States). *Cancer Causes Control*. 14:531–539.

Sterigenics International, LLC. 2018. Willowbrook, IL: Ethylene Oxide Sterilization. Accessed from: https://www.sterigenics.com/facilities_pdfs/2018/eo/n_amer/Willowbrook.pdf.

United States Census (Census). 2016. American Fact Finder: 2016 Population Estimates. Accessed from http://www.census.gov.

United States Environmental Protection Agency (U.S. EPA). 2018. Validated Raw Data Package. Provided to ATSDR by U.S. EPA Air and Radiation Division (ARD) for review on 6/6/2018.

United States Environmental Protection Agency (U.S. EPA). 2016. Evaluation of the Inhalation Carcinogenicity of Ethylene Oxide. National Center for Environmental Assessment, Washington DC. Accessed from http://www.epa.gov/iris.

14

740
1990

IN THE CIRCUIT COURT OF THE EIGHTEENTH JUDICIAL CIRCUIT
DUPAGE COUNTY, ILLINOIS
CHANCERY DIVISION

PEOPLE OF THE STATE OF ILLINOIS,          )
*ex rel.* LISA MADIGAN, Attorney          )
General of the State of Illinois,          )
                                           )
        Plaintiff,                         )
                                           )
        v.                                 )        No.  2015 CH 651
                                           )
STERIGENICS U.S., LLC,                     )
a Delaware limited liability company,      )
                                           )
        Defendant.                         )

**CASE CLOSED**

JUDGE'S INIT. _____

**FILED**  2015 SEP 18 AM 9: 21

FILED DATE: 10/10/2018 5:12 PM   2018L011004

## CONSENT ORDER

Plaintiff, PEOPLE OF THE STATE OF ILLINOIS, *ex rel.* LISA MADIGAN, Attorney

General of the State of Illinois, the Illinois Environmental Protection Agency ("Illinois EPA"),

and Defendant, STERIGENICS U.S., LLC, (collectively, "Parties to the Consent Order") have

agreed to the making of this Consent Order and submit it to this Court for approval.

## I.    INTRODUCTION

This stipulation of facts is made and agreed upon for purposes of settlement only and as a

factual basis for the Court's entry of the Consent Order and issuance of any injunctive relief.

None of the facts stipulated herein shall be introduced into evidence in any other proceeding

regarding the violations of the Illinois Environmental Protection Act ("Act"), 415 ILCS 5/1 *et*

*seq.* (2014), and the Illinois Pollution Control Board ("Board") Regulations, alleged in the

Complaint except as otherwise provided herein.  It is the intent of the parties to this Consent

Order that it be a final judgment on the merits of this matter.

1

**EXHIBIT**
**B**

FILED DATE: 10/10/2018 5:12 PM   2018L011004

**A.     Parties**

1.      On April 3, 2015, a Complaint was filed on behalf of the People of the State of Illinois by Lisa Madigan, Attorney General of the State of Illinois, on her own motion and upon the request of the Illinois EPA, pursuant to Section 42(d) and (e) of the Act, 415 ILCS 5/42(d) and (e) (2014), against the Defendant.

2.      The Illinois EPA is an administrative agency of the State of Illinois, created pursuant to Section 4 of the Act, 415 ILCS 5/4 (2014).

3.      At all times relevant to the Complaint, Defendant Sterigenics U.S., LLC was, and is, a Delaware limited liability company, and operated a gaseous sterilization business located at 7775 Quincy Street, Willowbrook, DuPage County, Illinois ("Facility" or "Site").

4.      The Defendant's sterilization process uses ethylene oxide, a hazardous air pollutant, and generates ethylene glycol and other chemicals.

5.      Plaintiff has alleged that, on or about October 7, 2013, the Defendant released ethylene glycol into soil and groundwater at, and in the vicinity of, the Site.

6.      On October 21, 2013, the Defendant reported the uncontrolled release of 30 pounds of ethylene oxide gas to the atmosphere. The Defendant subsequently revised its estimate of the quantity of ethylene oxide released to approximately 12 pounds.

**B.     Allegations of Non-Compliance**

Plaintiff contends that the Defendant has violated the following provisions of the Act and Board Regulations:

Count I:      WATER POLLUTION, violation of 415 ILCS 5/12(a) (2014);

Count II:     CREATING A WATER POLLUTION HAZARD, violation of 415

2

ILCS 5/12(d) (2014);

Count III:   VIOLATION OF GENERAL USE WATER QUALITY
             STANDARDS, 415 ILCS 5/9(a) (2014), and 35 Ill. Adm. Code
             302.203;

Count IV:    NPDES PERMIT VIOLATION, 415 ILCS 5/12(f) (2014), and 35
             Ill. Adm. Code 309.102;

Count V:     AIR POLLUTION, violation of 415 ILCS 5/9(a) (2014) and 35 Ill.
             Adm. Code 201.141;

Count VI:    VIOLATION OF CAAPP PERMIT CONDITIONS: FAILURE
             TO COMPLY WITH NESHAP EMISSION STANDARDS,
             415 ILCS 5/9.1(d) (2014), 415 ILCS 5/39.5(6) (2014),
             40 CFR 63.362(a), and Conditions 7.1.6(c)(1) and 7.1.3(b)(ii) of
             CAAPP Permit No. 95120085;

Count VII:   VIOLATION OF CAAPP PERMIT CONDITIONS: FAILURE
             TO COMPLY WITH EMISSION LIMITATIONS FOR THE
             CHICAGO AREA, 415 ILCS 5/9(a) (2014), 415 ILCS 5/39.5(6)
             (2014), 35 Ill. Adm. Code 218.986(a), and Condition 7.1.3(d)(i) of
             CAAPP Permit No. 95120085.

**C.    Non-Admission of Violations**

The Defendant represents that it has entered into this Consent Order for the purpose of

settling and compromising disputed claims without having to incur the expense of contested

litigation. By entering into this Consent Order and complying with its terms, the Defendant does

not affirmatively admit the allegations of violation within the Complaint and referenced above,

and this Consent Order shall not be interpreted as including such admission.

**D.    Compliance Activities to Date**

1.    On January 13, 2014, the Defendant applied to enter its Facility into Illinois

EPA's voluntary Site Remediation Program ("SRP") to address remediation of the release of

ethylene glycol, propylene glycol and sulfate from the Facility. The Facility remediation project

FILED DATE: 10/10/2018 5:12 PM    2018L011004

FILED DATE: 10/10/2018 5:12 PM    2018L011004

was designated under the SRP as the "Sterigenics US LLC site, LPC No. 0431105032" ("On Site SRP").

    2.     On November 18, 2014, Illinois EPA issued a No Further Remediation letter ("NFR letter") to the Defendant for the work performed under the On-Site SRP.  The Defendant recorded the NFR letter for the On-Site SRP with the office of the DuPage County Recorder on December 5, 2014.

    3.     On July 13, 2014, the Defendant applied to enter off-site areas which were affected, or potentially affected, by the release of ethylene glycol, propylene glycol, and sulfate into the SRP.  The off-site remediation project has been designated by Illinois EPA as the "Willowbrook Centre Joint Venture, LPC No. 0431105077" ("Off-Site SRP").

    4.     On May 29, 2015, Illinois EPA issued an NFR letter to the Defendant for work performed under the Off-Site SRP.  The Defendant recorded the NFR letter for the Off-Site SRP with the office of the DuPage County Recorder on July 6, 2015.

## II.    APPLICABILITY

    This Consent Order shall apply to and be binding upon the Parties to the Consent Order. The Defendant waives as a defense to any enforcement action taken pursuant to this Consent Order the failure of any of its officers, directors, agents, employees or successors or assigns to take such action as shall be required to comply with the provisions of this Consent Order.  This Consent Order may be used against the Defendant in any subsequent enforcement action or permit proceeding as proof of a past adjudication of violation of the Act and the Board Regulations for all violations alleged in the Complaint in this matter, for purposes of Sections 39 and 42 of the Act, 415 ILCS 5/39 and 42 (2014).

FILED DATE: 10/10/2018 5:12 PM    2018L011004

### III.    JUDGMENT ORDER

This Court has jurisdiction of the subject matter herein and of the Parties to the Consent Order and, having considered the stipulated facts and being advised in the premises, finds the following relief appropriate:

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED:**

**A.    Civil Penalty**

1.    The Defendant shall pay a civil penalty of Fifty Thousand Dollars ($50,000.00). Payment shall be tendered at time of entry of the Consent Order.

2.    The civil penalty payment shall be made by certified check or money order payable to the Illinois EPA for deposit into the Environmental Protection Trust Fund ("EPTF").

3.    The case name and case number shall appear on the face of the certified check or money order.

**B.    Future Compliance**

1.    The Defendant shall comply with the terms and conditions of its Clean Air Act Permit Program ("CAAPP ) Permit.

2.    This Consent Order in no way affects the responsibilities of the Defendant to comply with any other federal, state or local laws or regulations, including but not limited to the Act and the Board Regulations.

3.    The Defendant shall cease and desist from future violations of the Act and Board Regulations that were the subject matter of the Complaint.

**C.    Enforcement and Modification of Consent Order**

1.    This Consent Order is a binding and enforceable order of this Court. This Court shall retain jurisdiction of this matter and shall consider any motion by any party for the purposes

5

of interpreting and enforcing the terms and conditions of this Consent Order. The Defendant

agrees that notice of any subsequent proceeding to enforce this Consent Order may be made by

mail and waives any requirement of service of process.

      2.     The Parties to the Consent Order may, by mutual written consent, extend any

compliance dates or modify the terms of this Consent Order without leave of this Court. A

request for any modification shall be made in writing and submitted to the designated

representatives. Any such request shall be made by separate document, and shall not be

submitted within any other report or submittal required by this Consent Order. Any such agreed

modification shall be in writing and signed by authorized representatives of each party, for filing

and incorporation by reference into this Consent Order.

**D.    Release from Liability**

      In consideration of the Defendant's payment of a $50,000.00 civil penalty and its

commitment to cease and desist as contained in Section III.B.2 above, the Plaintiff releases,

waives and discharges the Defendant from any further liability or penalties for the violations of

the Act and Board Regulations that were the subject matter of the Complaint herein. The release

set forth above does not extend to any matters other than those expressly specified in Plaintiff's

Complaint filed on April 3, 2015. The Plaintiff reserves, and this Consent Order is without

prejudice to, all rights of the State of Illinois against the Defendant with respect to all other

matters, including but not limited to the following:

     a.    criminal liability;

     b.    liability for future violations;

     c.    liability for natural resources damage arising out of the alleged violations; and

     d.    the Defendant's failure to satisfy the requirements of this Consent Order.

Nothing in this Consent Order is intended as a waiver, discharge, release, or covenant not to sue for any claim or cause of action, administrative or judicial, civil or criminal, past or future, in law or in equity, which the State of Illinois may have against any person, as defined by Section 3.315 of the Act, 415 ILCS 5/3.315 (2014), other than the Defendant.

**E.  Execution and Entry of Consent Order**

This Order shall become effective only when executed by all Parties to the Consent Order and the Court.  This Order may be executed by the parties in one or more counterparts, all of which taken together shall constitute one and the same instrument. The undersigned representatives for each party certify that they are fully authorized by the party whom they represent to enter into the terms and conditions of this Consent Order and to legally bind them to it.

7

WHEREFORE, the parties, by their representatives, enter into this Consent Order and

submit it to this Court that it may be approved and entered.

AGREED:

FOR THE PLAINTIFF:

PEOPLE OF THE STATE OF ILLINOIS
*ex rel.* LISA MADIGAN
Attorney General of the
State of Illinois

ILLINOIS ENVIRONMENTAL
PROTECTION AGENCY

MATTHEW J. DUNN, Chief
Environmental Enforcement/
Asbestos Litigation Division

LISA BONNETT, Director
Illinois Environmental Protection Agency

BY: _Elizabeth Wallace_
    ELIZABETH WALLACE, Chief
    Assistant Attorney General
    Environmental Bureau

BY: _____
    JOHN J. KIM
    Chief Legal Counsel

DATE: 9/14/15

DATE: 9/10/15

FILED DATE: 10/10/2018 5:12 PM    2018L011004

FILED DATE: 10/10/2018 5:12 PM  2018L011004

FOR THE DEFENDANT:

STERIGENICS U.S., LLC

BY: _KAltebooman_____

    Its: _SVP - Global EH&S_____

DATE: _08-Sent-2015_____


ENTERED:

_Bonne M Nestor_____
JUDGE

DATE: _9-18-15_____


*People v. Sterigenics U.S. LLC, 15 CH 651*

9